**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

GILBERT JAMES,

        Plaintiff,

v.                               Civil Action No.  3:11cv221

ENCORE CAPITAL GROUP, INC.,
MIDLAND FUNDING, LLC and
MIDLAND CREDIT MANAGEMENT, INC.

        Defendants.

## AMENDED COMPLAINT

COMES NOW the Plaintiff, Gilbert James (hereafter, "James" or "Plaintiff"), by counsel, and as for his Amended Complaint against the Defendants, he alleges as follows:

### PRELIMINARY STATEMENT

1.    This is an action for actual, statutory, treble and punitive damages, declaratory and injunctive relief, costs, and attorney's fees brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(b) (FCRA), Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq*, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq* ("RICO"), for the Defendant's abuse of process, and for the civil conspiracy that it engaged in.

### JURISDICTION

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1367, and pursuant to 15 U.S.C. § 1681p.

### PARTIES

3.    The Plaintiff is a natural person and a "consumer" as defined by the FCRA.

4.      Defendant Encore Capital Group, Inc. (hereafter, "Encore") is a Delaware corporation with its principal place of business located in San Diego, California and which regularly conducts business in Virginia.

5.      Defendant Midland Funding, LLC (hereafter, "Midland Funding") is a Delaware Limited Liability Company and is a wholly owned subsidiary of Encore.

6.      Defendant Midland Credit Management, Inc., (hereafter, "MCM") is a foreign corporation with its principal place of business located in San Diego, California and which regularly conducts business in Virginia.  It is a wholly owned subsidiary of Encore.  It is also a "furnisher" of credit information to the national consumer reporting agencies.

## STATEMENT OF FACTS

### Encore, MCM and Midland Funding Operate as a Single Business Operation

7.      Defendants operate as a debt buying enterprise.  Encore is not simply a parent holding company, though it owns 100% of the shares and interests in MCM and Midland Funding.  Instead, all three Defendants operate as parts of a single business operation.  Encore provides management and decision-making, Midland Funding exists as an employee-less paper entity that holds title to the enterprise's purchased debt portfolios and MCM operates as the front for contact with the targeted debtor-consumers, calling itself the "servicer" of the Defendants' collection accounts.

8.      On its webpage, Encore explains that, "Encore Capital Group and its subsidiaries (collectively, the "Company") is a leader in financially distressed consumer debt buying and recovery. We purchase defaulted consumer loans from major banks, credit unions, and utility providers and work directly with individuals as they repay their obligations."

http://www.encorecapital.com/about last visited August 29, 2011.

9.  The organizational structure of the business is arranged as presented in Exhibit "A", Encore's organizational chart.

10.  Encore does not operate independent of MCM and Midland Funding.  It does not have a separate office, separate management or separate business and income.   Instead, it serves as the name of the Encore family of subsidiaries, all of who are interrelated and inseparably operated as a single business operation.

11.  The CEO of Encore is also the President of MCM.   The majority of "officers" of Encore or MCM are also officers or directors of other Encore family businesses.

12.  Encore has little or no income that is not directly derived from MCM and Midland Funding.

13.  Encore has consistently held itself out to investors, media, regulators and others as the entity that is engaged in the debt buying and collection operations alleged in this lawsuit. Encore refers to itself as a frontline entity, part of the "we" as in "we buy and collect debts" or "We currently employ more than 2,100 people, and possess a large third-party network of collection agencies and litigators that spans the United States."  As recently as its August 1, 2011 Second Quarter Financial Results, Encore described itself – not simply its family of subsidiaries – as a debt collector, boasting, that "Encore Capital Group, Inc. (Nasdaq: ECPG), [is] a leader in consumer debt buying and recovery[.]"

14.  Midland Funding does not have any employees.  It is a shell entity used by Encore to purchase and hold technical ownership of the debt portfolios Encore purchases.  Encore and MCM holds all of the company's personnel and active resources.  Midland Funding purchases the debt portfolios and then MCM duns the consumer debtor "on behalf" of Midland Funding.

15.  All or nearly all of the relevant debt collection and "affidavit" manuals used by

Defendants to perform such tasks and operations are identified with logos and headings stating that they were the procedures of "Encore Capital Group, Inc. and its subsidiary Midland Credit Management, Inc."

16.   There is literally no attempt to separate the business, personnel or operations of Encore from MCM and the related family of entities.  For example, one of the lead employees responsible for training and overseeing the work of the "Legal Specialist" employees who actually sign the affidavits alleged in this case to be fraudulent is an attorney named Rita Melconian.  She is both the Assistant Secretary at Encore and as well as Corporate Counsel in the Legal Affairs and Litigation department at MCM.  Similarly, Xenia Murphy is the "Director of Legal Outsourcing" at Encore, but it is actually MCM or Midland Funding that officially "hires" and is to supervise the third party law firms that handle the Defendants' collection lawsuits.

17.   The single and principal business purpose of each Defendant is the collection of debts, and each Defendant is a debt collector as that term is defined at 15 U.S.C. §1692a(6).  Each Defendant uses various instrumentalities of interstate commerce and the mails in the business for which the principal purpose is the collection of any debts.

18.   For example, and without limitation, Encore engages in interstate commerce by shopping for, pricing and negotiating to purchase large portfolios of charged-off credit card debts from third parties creditors – credit card companies.   All of these steps are taken by individuals who are employed by Encore.  They are accomplished for the sole purpose of collecting these defaulted debts from consumers.   In fact, Encore resells very few, if any, of these accounts after purchase.  The single way that Encore makes money from these accounts is collecting on them from consumers.

4

19.   Similarly, Midland Funding is a debt collector.  It is created for the single purpose of facilitating and causing the collection of the accounts that Encore purchases.  Title to the accounts is then held in the name of Midland Funding, which is analogous to Encore's "filing cabinet" in which it stores the purchased accounts while it tries to collect it from consumers.  It is the title owner to these Encore purchases.  And it then becomes the named "Plaintiff" in the hundreds of thousands of collection actions brought by the Defendants around the country.  Most of its actions require the use of the mails and interstate commerce for the purpose of collecting consumer debts.

20.   MCM, on the other hand, serves as the frontline company that deals directly with targeted consumer debtors.  This enables Encore, a publicly traded company, to keep its name clear of the less savory actions in which its company is engaged.  It directs the actions of the Encore personnel who interact with the debtors and with the Defendants' third-party collection law firms, allegedly as the agent of Midland Funding.  Again, much of its work and tasks require the use of the mails and interstate commerce for the purpose of collecting consumer debts.  For example, MCM does so by causing lawsuits to be filed across the Commonwealth of Virginia (and the country) on behalf of Defendant Midland Funding.  MCM is primarily responsible for generating the false evidence served upon consumers and submitted to courts in its collection actions.

**Defendants' Debt Buying Operation**

21.   Defendants accomplish their debt-buying operation by purchasing multiple multi-million dollar portfolios of credit accounts that have been charged off by their original creditor.  Most of these are credit card accounts.

22.   The personnel and resources used to accomplish and transact these purchases are

nearly all those maintained in the name of Encore.  Encore employees negotiate the deals and purchase the portfolios, regardless as to whether or not Encore then titles them in the name of Midland Funding.

23.   When Defendants collectively purchase debt portfolios, such as the Capital One portfolio that contained the alleged James account, they do not actually purchase anything other than the theoretical claim of ownership.  There are no notes assigned.  No contracts are transferred.  All that Defendants actually purchase is an electronic list of consumers and their last known addresses with an amount the creditor claims to have been owed.  Often the interest rate is not included, dates of birth or social security numbers are not included, and addresses have not been updated.

24.   Defendants do not actually purchase and receive the credit contracts, their specific terms, payment histories, sales or billing documents and other documents absolutely necessary to properly prosecute and collect a debt or even to know with any reasonable degree of confidence that a specific debtor opened, used and then failed to pay a debt in a specific amount.

25.   In fact, though Defendants will in contested collection cases produce what is claimed to be an original cardmember agreement or document containing terms and conditions of a credit card account, these documents are false.  Instead, creditors who do transfer or make available later the "terms and conditions" or cardmember agreements do not provide Defendants the actual agreement or documents for that specific account.  Instead, the creditor provides and the Defendants retain only a generic sample contract, which they later represent to Courts as the genuine contract for that specific consumer account.

26.   For a number of years, debt buyers such as the Defendants did not need this

6

information or these documents because they had created a means to circumvent the rigors and fairness of state court – the law firm that did nearly all such collection work nationally had secretly purchased a company – previously founded by the credit card industry – the National Arbitration Forum and used it as a means to avoid the proofs required by actual judges.  See e.g.

*http://www.businessweek.com/magazine/content/08_24/b4088072611398.htm;  Midland Funding NCC-2 Corp. v. Johnson*, 2008-Ohio-3900.

27.    However, this golden goose collapsed for Midland and its industry affiliates when the National Arbitration Forum was exposed by the Minnesota Attorney General as a front owned by the same collectors that claimed that the entity was a genuine neutral arbitrator.

28.    The NAF thereby consented to end all consumer arbitration and the national collection firm – Mann Bracken – was placed into receivership. http://www.nytimes.com/2009/07/20/business/20credit.html.  The State of Maryland judiciary even issued an order staying litigation and, where appropriate,vacating all of its Maryland judgments.

29.    As a result, the Defendants have found it necessary to return to the practice of filing civil lawsuits to collect, but were faced with having to do so for accounts lacking any of the information, let alone documents necessary to prove a case by a preponderance of evidence, or even in a default posture by Virginia General District Court judges who *sua sponte* began to demand more rigorous proof from debt.buyers.

**Defendants' Fraudulent Affidavit Process was enjoined**

30.  Following the collapse of the NAF, the Defendants have returned to the practice of litigation against consumers as a means to collect the purchased accounts.  In fact, the majority

of its revenue is derived from these "legal collection" collection channels.  Defendants have

established relationships with almost 100 different debt collection law firms in the country who

serve less in the capacity as legal counsel, and more as an outsource vendor.  The law firms are

paid a contingency percentage of recovery and neither exercise control over any Defendant nor

do they submit to control over their own practices by the Defendants.

31.  In 2008, in an otherwise routine collection action brought by MCM or Midland

Funding in an Ohio state court, it was discovered that the affidavits used by Defendants in that

case and all others were materially false.  Specifically, the Ohio consumer discovered:

a.  the Midland affidavits were not generated by any of the Defendants, but instead by the

third party law firms who inputted the material information (e.g. principal, interest, original

creditor, etc) into an online computer program (www.YouveGotClaims.com) and then requested

the type of affidavit desired;

b.  the affidavits were then printed on an affidavit printer in Defendants' office, usually

hundreds or even thousands at a time;

c.  clerical employees of MCM were assigned the task of signing over 200 affidavits per

day.  They "find[] the stack on a printer, signs them, and send them by internal mail to the

notary. ("Q: Where do your affidavits come from? A: As far as what I deal with, they just come

from the printer as far as where we get them"))." *Midland Funding LLC v. Brent*, 644 F. Supp.

2d 961, 966-67 (N.D. Ohio 2009) *modified on reconsideration,* 308CV1434, 2009 WL 3086560

(N.D. Ohio Sept. 23, 2009);

d.  the MCM employee never read the affidavits or checked them against the actual

material and substantive account records to determine their truth or validity;

8

e. the affidavits contained numerous material falsehoods. They misrepresented the personal knowledge of the affiant; that she had reviewed the actual contract documents regarding the account; or even that such documents existed.

32. Following the Ohio discovery of this pattern of falsehoods (and removal to federal court), the consumer in that case moved for summary judgment and obtained it. In addition, the Ohio federal court enjoined Defendants "from using form affidavits that falsely claim to be based on the affiant's personal knowledge." *Midland Funding LLC v. Brent*, 308CV1434, 2009 WL 3086560 (N.D. Ohio Sept. 23, 2009).

33. The Ohio federal court stated, "However, this Court finds that the affidavit as a whole is both false and misleading for the aforementioned reasons and notwithstanding the fact that some of the data in it are correct. It is unclear to this Court why such a patently false affidavit would be the standard form used at a business that specialized in the legal ramifications of debt collection." *Midland Funding LLC v. Brent*, 644 F. Supp. 2d 961, 969 (N.D. Ohio 2009) *modified on reconsideration,* 308CV1434, 2009 WL 3086560 (N.D. Ohio Sept. 23, 2009)/

34. Notwithstanding that Defendants were so ordered and warned, they continued long past the September 2009 injunction to falsely represent to state courts and to the consumers they sued that their collection affidavits were based on the affiant's personal knowledge. Accordingly, in early 2011, Defendants were forced to attempt a national settlement of all claims for a class defined to include:  "All natural persons (a) sued in the name of Encore Capital Group, Inc., Midland Funding, LLC, Midland Credit Management, Inc., or any other Encore and/or Midland-related entity (collectively, "Midland"), (b) between January 1, 2005 and [March 9, 2011], (c) in any debt collection action in any court (d) where an affidavit attesting to facts

9

about the underlying debt was used by Midland in connection with the debt collection lawsuit."

35.   The Plaintiff opted out of the Ohio class action, as did hundreds of other Virginians.

36.   The Ohio Court found that the claims of consumers for affidavits created before the August 2009 injunction were common and typical with those for affidavits created after August 2009.

37.   Notwithstanding that Defendants actually settled a national class action based in significant part on the affidavit procedures they continued to use through at least March 9, 2011, Defendants have not materially changed them since 2009.

38.   The only major difference between the procedures Defendants used as discovered and enjoined in Ohio and those used today is that Defendants now claim that their employees actually read the affidavit and have it signed in front of a notary.  Nothing else has materially changed.

39.   For example, Defendants still rely on the outside collection law firms to create the affidavits.  The law firm enters all of the unique information in the affidavit.  The MCM computer then inserts the information field values provided by the outside firm into the relevant blanks in the form affidavit.  The MCM printer then prints all affidavits in the system early in the morning each day.

40.   Just as before the Ohio class case, the MCM computer inserts the name and address for the clerical employee who will have to sign the affidavit.   Each set of affidavits is essentially assigned in a random manner to specific clerical employees based on a supervisor's allocation of percentage of work to be divided that day.  The affidavits are printed in alphabetical order by state.  Then, as many as 400 at a time are dropped at the desk of each assigned affiant employee.

41.  Before August 2009, the procedure was to sign without ever reading.  Today, Defendants claim that their employees are required to read each affidavit.  Notwithstanding such claims, MCM employees have testified as late as December 2010 that even after the 2009 changes, the affidavits were still often signed without reading or were signed outside the presence of the notary.

42. However, absent actual and personal knowledge of the substantive account records and documents, it is immaterial as to whether or not the affiant reads the affidavit.  The affiant's statements and claims to the contrary in a sworn affidavit are perjurious.

43.  Defendants' current affidavits and affidavit procedures are materially dishonest in two important ways.  First, they continue to include objectively false statements.  These include, using Mr. James' affidavit (Exhibit "B") as an example:

a.  that the affiant "has access to pertinent account records[.]"

b. that the affiant makes the statements in the affidavit, "based upon personal knowledge of those account records maintained [by Midland Funding]."

c.  that the affiant has "access to and ha[s] reviewed the records pertaining to the account[.]"

d.  that the affiant is "familiar with the manner and method by which MCM creates and maintains business records pertaining to the account."

e.  that the witness has personal knowledge and knows that the records were kept in the regular course of business, (and how and by whom).

f.  that the affiant has personal knowledge of the existence and amount of the asserted

11

debt balance.

g.  if called to testify in court, the affiant would be competent to testify under oath to all contents in the affidavit.

44.  The affiant clerical employees do not have access to any account records.  Instead, they use a single, one-page custom designed computer screen – a program used solely for the affidavit process – titled the "Validation" screen.  The validation screen (Exhibit "C") lists the values for each of the fields that were inputted by the collection law firm and requires the clerical employee only to compare the value in the field with the value contained in the affidavit, and check a box for each field that is different.

45.  These procedures are not optional.  The MCM clerical employees are not permitted to review or access actual account records or documents in "validating" and then signing the "sworn" affidavits.

46.  Defendants' current affidavits and affidavit procedures are also materially dishonest in a second even less-scrupulous way.  Defendants have created and redefined internally language that they contemplated would be misinterpreted by the reviewing judge in the collection matter.   The affidavits are manufactured using language that Defendants tell their clerical affiants would mean something other than the rest of the world would understand.

47.  For example, the affiant in this case testified that she is a "custodian" of Defendants' business records.  But, according to her account of her employer's instructions, so is every single employee in the company's large Minnesota facility other than the mail clerk.  Literally.   She has been informed by Defendant that when she claims to be a custodian of records in the affidavits MCM puts in front of her to sign, this merely means that she has, at some moment in

time, looked at some of the account information in one or more of Defendants millions of records.

48.   Similarly, the Defendants have taught their affiant employees to believe that a "business record" is the value entered in the several fields in the "validation" screen (Exhibit "C"). So, for example, using Exhibit "C", the actual words "John Q. Sample" would be a business record by the definition Defendants have taught to their affiant workers. Thus, when the employee testifies under oath, "I have reviewed the business records for this account", she is really meaning, "I have read the data contained in 'Exhibit C'."

49.   Defendants Encore and MCM have created several PowerPoint presentations that have been used by Encore management (and counsel) to "teach" this MCM-specific language (the redefined language in its collection affidavits) to its clerical affidavit team. For example, Encore and MCM use the language, "I have access to pertinent account records" in their affidavits. Behind the scenes, they then tell their employees, this means only "I have access to the programs I need to verify the information in this affidavit." (the Exhibit "C" validation screen). Defendants' procedures are full of such mis-use of language.

50.   Defendants' affidavits also consistently reference their affiant's access to and personal knowledge and review of an account's "business records" or "account records." This, for Defendants, will never mean or refer to credit card statements, assignment documents from the original creditor, cardmember agreements, consumer correspondence, or even electronic recordings of such documents. Instead, it simply means the Exhibit "C" Validation screen, which is a screen and data summary that is not regularly maintained or used by Defendants for any purpose other than the affidavit-signing ceremony.

51. The validation screen summary is simply a search results output.   Claiming personal knowledge of the underlying records and information after reading the one page validation screen is comparable to someone performing a Google search, reviewing just the one page of results links (and not even the linked-websites themselves) and then claiming to have personal knowledge of all of the information that would have been found at the various sources there listed.

52. As another example of Encore's dishonest language, when Defendants' affidavits reference the original creditor's "actual agreement applicable to a [consumer], or an exemplar of such agreement", they inform their clerical affiants that this really just means, "credit card terms and conditions/ agreements that may have been the one that was issued[.]"  Defendants keep an electronic database of sample terms and conditions of various credit card agreements in a system named "Xdocs".

53. When a third party vendor collection firm wants to attempt to prove the terms of an actual credit card contract, that firm picks a documents from these samples and Defendants' affiants sign an affidavit claiming that they have personal knowledge that the submitted document actually belongs to the targeted consumer debtor.

54. Defendants' policy and procedures documents, which are not attached hereto because they have been inappropriately designated by Defendants as confidential, are filled with similar linguistic dishonesty.

55. The MCM collection affidavits are created and provided for use in collection courts around the country.  For example, in Virginia they are most often used to present to General District Court judges as a means to prove the existence, terms and balances of the collection

credit accounts.  Accordingly, when Defendants and their attorneys drafted the form affidavits

(in house and in an outside law firm that conspired to draft the form affidavits), they did so for

the purpose of intended misdirection.   They are designed to leave a collection court believing

facts that are other than the affiant was verifying.

56.  Translated to the language that a General District Court would interpret in the same

manner as the affiant could honestly attest, the Defendants' affidavits would have to say:

> "I am employed by MCM for the single purpose of signing collection affidavits.  I
> am not responsible for and have no involvement in or knowledge of the facts
> regarding how Encore acquired this account, let alone its history prior to that
> point.  I have not reviewed any underlying documents, account history, or other
> business records.  What I did do is to enter the account number listed in the
> printed affidavit into a search screen we call "Validation Screen" and then
> compare the basic information in the affidavit against the values in the search
> screen output."

57.  Defendants' conduct and procedures in creating, executing and presenting to courts

and consumers the pre- and post-2009 affidavits (including the one that is the subject of this

action) is both overtly fraudulent and as well fails to conform to societal standards of moral

uprightness, fundamental honesty, and fair dealing.

58.  Once signed and notarized, Defendant MCM's employees place the affidavit in an

envelope to be sent via the United States Postal Service or other public mail carrier and mailed to

the local collection firm to be used in a collection lawsuit.

59.  In addition to the exchange of the affidavits by mail, on information and belief,

the Plaintiff alleges that the same parties exchange money across state lines by either bank wire

or mail.

60.  Upon information and belief, the third party law firms and the Defendants also

exchange numerous documents besides the unlawful affidavits by mail and have ongoing and

regular telephone communications across state lines.

61.  In addition to the deceit contained within the MCM affidavits, Defendants are also aware that its Virginia third party law firm adds a "Statement of Account" attachment, stapled to the affidavits that are mailed back to the law firm's office.  This document is actually a print-screen from the Virginia firm's own system and is not a document attached by the affiant. Defendants through their collection firm then present this attachment as if it were authenticated as part of the affidavit itself, even though the affiant has never even seen the document.

**Defendants' Motives**

62.  Encore's business model depends almost entirely on – and even more certainly than is so with other for-profit businesses – reducing and capping its costs of doing business.  More precisely, Encore's focus has been the cost-efficiency of its collections, its cost incurred per dollar collected.

63.  For example, in its most recent Annual Report (10k), Encore explains: "Cost efficiency is central to our collection and purchasing strategies. We experience considerable cost advantages, stemming from our operations in India, our enterprise-wide, activity-level cost database, and the development and implementation of operational models that enhance profitability."

64.  And Encore concedes in its Annual Report, "These receivables are difficult to collect, and we may not be successful in collecting amounts sufficient to cover the costs associated with purchasing the receivables and funding our operations. If we are not able to collect on these receivables or collect sufficient amounts to cover our costs, this may materially and adversely affect our results of operations."  As of early 2011, Encores costs of collection

were 4.2¢ for every dollar collected.

65.   With the return to litigation as the necessary and most important means for Defendants to collect from consumer debtors, Defendants have been forced to confront the expense and difficulty of proving their collection cases in courts of law.   Nearly every court system in the nation requires some degree of proof – of testimony, written or otherwise.

66.   Defendants have met this obligation by use of their collection affidavits, required by many courts and certainly those in Virginia, to be under oath and based on personal knowledge.

67.   However, drafting, reviewing and honestly confirming the substantive content of a collection affidavit takes time.  An employee would need to review actual business records and substantively confirm the validity of the asserted indebtedness.  Currently Defendants' clerical employees may sign close to 400 affidavits a typical workday.  Assuming a one hour lunch, two 15 minute breaks and 1 hour spent doing nothing but signing collection affidavits before a notary, that leaves 5.5 hours, or 330 minutes available to an affiant for reading and "validating" collection affidavits.  If the employee does so for only 300 affidavits, that leaves barely one minute to read and then "validate" each affidavit.

68.   Defendants have created this assembly-line, "read and sign" process in order to protect their extremely low 4.2¢ per dollar costs of collection and to maximize profit at nearly all cost.

69.   Defendants have fired at least one clerical affiant employee who did not produce a sufficient quantity of signed affidavits.

70.  Beyond Defendants' sacrifice of honesty for cost control, it has adopted its affidavit language and process for another improper means.   The truth is that for most of its purchased accounts Defendants could not obtain even default judgments against consumers if it told the

17

truth.

71.     The litigation affidavits are created and deliberately worded to conceal from the

consumer target and from the subject court that MCM does not maintain any records, documents,

applications, or other admissible and necessary evidence that the target debtor actually opened or

used the account and thus owes money to an originating creditor.

72.     If Defendants revealed the truth in their affidavits, there would be no legal basis

by which they could obtain a civil judgment in a Virginia court.  For example, many General

District Courts have crafted unique procedures to confront the debt-buyer problem by requiring

that a debt buyer must show that it possesses billing statements, a credit contract or other

documentary proof before it can collect most, if not all, of its asserted accounts.  *See e.g.* Fairfax

County, Virginia General District Court Best Practices: Default Judgments/Debt Buyers (2009)

(Exhibit "D").

73.     The issue is so conclusively established in Virginia that it was the subject of an

instructional panel at the 2008 "Judicial Conference of Virginia for District Court Judges," in

which three Virginia judges outlined the impediment to debt buyer lawsuits prosecuted without

underlying knowledge and documents. (*Purchased Debt Cases – Don't Forget the Luggage*,

Hon. Lisa A. Mayne, Judge Fairfax General District Court, Hon. Lorraine Nordlund, Judge,

Fairfax General District Court, Hon. Robert A. Pustilnik, Judge Richmond General District Court

– Civil).

74.     Defendants bring their collection actions under a theory of "Open Account."

However,

> "To plead a *prima facie* cause of action on open account in some jurisdictions, the
> plaintiff must file an affidavit verifying that the amount claimed is true and

18

correct.[18] Most debt buyers would be unable or reluctant to do this since they do not have supporting documentation, have no personal knowledge of the accounts in question or the selling creditor's accounting practices, and are not able to generate account reports in the ordinary course of business. In other jurisdictions, even an affidavit summarily affirming the balance due is not sufficient to obtain the burden-shifting associated with *prima facie* validity."

John Rao, Debt Buyers Rewriting of Rule 3001: Taking the "Proof" Out of the Claims Process, Am. Bankr. Inst. J., July/August 2004, at 16, 63. Thus, Defendants would be unable to convert most of their purchased charged-off accounts into civil judgments without the false affidavits. For Encore, given the nature and terms of its portfolio purchases of credit accounts, there are only two options – use a false affidavit or forego a civil judgment. There was no alternate possibility of correcting the affidavits to make them both truthful and viable. Accordingly, Defendants had to create a means to misdirect judges and consumers away from its near total lack of supporting documents, records and data.

### Defendants' Specific Collection Conduct regarding Mr. James

75. In late 2008 or early 2009, Plaintiff learned that various credit card accounts had been opened in his name without his knowledge or consent. The Plaintiff had been the victim of identity theft. One of these accounts was a Capital One account with an account number ending in -2987 (hereafter, the "account).

76. Thereafter, Plaintiff was contacted by Defendant MCM on behalf of Defendant Midland Funding and it claimed that it now owned this alleged debt and was seeking to collect it from him.

77. Plaintiff clearly and unambiguously notified the Defendants that he was not the individual who had opened the accounts and was not responsible for the debt. He provided two executed and completed Federal Trade Commission ID Theft affidavits and included all of the

information known to him.

78.     In response, and with actual knowledge that Plaintiff was not responsible for the Capital One -2987 account, Midland Funding sued Plaintiff in the General District Court for the City of Richmond in an attempt to collect this debt.

79.     At all times relevant hereto, Plaintiff was a resident of Hanover County, Virginia.

80.     At all times relevant hereto, including at such time as it initiated the lawsuit against him, the Defendants were aware that Plaintiff was not a resident of the City of Richmond.

81.     Defendants lacked any evidence from Capital One that Plaintiff had opened, used or was even connected to the account, and had actual knowledge of Plaintiff's prior documented disputes that he was the victim of identity theft and not responsible for the debt.

82.   Plaintiff was served with one of the affidavits described herein, Exhibit "B" sometime after the April 9, 2010 Warrant in Debt filing date.

83.   The Defendants' affidavit was materially false in all of the ways so far alleged.  For example and without limitation, the affiant had not reviewed any business or account records; she did not have personal knowledge of the indebtedness or the account; she did not consider any substantive documents; no substantive documents existed; she did and could not check to determine if the Plaintiff had validly disputed the account (he had) and the affiant certainly wouldn't have been competent to ever testify in a court of law that Mr. James was so indebted (or as regards anything else in the affidavit).

84.     Thereafter, in response to the collection lawsuit, Plaintiff communicated to Midland Funding and MCM again that this was not his debt.  He even provided a sworn affidavit to the Defendants – one contained his true personal knowledge that he had not opened the

account at issue.

85.     Midland Funding, MCM and/or one of their agents received the affidavit from the Plaintiff.

86.     Midland Funding, MCM and/or one of their agents misrepresented to the Plaintiff that upon receipt of the sworn statement, it would discontinue the litigation against him.

87.     Plaintiff relied on these representations.

88.     In August of 2010, and unknown and without notice to the Plaintiff, the Defendants did not discontinue the collection action.  Instead, it proceeded to obtain a default judgment against the Plaintiff in the amount of One Thousand Sixty One and 85/100 Dollars ($1,061.85), plus six percent interest from the date of judgment and Fifty-Three Dollars ($53.00) in judgment costs.

89.  In order to obtain the default judgment, the General District court necessarily relied upon the false collection affidavit and attachment which were presented to the General District court judge in August 2010.

90.     Plaintiff learned that the Defendant had fraudulently secured this judgment against him only when he began the process of attempting to purchase a house that he would move into with his future wife and discovered the judgment notation on his credit report.

91.     Plaintiff was instructed that because of the existence of this judgment, he was required to pay the judgment off before he could even be considered for a mortgage loan.

92.     Plaintiff was thereafter forced to pay off the amount of the fraudulent debt in full to the Defendants, suffering actual, out-of-pocket damages as a result.  The satisfaction was

recorded in the courthouse on March 31, 2011.

93.     Even after Plaintiff paid the fraudulent debt, a national public records vendor –
LexisNexis – and each national consumer reporting agency continued to report that the
fraudulent judgment was outstanding, causing continued damage to the Plaintiff and frustrating
his efforts to secure a home for himself and his future wife.

94.  In Spring 2011, the Plaintiff was able to retain counsel to assist him in all matters
related to Defendants.  Through such representation, Mr. James was able to cause the vacatur of
the Midland Funding judgment.

**Mr. James Disputes the MCM Account in his Credit Report**

95.  In addition to the credit reporting damage caused by the entry of the fraudulently
obtained judgment, MCM also harmed the Plaintiff by reporting inaccurately the disputed
account in his credit files with Equifax, Trans Union and Experian (collectively the "consumer
reporting agencies" or the "CRAs").

96.  MCM is a credit furnisher governed by the FCRA, 15 U.S.C. § 1681s-2.

97.  MCM reported a collection account to the national CRAs.  It did not report that the
debt was disputed.

98.  In 2011, on two occasions the Plaintiff disputed the account to the three national
CRAs.  He unambiguously stated that the debt was not his.

99.  On information and belief, the Plaintiff alleges that each CRA then forwarded his
disputes to MCM through the credit industry's "e-Oscar" system and in response to each dispute,
MCM simply responded that it had "verified" that the account belonged to it and was owed by

Mr. James.

100.  MCM's standard procedure for receiving and processing consumer disputes is to do so entirely by automated response, its "automated batch interface" system.  It does not conduct a substantive investigation.  No human being looks at the files or disputes.  Literally nothing is done to investigate these disputes.

101.  MCM also knew when it received the Plaintiff's disputes (or any consumer's dispute that an MCM account was not his or her obligation) that it did not have any underlying documents – cardmember agreements, signed application, credit card statements, etc. – to support the debt.  MCM's only lawful option was to delete the tradeline.

102.  MCM had actual knowledge that this is what the FCRA required - a "meaningful searching inquiry" and that MCM could not re-report or "verify" the account tradeline to the CRAs when it lacked underlying documentation.

103.  In 2000, the Federal Trade Commission held that the FCRA barred a debt buyer from "verifying" a tradeline disputed by a consumer when it did not possess the original documents.  The FTC entered into a Consent Decree with Performance Capital Management, Inc. (PCM), a debt buyer and furnisher of credit information subject to § 1681s-2. Among the FTC's allegations was that upon receiving a CDV form from a CRA, "it is the practice of PCM to compare the name, address, and information in PCM's computer database with the information provided on each consumer dispute verification form.  Where the two match, PCM reports that is has verified as accurate the information in its file."  The FTC alleged that "verifying information in the computerized PCM file does not constitute an 'investigation' for purposes of  Section 623(b) [§ 1681s-2(b13)]."  The FTC's Consent Decree remedied this

23

noncompliance with § 1681s-2(b) with entry of the following injunction enjoining PCM from:

> failing to properly investigate consumer disputes, as required by Section 623(b) of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), when consumer reporting agencies refer disputes to the defendant pursuant to Section 611(a)(2), 15 U.S.C. § 1681i(a)(2).  In order to comply with Section 623(b) when a consumer disputes the accuracy of information reported by the defendant to a consumer reporting agency, defendant shall either verify the information with the original account records within the time period set forth in the Fair Credit Reporting Act or take all necessary steps to delete the information from the files of all consumer reporting agencies to which the information was reported. <u>In any situation where the defendant either knows that no original records exist, or is informed by the original creditor that no records exist, the defendant shall, within five business days after receiving the consumer dispute, notify all consumer reporting agencies to which the information has been provided that the information is to be deleted</u> from the file of the consumer who has disputed the account;…. (Emphasis added).

Consent Decree, Order, Section II.

104.  Then, in 2004 the United States Court of Appeals for the Fourth Circuit issued what remains the seminal opinion setting the investigation threshold under Section 1681s-2(b) of the FCRA.  The Fourth Circuit held, "The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." *Am. Heritage Dictionary* 920 (4th ed.2000); *see Webster's Third New Int'l Dictionary* 1189 (1981) (defining "investigation" as "a searching inquiry"). Thus, the plain meaning of "investigation" clearly requires some degree of careful inquiry by creditors."  *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004). Further, in circumstances in which the furnisher (like MCM) lacks underlying account documents, like the credit card application, it can "not conclusively verify that" the consumer was obligated.

105.  But MCM's notice and knowledge was not simply remote.  In fact, MCM itself as recently as February 2011 suffered a $723,000 judgment ($623,000 of which was awarded as

punitive damages) for its use of the very same procedures it imposed on Mr. James' disputes

which it handled months after that verdict.  In sustaining the February verdict, the Alabama

federal court stated:

> In the facts before this court, the degree of reprehensibility is great, as defendant
> has stood by its faulty system for years, insisting its procedures are reasonable, in
> the face of obvious evidence otherwise. …
>
> Under the defendant's system, when a consumer disputes a debt, 95% of such
> disputes are checked by a computer merely making sure the disputed debt is the
> same as the information defendant has in its system already. Upon such review,
> defendant then asserts the debt is valid each and every time. As plaintiff points
> out, defendant receives about 8,000 disputes per week and for 95% of those
> disputes, defendant checks its own records as a means of validating the debt,
> although the debts are all purchased, at discount, from various creditors who have
> been unable to collect on them. The jury determined defendant's conduct to be
> reprehensible. This court will not set that finding aside, as there is more than
> sufficient evidence to support such a finding.

*Brim v. Midland Credit Mgmt., Inc.*, CV-10-J-369-S, 2011 WL 2665785 (N.D. Ala. May 4,

2011).

## COUNT ONE:
## (Violation of 15 U.S.C. § 1692e - FDCPA)
## All Defendants

106.    Plaintiff realleges and reincorporates all previous paragraphs as if fully set out

herein.

107.  Defendants Encore, Midland Funding and MCM are "debt collectors" as governed

by the FDCPA.

108.  Defendants Encore, Midland Funding and MCM used false, deceptive and

misleading representations or means in connection with the collection of the alleged debt from

the Plaintiff, in violation of 15 U.S.C. §1692e.

109.    Defendant Encore is also liable for the actions of Defendants Midland Funding and MCM pursuant to the doctrine of respondeat superior because they conducted the actions described herein while acting under the direct control and decision-making Encore and for its direct benefit.

110.    The Defendants are each liable to the Plaintiff for his actual damages sustained, statutory damages, and reasonable attorney's fees and costs as provided for by 15 U.S.C. §1692k.

## COUNT TWO:
### (Violation of 15 U.S.C. § 1692e(2))
### All Defendants

111.    Plaintiff realleges and reincorporates all previous paragraphs as if fully set out herein.

112.    Defendants Encore, Midland Funding and MCM falsely represented the character, amount and legal status of the alleged debt, in violation of 15 U.S.C. §1692e(2).

113.    Defendant Encore is also liable for the actions of Defendants Midland Funding and MCM pursuant to the doctrine of respondeat superior because they conducted the actions described herein while acting under the direct control and decision-making Encore and for its direct benefit.

114.    The Defendants are each liable to the Plaintiff for his actual damages sustained, statutory damages, and reasonable attorney's fees and costs as provided for by 15 U.S.C. §1692k.

## COUNT THREE:

### (Violation of 15 U.S.C. § 1692e(11)

### All Defendants

115.     Plaintiff realleges and reincorporates all previous paragraphs as if fully set out herein.

116.     On or after April 9, 2010, the Defendants sent a communication to the Plaintiff in their attempt to collect a debt that bore the legend "Affidavit – Default Judgment".  (hereafter, "Affidavit 1").  They also caused the same to be served upon him by law enforcement.

117.     The Defendants sent this communication to the Plaintiff at a time when he was not in default, in an effort to deceive the Plaintiff.

118.     On or after April 9, 2010, the Defendants further sent a communication to the Plaintiff that bore the legend "Affidavit of Nancy Kohls" (hereafter "Affidavit 2").  They also caused the same to be served upon him by law enforcement.

119.     The Defendants further sent a communication to the Plaintiff that bore the legend "Summary Screen", and which purported to contain information indicating the details of the account.  They also caused the same to be served upon him by law enforcement.  They attached this documents to the affidavit to mislead the court into the belief that the Summary Screen was part of the affidavit.

120.     Affidavit 1, Affidavit 2 and the "Summary Screen" each failed to inform the Plaintiff that the Defendants were debt collectors, that they were attempting to collect a debt, and/or that any information obtained would be used for that purpose, in violation of 15 U.S.C. §1692e(11).

27

121.    Defendant Encore is also liable for the actions of Defendants Midland Funding and MCM pursuant to the doctrine of respondeat superior because they conducted the actions described herein while acting under the direct control and decision-making Encore and for its direct benefit.

122.    The Defendants are each liable to the Plaintiff for his actual damages sustained, statutory damages, and reasonable attorney's fees and costs as provided for by 15 U.S.C. §1692k.

**COUNT FOUR:**
**(Violation of 15 U.S.C. § 1692g)**
**All Defendants**

123.    Plaintiff realleges and reincorporates all previous paragraphs as if fully set out herein.

124.    Defendants Encore, Midland Funding and MCM failed to, at any time, send the Plaintiff a written notice that complied with the requirements of 15 U.S.C. §1692g(a) and which informed him of his right to request verification of the debt.

125.    Defendant Encore is also liable for the actions of Defendants Midland Funding and MCM pursuant to the doctrine of respondeat superior because they conducted the actions described herein while acting under the direct control and decision-making Encore and for its direct benefit.

126.    The Defendants are each liable to the Plaintiff for his actual damages sustained, statutory damages, and reasonable attorney's fees and costs as provided for by 15 U.S.C. §1692k.

28

### COUNT FIVE:

### (Violation of 15 U.S.C. § 1692i)

### All Defendants

127.    Plaintiff realleges and reincorporates all previous paragraphs as if fully set out herein.

128.    Defendants Midland Funding and MCM brought a legal action on a debt against the Plaintiff, but did not bring the action in the judicial district or similar legal entity in which Plaintiff signed the contract sued upon; or in which the Plaintiff resided at the commencement of the action.

129.    Defendant Encore is also liable for the actions of Defendants Midland Funding and MCM pursuant to the doctrine of respondeat superior because they conducted the actions described herein while acting under the direct control and decision-making Encore and for its direct benefit.

130.    The Defendants are each liable to the Plaintiff for his actual damages sustained, statutory damages, and reasonable attorney's fees and costs as provided for by 15 U.S.C. §1692k.

### COUNT SIX:

### (Violation of 18 U.S.C. §1961 - Racketeer Influenced and Corrupt Organizations Act)

### All Defendants

131.    Plaintiff realleges and reincorporates all previous paragraphs as if fully set out herein.

132.    Defendants and their third party collection law firms across the country (including at least three in Virginia) constitute an "enterprise" as defined by 18 U.S.C §1961, as distinct corporations or legal entities.  In addition, Defendants used other third-party attorneys to help

them create the false affidavits and procedures alleged herein, drafting language that Defendants and these attorneys knew would be interpreted incorrectly by consumers and courts around the country.  They were designed to be misinterpreted.  Such conduct was not simply unethical, but as well was criminal.

133.  All of these law firms and each Defendant were engaged for a common economic purpose of enabling the collection of credit card accounts purchased by Encore.

134.  Further, the law firms and Defendants existed as a collection enterprise outside the function of creating and causing to be presented to courts the fraudulent collection affidavits. That is, they were not associated with one another merely for the purpose of creating and using the affidavits.

135.  Although Defendants exercised some indirect control over the collection law firms, they were separate entities and each operated in its own self-interest.  However, they were organizationally structured in a defined set of relationships and roles and were so engaged for an ongoing continuous business relationship.

136.    The racketeering proceeds obtained by Defendant MCM as a result of the activities of the enterprise flowed through Defendant MCM, to Defendant Midland Funding, and ultimately to Defendant Encore to increase its balance sheet, profitability, and appeal to investors.  The proceeds were also used by each such person in continued furtherance of the enterprise, including, but not limited to continuing to pay the salaries of the employees who continued to sign and transmit the affidavits through the mail, as well as the salaries of those who supervised them and directed their actions.

137.  The Enterprise had an effect on interstate commerce.  The transmission of the false

affidavits through the United States mail system for re-transmission by the local collection firms (again back through the United States mail system) to consumers and various state courts affected interstate commerce.  The transmission of the racketeering proceeds back to the Defendants by use of the United States mail system or via electronic wires also affected interstate commerce.  Its consumer targets are scattered across the country.  Court fees are paid across the country, an judgments are then taken and enforced in nearly every state (if not every state).

138.  In their "enterprise", Defendants engaged in a pattern of racketeering activity. Their fraudulent affidavit scheme began sometime before 2008 and has continued without interruption into the present.  It continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

139.  The conduct and actions of the Defendants as alleged herein – creating fraudulent affidavits for use in collection lawsuits violated the federal mail and wire fraud statutes. 18 U.S.C. §§ 1341, 1343.  They involved an ongoing scheme to defraud consumers and courts.  And they used both the mails and the interstate wires.

140.    This practice was used by the Defendants with respect to numerous affidavits that it caused to be filed in General District Courts across the Commonwealth of Virginia since at least as far back at 2008.  According to recent data provided by the Executive Secretary of the Supreme Court of Virginia for a 473-day period, the Defendant files an average of 28.8 such lawsuits in Virginia's General District Courts per calendar day.  Plaintiff's counsel has reviewed the actual court files from more than 600 such cases filed by the Defendants, and nearly all of these contain the same fraudulent affidavits.

141.  Further, Defendants and the Enterprise follow the same unlawful procedures nationwide for the same purposes, and with the same results, victims and methods of committing the offense alleged herein.

142.  Both the Plaintiff and the City of Richmond General District Court relied on the fraudulent affidavits.

143.  Plaintiff was injured as a result of the Defendants' violations of 18 U.S.C. §1962 and is entitled to treble his actual damages, the cost of this suit, and a reasonable attorney's fee.

144.  Plaintiff also seek an injunction ordering Defendant Encore to divest itself of any interest in any enterprise pled herein, including the receipt of racketeering profits, prohibiting the Defendants from continuing to engage in any enterprise pled herein, and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

**COUNT SEVEN:**

**(Virginia Civil Conspiracy)**

**All Defendants**

145.  Plaintiff realleges and reincorporates all previous paragraphs as if fully set out herein.

146.  As alleged herein, Defendants combined to accomplish by concerted effort – together and with their third party collection law firms – to use unlawful means for an unlawful purpose.  By example and without limitation, the unlawful means was the perjury and false statements.  The unlawful purpose was to use such false affidavits to make a false statement to a civil court – one that the parties knew was false when made and to obtain a civil judgment on a debt the Defendants knew they could not otherwise verify or prove.

147.   Although the third-party law firms operated at times as agents of the Defendants, they were not fully so.  Defendants and the third party law firms had separate and personal stakes in the illegal objectives alleged herein.

148.   Defendants conducted themselves in this manner with intent to defraud and with legal and actual malice as to the Plaintiff and to the civil courts.  The Plaintiff is entitled to and each Defendant is obligated to pay punitive damages.

149.   As a result of Defendants' civil conspiracy, Plaintiff suffered actual damages in the form of economic injury to his credit and the need to have paid to Defendants a debt that he never owed.  He also suffered substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over the subject debt.

## COUNT EIGHT:
### (Virginia Abuse of Process)
### All Defendants

150.   Plaintiff realleges and reincorporates all previous paragraphs as if fully set out herein.

151.   Defendants' filing of the state court collection lawsuit and improper use of the affidavits was accomplished with the improper motive and purpose of obtaining a judgment on a debt that it could not confirm or know was actually owed by the Plaintiff and was accomplished through the improper use of a false affidavit as means to circumvent the impossible burdens faced if they actually had to prove an indebtedness.

152.   Defendants conducted themselves in this manner with intent to defraud and with legal and actual malice as to the Plaintiff and to the civil court.  The Plaintiff is entitled to and each Defendant is obligated to pay punitive damages.

33

153.    As a result of Defendants' abuse of process, Plaintiff suffered actual damages in the form of economic injury to his credit and the need to have paid to Defendants a debt that he never owed.  He also suffered substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over the subject debt.

## COUNT NINE:
## Violation of the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(b)
## (Defendant MCM only)

154.   Plaintiff realleges and reincorporates all previous paragraphs as if fully set out herein.

155.   On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, MCM violated the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(b) by failing to fully and properly investigate the Plaintiff's disputes regarding the account, and/or by reporting inaccurately the results of such investigation.

156.   As a result of this conduct, action and inaction of MCM, the Plaintiff suffered actual damages including without limitation, by example only and as described herein on Plaintiff's behalf by counsel:  loss of credit, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

157.   MCM's conduct, action and inactions were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, MCM was negligent, entitling the Plaintiff to recover under 15 U.S.C. §1681o.

158.   The Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys fees from MCM in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

WHEREFORE, Your Plaintiff demands judgment for compensatory, statutory, punitive and treble damages against the Defendants; for declaratory and injunctive relief pursuant to RICO; for his attorney's fees and costs; for pre-judgment and post-judgment interest at the legal rate, and such other relief the Court does deem just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED**.

Respectfully submitted,
**GILBERT JAMES**


By:_____/s/_____
Of Counsel


MATTHEW J. ERAUSQUIN, VSB #65434
LEONARD A. BENNETT, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:    (703) 273-7770
Fax:    (888) 892-3512
matt@clalegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of September, 2011, I have filed the foregoing electronically using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

David Neal Anthony
Timothy St. George
Troutman Sanders LLP
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23218-1122

John C. Lynch
Troutman Sanders LLP
P. O. Box 61185
222 Central Park Ave
Suite 2000
Virginia Beach, VA 23462


_____/s/_____
MATTHEW J. ERAUSQUIN, VSB #65434
LEONARD A. BENNETT, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:     (703) 273-7770
Fax:     (888) 892-3512
matt@clalegal.com