1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                    RICHMOND DIVISION

4

5    --------------------------------------
                                          :
6    GILBERT JAMES                        :    Civil Action No.
                                          :    3:11CV00221
7    vs.                                  :
                                          :
8    ENCORE CAPITAL GROUP, INC., et al.   :    January 23, 2012
                                          :
9    --------------------------------------

10

11        COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13             UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   Leonard A. Bennett, Esquire
     Consumer Litigation Association, PC
17   12515 Warwick Boulevard
     Suite 100
18   Newport News, Virginia  23606

19   Matthew J. Erausquin, Esquire
     Consumer Litigation Associates, PC
20   1800 Diagonal Road
     Suite 600
21   Alexandria, Virginia  22314
     Counsel for the plaintiff

22

23

24                 Peppy Peterson, RPR
                 Official Court Reporter
25            United States District Court

```
 1   APPEARANCES:  (cont'g)

 2   David N. Anthony, Esquire
     Timothy J. St. George, Esquire
 3   Troutman Sanders, LLP
     Troutman Sanders Building
 4   1001 Haxall Point
     Richmond, Virginia  23219
 5
     John C. Lynch, Esquire
 6   Troutman Sanders, LLP
     222 Central Park Avenue
 7   Suite 2000
     Virginia Beach, Virginia  23462
 8   Counsel for the defendant

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3           THE CLERK:  Civil action number 3:11CV00221, Gilbert

4    James versus Encore Capital Group, Inc., et al.  Mr. Leonard A.

5    Bennett and Mr. Matthew J. Erausquin represent the plaintiff.

6    Mr. John C. Lynch, Mr. David N. Anthony, and Mr. Timothy St.

7    George represent the defendant.  Are counsel ready to proceed?

8           MR. BENNETT:  Plaintiff is, Your Honor.

9           MR. LYNCH:  Yes, Judge.

10          THE COURT:  You all haven't done very well.  I need

11   to know why it is that you feel like you need to ask for

12   everything under the sun.  Can't you tailor your stuff, your

13   requests narrowly, use the English language the way that the

14   queen and the king intended it to be used?  And I don't know

15   why you object to every single thing that they do and why, if

16   there is this objection, you can't sort the thing out.

17          You're going to provide documents.  Your client is

18   through not providing information.  They're going to provide

19   it.  The reasons that I see for objecting to it bother me

20   greatly.  I've got a distinct feeling from what I've been

21   through in this case that it is coming from the corporation and

22   not from the law firm, and that bothers me, too.

23          Raise the blinds, would you, please.  Now, so I'm

24   going to have to sit here and rule on things that you all could

25   deal with and could have dealt with.

1          Now, the way you do this stuff, the way you do the

2     briefs is that you take a request, you say what you want, you

3     say where you've gotten if you've negotiated it down, and then

4     you explain why you should win on the point you're winning on.

5     Get them out, let's go.

6          Let me have the discovery so I can read it while

7     you're doing it.  Let's take their objections to -- I'm so

8     tired of protective order motions.  Let's go with your

9     discovery and your motion to compel.  Let's go.

10          MR. BENNETT:  Yes, sir.  Well, the --

11          THE COURT:  I'm really fed up with it.  You've got a

12     motion to compel.  That's docket number 110.  Maybe that will

13     solve a lot of it.

14          MR. BENNETT:  Your Honor, 110 is the motion regarding

15     defendant's motion to compel.

16          THE COURT:  Do you know what it is?

17          MR. BENNETT:  Yes, sir.

18          THE COURT:  I'm going to just grant them and deny

19     them with a flip of a coin, and then I don't have to worry

20     about them anymore.

21          MR. BENNETT:  Judge, 110 is their motion to compel

22     which, I believe, we've satisfied.

23          THE COURT:  That's what I want to know.  Has it been

24     satisfied?

25          MR. ANTHONY:  No.

1              THE COURT:  I mean they say no, you say yes.  What is

2    it?

3              MR. BENNETT:  Judge, at that time --

4              THE COURT:  What is it you want, Mr. Anthony?  Tell

5    me.

6              MR. ANTHONY:  Your Honor, this is an interrogatory

7    that essentially asks Mr. Bennett to detail which particular

8    sub-provisions of the civil RICO claim he is asserting against

9    our client and the facts supporting that.

10             It was our understanding, based upon the briefing,

11   that Mr. Bennett was going to supplement that about a week or

12   ten days ago, and that's not happened to my knowledge.

13             THE COURT:  So what are you doing?

14             MR. BENNETT:  I supplemented it --

15             THE COURT:  It's a contention interrogatory,

16   basically, isn't it?  What does it say?  Let me see it.

17             MR. BENNETT:  I sent a letter to counsel.

18             THE COURT:  Here it is.  "Set forth each and every

19   fact or application of law to fact to support your allegation

20   that defendants violated the RICO, including as alleged in your

21   complaint.  Include in your response to specific subdivisions

22   of 18 U.S.C. that they're alleged to have violated and all

23   persons with knowledge of your contention."

24             That's three interrogatories.  Apparently, the only

25   part that is at issue is the second sentence, "Include in your

1  response the specific subsection"; is that right, Mr. Anthony?

2  Yes or no?

3           MR. ANTHONY:  I think that's right, Your Honor.

4           THE COURT:  Okay.  Have you told them the specific

5  subsections your are talking about?

6           MR. BENNETT:  Yes, Your Honor, I have.

7           THE COURT:  What did you tell them?

8           MR. BENNETT:  I told them -- what they had asked was

9  which subsections of 1962 -- 18 U.S. Code 1962.

10           THE COURT:  No, 1961.

11           MR. BENNETT:  Judge, when we spoke at the

12  meet-and-confer, the only question that the defendant

13  suggested --

14           THE COURT:  In the motion to compel, in the

15  interrogatory, it says 1961, *et seq*., and then it says the same

16  thing in the motion to compel and the same thing in the brief

17  to the motion to compel.  Now, why isn't that what we're

18  dealing with?

19           MR. BENNETT:  Well, Judge, what it asked for is the

20  specific subdivisions of 1961, *et seq*.  In all of the

21  meet-and-confer was which provisions of 1962 were -- which

22  we -- that was all of the discussion.  100 percent of the

23  discussion that we had, which was brief -- it was a two-minute

24  discussion -- was they wanted us to tell them which --

25           THE COURT:  Is what you want 1962(c), or do you want

1    61?  You asked for 61.  That's what the briefs say.  *Et seq.* is

2    not a sufficiency, and your motion actually deals with 1961.

3    Which is it that you want?  That's what I want to know.

4              MR. ANTHONY:  Your Honor, I believe it's 1961.  The

5    point of it was, what is the portion of civil RICO that he

6    seeks --

7              THE COURT:  But that's not what you asked.  You're

8    bound by what you ask, and you asked 1961.  If you asked the

9    wrong question and what you wanted was 1964(c), then that's the

10   end of it.  I'm through with it.

11             MR. ANTHONY:  Your Honor, if my memory is right, the

12   complaint doesn't limit it that way.

13             THE COURT:  That's irrelevant.  We're dealing with

14   your questions.

15             MR. ANTHONY:  So --

16             THE COURT:  You are supposed to ask your questions

17   the way you want them.  If you don't ask them, I'm not dealing

18   with them.  Now, you all apparently agreed to interpret that as

19   something other than 1961.  So what did you agree to interpret

20   it as so far as you are concerned, Mr. Anthony?

21             MR. ANTHONY:  Your Honor, it was my understanding

22   that we were asking Mr. Bennett to provide more information

23   about what his civil RICO claim was.

24             THE COURT:  No, I'm not asking that question, though.

25   I'm asking you a different question.  That is, what did you

1  all, in your meet-and-confer, agree to do?

2          MR. ANTHONY:  That's what I was telling.  My

3  understanding was --

4          THE COURT:  So you agreed, you think, to tell him --

5  tell you what part of RICO he was proceeding under; is that

6  right?

7          MR. ANTHONY:  That was my understanding.

8          THE COURT:  Did you understand that?

9          MR. BENNETT:  No, sir.

10          THE COURT:  What did you understand?

11          MR. BENNETT:  They expressly said which provision of

12  1962.  I then said to Mr. St. George and Mr. Anthony --

13          THE COURT:  Are you proceeding only under 1962?  Yes

14  or no?  You know what your complaints say.  What's your theory?

15          MR. BENNETT:  Well, there are different -- that

16  component of the RICO claim, which is that -- we have alleged

17  wire mail fraud, but that was never -- but that's not a 1962

18  question.  The only question that we had any discussion about

19  at all, on my law license, was 1962.

20          THE COURT:  This shows you why you're not getting

21  anywhere right now.  I cannot believe we can't -- you couldn't

22  have resolved this with a simple discussion.

23          MR. BENNETT:  I sent a detailed letter -- and I'm

24  sorry.  Apparently you didn't get it -- last Thursday that

25  outlined 1962 provisions (a) and (c) and (d).  Mr. St. George

```
 1    and I had discussion.  Mr. St. George --

 2              THE COURT:  1962 what?

 3              MR. BENNETT:  (a), (c), and (d).

 4              THE COURT:  Okay.

 5              MR. BENNETT:  And Mr. St. George even said to me,

 6    when I said, "All of the provisions," Mr. St. George, if you

 7    recall, Tim, he said, "You don't really mean that.  You don't

 8    mean all four of those," when I outlined (a), (b), (c), (d),

 9    and you said, "You don't mean all four of those really."

10              THE COURT:  All right, now don't -- we're not going

11    to get into that.  Your letter says (a), (c), and (d).

12              MR. BENNETT:  Yes, Your Honor.

13              THE COURT:  Did you get the letter?

14              MR. ANTHONY:  I didn't, Your Honor.

15              THE COURT:  Where is it?  Do you dispute you got the

16    letter?

17              MR. ANTHONY:  I did not come in here having seen this

18    letter, Your Honor.

19              THE COURT:  Where is the letter?  Did you give it to

20    him or not?

21              MR. BENNETT:  I emailed it --

22              THE COURT:  Show it to him.

23              MR. BENNETT:  -- from my home.

24              MR. ANTHONY:  I'm not disputing, Your Honor, that Mr.

25    Bennett --
```

```
 1                  THE COURT:  Okay.  Then it's resolved; right?

 2                  MR. ANTHONY:  If he says he sent us a letter and

 3      outlined --

 4                  THE COURT:  Do you have a copy of the letter?

 5                  MR. ANTHONY:  -- that, then it's resolved.

 6                  MR. BENNETT:  I didn't print the letter out, Judge.

 7                  THE COURT:  Would you all quit relying on non-printed

 8      material, because I can't judge non-printed material.  Do you

 9      have your telephone with you or your BlackBerry so you can call

10      it up and at least I can see the email or he can see it?  Do

11      you have yours?

12                  MR. ANTHONY:  I don't remember -- I don't have my

13      BlackBerry.

14                  MR. BENNETT:  You can't bring our phone in the

15      courtroom.

16                  THE COURT:  Yes, you can.

17                  THE CLERK:  That's changed.

18                  THE COURT:  That changed sometime ago.

19                  THE CLERK:  Can you use the internet here to get it?

20                  MR. BENNETT:  I can.

21                  THE COURT:  I'm worn thin with this.  This is

22      ridiculous that I'm expending any time doing this.  I had to

23      read this stuff over the weekend, last week, and all because

24      you all don't communicate.  It's just not right.

25                  MR. BENNETT:  We have communicated at length, Judge.
```

1    It was this --

2              THE COURT:  A communication that doesn't get there is

3    not a communication.

4              MR. BENNETT:  I understand.

5              THE COURT:  A communication that's not read is not a

6    communication.

7              MR. ANTHONY:  Your Honor, that has been, by far, the

8    exception.  This is the first time that I know of where this

9    has happened with Mr. Bennett.

10             THE COURT:  How can I rule on it though?  How do I

11   rule on it without you having proof here, and if you all won't

12   agree, then I have to rule.  I need proof.

13             MR. BENNETT:  Judge, I agreed, I committed to provide

14   them the section of 1962.  I told the defense lawyers I would

15   do that.

16             THE COURT:  And you have done that.

17             MR. BENNETT:  I have but --

18             THE COURT:  He has done that, given you 1962(a), (c),

19   and (d).  Doesn't that satisfy that sentence?

20             MR. ANTHONY:  I would think that it does, Your Honor.

21             THE COURT:  Done.  Okay.  Then that is moot by virtue

22   of compliance.  All right.  Is that all -- and then I'm not

23   going to grant any attorney's fees.  There's been no showing

24   attorney's fees are appropriate.  Is that the extent of the

25   defendant's motion to compel, number 110?

```
 1              MR. ANTHONY:  Yes, sir.

 2              THE COURT:  All right.  That takes care of that.  Now

 3    where do we go?  Plaintiff's motion for sanctions, docket

 4    number 98.  What is it that you want me to do?

 5              MR. BENNETT:  Judge --

 6              THE COURT:  And I don't want any general nonsense.  I

 7    want the specific question and answers that are at issue so I

 8    can rule specifically.  And if you -- Exhibit A.  Let's see.

 9    Where is Exhibit A?  Do you have a copy of Exhibit A?

10              MR. BENNETT:  Yes, sir.  Judge, we will withdraw

11    120 -- or...

12              THE COURT:  I'm dealing with docket number 98, motion

13    to compel, plaintiffs's motion to compel and sanctions pursuant

14    to Rule 37, to compel defendant's discovery production,

15    overrule and strike objections, and continue the trial, and

16    then you say --

17              MR. BENNETT:  I'm sorry.  Yes, sir.

18              THE COURT:  You've attached to it an Exhibit A.  Do

19    you have it?

20              MR. BENNETT:  I do, Judge.

21              THE COURT:  Are all of these requests that are listed

22    here, of which it looks to me like there are maybe 30, still at

23    issue?  If they aren't, which ones are not?  Or let me take it

24    this way:  Request 2(b).

25              MR. BENNETT:  That is still an issue, Judge.
```

1           THE COURT:  What is it?  Let me see.

2           MR. BENNETT:  Judge, if you take a look at exhibit...

3           THE COURT:  "All full or partial drafts and

4    additions/versions of your written materials used to instruct

5    or manage the preparation and/or signing of collection

6    affidavits by any of the employees since January 1, 2009,

7    through the present."  Is that the one you are talking about?

8           MR. BENNETT:  Yes, Your Honor.

9           THE COURT:  Did they file an objection to it?

10          MR. BENNETT:  They did.

11          THE COURT:  Was it filed timely?

12          MR. BENNETT:  The objection was filed timely.

13          THE COURT:  Why shouldn't you produce that, Mr.

14   Anthony?

15          MR. ANTHONY:  Your Honor, it's our belief -- two

16   parts.  The full -- we have produced the procedures.  Mr.

17   Bennett is asking as well for the drafts of those procedures,

18   and we think, A, that they are not relevant.

19          THE COURT:  Drafts and versions.  That is to say

20   there could be different versions in effect during the time

21   period that aren't drafts.

22          MR. ANTHONY:  They've been produced to my knowledge,

23   Your Honor.  It's the non-final, non --

24          THE COURT:  Are we only talking about the drafts?

25          MR. ANTHONY:  From our perspective, we are.  We've

1    produced everything else.

2          THE COURT:  Do you understand that to be what it's

3    about, Mr. Bennett, full or partial drafts?  They say editions,

4    versions they've provided.  Are we talking about the drafts

5    now?

6          MR. BENNETT:  That's correct, Judge.

7          THE COURT:  Why are the drafts discoverable?

8          MR. BENNETT:  Well, Judge, part of the allegation in

9    this case and the necessity of proof for us is the state of

10   mind, the motivation and intent of the defendant.

11         THE COURT:  They go to state of mind.  Why do they go

12   to state of mind?

13         MR. BENNETT:  Because if you look at the actual --

14   and they've been designated protected, so I'll be cautious how

15   I say in open court, but their final manuals have a section

16   that says, here is what the affidavit says, and then it says,

17   explanation to the employee.  So, for example, it says personal

18   knowledge.  It will say, personal knowledge does not mean that

19   you actually know what you are signing.  It means that you've

20   looked at this screen.

21         This language evolved and was parsed carefully by a

22   team of lawyers to try to come up with a, we allege, an end

23   result affidavit that is deceptive.  And so to the extent that

24   they were reworking words and language back and forth, we

25   allege as a means to manipulate or convey a different message

1  to general district court judges and to consumers, we believe

2  that goes to the state of mind.

3           THE COURT:  All right.

4           MR. BENNETT:  It's also not protectable.

5           THE COURT:  The objection is --

6           MR. BENNETT:  It's not in a privilege log.

7           THE COURT:  So it's not privileged, and the objection

8  is it's not relevant; is that right?

9           MR. ANTHONY:  Yeah.  Your Honor, either the policy

10  and procedure is deceptive or it's not.

11           THE COURT:  Okay.  I understand.  Objection

12  overruled.  Produce all those documents as required.  It is

13  relevant to state of mind.

14           MR. ANTHONY:  Your Honor, we also did file, in a

15  supplemental privilege log, a privilege objection.

16           THE COURT:  Unless the privilege log was provided

17  within the time required or I extended the time, it's of no

18  effect, the supplement.

19           MR. ANTHONY:  Well, Your Honor, we're going to have

20  this discussion further throughout, and I don't want to be

21  short with the Court.  Our review of the requirements under --

22           THE COURT:  Did you file these within 15 days of the

23  date that they were posited?

24           MR. ANTHONY:  We did not, but we did file an

25  objection on relevance, and, Your Honor, we're not required to

1   produce a privilege log for documents that are irrelevant.  And

2   so under that scenario, we would have --

3            THE COURT:  Okay.  A, they are relevant; B, your

4   privilege is overruled.

5            MR. ANTHONY:  What the effect of that is is to say

6   that if we are ultimately wrong or you disagree with us on

7   relevance, then we should have gone back and done it on the

8   first front.

9            THE COURT:  You should have.  Now, I understand --

10   I've read that section of it.  I understand what the note says,

11   but the note doesn't -- in the reviser's rule doesn't trump the

12   requirements of the orders that were issued by the Court.  The

13   Court orders were issued, and it tells you to provide the

14   privilege log.

15            The local rule says it, the pretrial scheduling order

16   says it, and there are some cases that say that you should --

17   that you proceed in accord with relevance and then have a

18   decision made on that and then do the privilege, and I don't

19   buy those rules, those decisions.  They are not right, and they

20   are not in control in this district at all or in this case

21   because of the pretrial orders.

22            That's just the way it is, and I'm sorry it is, but

23   it is.

24            MR. ANTHONY:  So is Your Honor saying that we have to

25   provide a privilege log for irrelevant documents?

```
1              THE COURT:  Mr. Anthony, I'm saying what I said, that
2    the rule says you have to provide your privilege log.  You have
3    to do what every litigant in this district has done for as long
4    as I've been on the bench and while I practiced law, and that
5    is when you have a privilege log, if you are claiming
6    privilege, you have to do it.
7              MR. ANTHONY:  And we believe --
8              THE COURT:  I understand what your argument is.  I
9    understand what the reviser's note says, and I understand what
10   some of those decisions say, but they are not decisions out of
11   this district, and in this district we have a different
12   approach.
13             And the rule -- the pretrial order says, if somebody
14   thinks that the pretrial order requirements are at odds with
15   some provision of the federal rule, it is obligatory on that
16   person to bring that issue to the Court's attention.  Isn't
17   that what it says?
18             MR. ANTHONY:  It is, Your Honor, but it also says
19   that, you know, the whole concept of a privilege log starts
20   with the premise that it's relevant.
21             THE COURT:  Mr. Anthony, the concept of a privilege
22   log -- the first thing is, the relevance objection to this one,
23   for example, is attenuated at the very best.  So what your
24   client is doing is using this to stage and delay this case.
25             MR. ANTHONY:  Your Honor, I would disagree.  Our
```

1    viewpoint --

2         THE COURT:  But at any rate, I think what I'm ruling

3    is this:  You have to do the privilege log in accord with the

4    local rules and the Pretrial Schedule A.  They apply.  The

5    cases that you cite to the contrary in other jurisdictions

6    don't control here because of what the local rule and the

7    pretrial schedule order says, and the pretrial schedule order

8    envisions a situation where a party may view that the Pretrial

9    Schedule A is at odds with the federal rules.

10        In that event, it is obligatory on that party to

11   bring that to the attention of the Court right away.  It wasn't

12   done, and that's the way it is.

13        MR. ANTHONY:  Well, Your Honor, I apologize.  I've

14   been a member of this Court a long time.  I clerked in this

15   court.  I have never understood that to be the case.  I have

16   filed privilege logs.  We have done everything we were supposed

17   to do under the federal rules, under the local rules, under

18   your scheduling order.

19        THE COURT:  Show me how you complied with the

20   scheduling order.  What part of the Pretrial Schedule A did you

21   bring -- at the time, did you think that the part of the

22   Pretrial Schedule A was at odds with the local rule?

23        MR. ANTHONY:  No, because we did not believe it was

24   relevant.

25        THE COURT:  That's irrelevant to your point.

1    MR. ANTHONY:  Your Honor, I'm not aware of anywhere

2    within Rule 26 that speaks to anything about the production of

3    irrelevant information.  Taken to its extreme, we would have

4    to, in every case, come in and file a motion for protective

5    order within 15 days to get an order from you to say we don't

6    have to produce irrelevant information.  That's never been the

7    case.

8    THE COURT:  Well, it has been the case in very many

9    cases that I've presided over, Mr. Anthony.

10   MR. ANTHONY:  Your Honor, if I can have one second.

11   THE COURT:  Did you look at the local rule -- if you

12   have an objection to the discovery process under C, you have to

13   file the objection within 15 days after service of the

14   interrogatories, request for application.

15   MR. ANTHONY:  We did file an objection, Your Honor.

16   I think where we are is on the timing of the filing of the

17   privilege log that specifically designates a particular item.

18   THE COURT:  What part of the local rule are you

19   relying on?

20   MR. ANTHONY:  I'm relying on Rule 26, Your Honor.

21   THE COURT:  Rule 26 -- the pretrial order in this

22   case tells you in B that you have to file your privilege list

23   or -- it says, "Unless otherwise ordered by the Court, the

24   claim of privilege or protection shall be waived unless the

25   inventory and description are served with the objections to the

1   request for production in the time required by the local

2   rules."  And the objections have to be filed within 15 days,

3   and if you don't do that, it's over.

4           Now -- and I cannot tell you the number of cases that

5   I have in which counsel either agree or come to the Court and

6   ask for additional time to file the privilege log, and I have,

7   to my knowledge, never granted either -- denied a request of

8   that kind.  I have always allowed people to do it if they --

9   all they have to do is have an agreement on what the time

10  period is that's called for, and then they can do it.

11          MR. ANTHONY:  Your Honor, from our perspective --

12          THE COURT:  The only argument here that I see that

13  has any potential bearing at all is that you say there's a

14  conflict between the federal rule and the pretrial order, but

15  the pretrial order says if you believe that that's the case,

16  you're supposed to come to the Court and say, this is a

17  problem, we need to deal with it.  And the fact of the matter

18  is I have, in many instances, had lawyers come here requesting

19  objections be resolved before privilege decisions are made.

20  I've had that happen, and I've tried to do it in some

21  instances, and it's not been done in others.

22          So I don't think there's anything unusual in this

23  case that wouldn't have allowed this to have been done.  The

24  real question is, though, whether you've waived your -- whether

25  it's fair to have you waive your privilege when the rule says

1    what it says and the pretrial order says what it says.  And

2    that -- I have to tell you, nobody has ever considered it to be

3    unfair before.

4         MR. ANTHONY:  Your Honor, two brief comments.

5    Whenever I have dealt with the privilege issue, either being on

6    the moving side or nonmoving side, it has been information that

7    has been core information that is clearly relevant, and the

8    parties are fighting about the privilege log, and the

9    presentation of the assimilation through that and discussion

10   with the client can oftentimes be a complicated thing and can

11   almost never be resolved in 15 days by the time, and typically

12   when we've done that, it's been when the documents are still

13   being gathered, you know there some privilege issues there.

14        How they're going to all shake out, how it's all

15   going to be put together on the privilege log takes some time,

16   and you're right, I'm not aware of any circumstance where the

17   Court has refused to allow a further extension of time in that

18   situation.

19        In this situation, Your Honor, if you look at the,

20   what we consider to be incredibly overbroad discovery requests

21   on the front end, we filed timely objections to that.  We filed

22   a timely privilege log which we had gotten by agreement some

23   additional time from Mr. Bennett which we always appreciate,

24   and we have --

25        THE COURT:  But you didn't come to the Court and say,

1  I want some extra time to file the privilege logs, there's a

2  big problem here with the way this discovery in this case is

3  posited that makes it almost impossible to do even -- I mean in

4  15 days, and in any event, this is not the way the rule ought

5  to be interpreted.  That didn't happen and so -- what happened

6  is that you filed your objections, and you let it ride.

7          MR. ANTHONY:  I disagree, Your Honor.  What you are

8  suggesting is that we have to come into court within 15 days,

9  articulate to the Court all of the reasons for, A, why

10  something is unduly burdensome; B, why something is relevant

11  and have the Court rule in 15 days on the scope of discovery on

12  all this when we don't even know what the documents are --

13          THE COURT:  No, Mr. Anthony, what happened is that

14  you are required to produce a privilege log even if you object.

15          MR. ANTHONY:  And we did.

16          THE COURT:  Unless -- and you are -- no, I mean in

17  the 15 days -- unless you get an extension of the 15-day

18  period.

19          MR. ANTHONY:  And we did.

20          THE COURT:  You got an extension of the 15-day

21  period?

22          MR. ANTHONY:  Yes, Your Honor.

23          THE COURT:  Where?

24          MR. ANTHONY:  By agreement with Mr. Bennett.

25          MR. BENNETT:  The privilege log they're talking

1    about, even to this day, does not include the documents that

2    are at controversy.  The privilege --

3              THE COURT:  Did you or did you not -- I didn't read

4    that in the papers.  Maybe I missed it.  Did you all or did you

5    not have an agreement to extend the privilege log?  I spent --

6    the answer to that ought to have been said 20 minutes ago, and

7    we could have saved a lot of time, because if there's an

8    agreement to extend it, then that's okay.

9              It's not done the right way.  It's not been done in

10   an order that I know of, and nobody pointed me to an order, and

11   that's the way you have to do it, but I don't think we should

12   stand on that ceremony.  Did you or did you not agree to an

13   extended time?  Within 15 days of the date of your objection --

14   of the date your discovery was filed, did you or did you not

15   agree to extend the time within which they could file their

16   privilege log, and if so, to what time did you agree?

17             MR. BENNETT:  We agreed to the enlargement of

18   discovery.  The Court has entered that order.

19             THE COURT:  No, that's not what I asked you.  Listen,

20   Mr. Bennett.  The discovery was filed on a date; right?

21             MR. BENNETT:  Yes, sir.

22             THE COURT:  What date was it filed?

23             MR. BENNETT:  I believe October 17th.

24             THE COURT:  All right.  Within 15 days of

25   October 17th, did you and Mr. Anthony agree that they could

1   file their privilege log later than 15 days which is when their

2   objections were due?  Did you agree to that?  Within that

3   period of time, did you agree to it?

4           MR. BENNETT:  No, sir.

5           THE COURT:  Do you take the position they did agree

6   to it within 15 days?

7           MR. ANTHONY:  Yes.

8           THE COURT:  Where is the evidence of that agreement?

9           MR. ANTHONY:  Your Honor, I'm sure we have an email.

10  I didn't think that was the issue --

11          THE COURT:  How could you not think that?

12          MR. ANTHONY:  Because I thought the issue was the

13  description of the document on the privilege log, not the

14  extension of time to file the privilege log, Your Honor.

15          MR. BENNETT:  They didn't note this as privileged,

16  but the privilege log -- we would not object to a privilege log

17  that had been filed October 17th or earlier with the discovery

18  responses, but this was -- the subject --

19          THE COURT:  That's not the point we're at right now.

20          MR. BENNETT:  Yes, sir.

21          THE COURT:  If you agreed before the fact to the

22  filing of a privilege log later, then they haven't fallen

23  within the rule that is prescribed by the combination of

24  Rule 26, the local rules, and the scheduling order, Pretrial

25  Schedule A in this case, and that's all I'm interested in.  You

1   say you didn't agree, you say you did.  How am I to decide that

2   unless I see the proof of it?

3          MR. ANTHONY:  Your Honor, the agreement was that we

4   would file our privilege log at the time we filed our

5   objections.  There's not been any sort of argument from Mr.

6   Bennett that we have waived our objections by not filing those

7   within 15 days which, admittedly, did not occur because we had

8   an agreement to do so.  This was filed at the same time as our

9   discovery objections.

10          MR. BENNETT:  Judge, I think what the defendant is

11   referring to is the defendant's --

12          THE COURT:  You're going to have to show me the

13   agreement.  I have to tell you, gentlemen, I don't like being

14   in cases where the lawyers can't agree to what's in writing.

15   Now, that's bizarre.

16          MR. BENNETT:  Judge, we don't object to the filing --

17   if the defendant had filed a privilege log by the date that

18   they served their objections in September, or October 17th,

19   they filed their -- that the agreement would have been, as we

20   often have an agreement that the defendant --

21          THE COURT:  Did you agree to that?

22          MR. BENNETT:  I would not object, Judge --

23          THE COURT:  No, that's not the question.

24          MR. BENNETT:  I will say, yes, Judge, I would have

25   agreed that they could have filed a privilege log by October

1   17th.

2           THE COURT:  Did they file one by October 17th?

3           MR. BENNETT:  They filed a privilege log by

4   October 17th.

5           THE COURT:  And is this document on it?

6           MR. BENNETT:  No, Judge.

7           THE COURT:  Wait.  That's the rule.  Sorry.  All

8   right, let's go.  I also think, after reading this brief,

9   reading the papers, there's been a prima facie showing of an

10  exception to waive the privilege.  It's a crime-fraud issue,

11  isn't it?  RICO is a crime.

12          You have the lawyers inhouse that are participating

13  in the crime, according to the allegations and the showing

14  that's been made, because they drafted these documents that are

15  allegedly the misrepresentations that were made to courts all

16  over the country.  Why isn't that a waiver of the privilege

17  even if you have a privilege, Mr. Anthony?

18          MR. LYNCH:  I can address that, Judge.  One

19  fundamental issue in this case, and Mr. Bennett brought it up

20  during the initial pretrial conference, and we probably should

21  have been more specific about it.  There was an affidavit, and

22  attorney generals are investigating Midland about the old

23  affidavit.  There was a class action in Ohio pertaining --

24          THE COURT:  And it was drafted by lawyers.

25          MR. LYNCH:  It was drafted by lawyers.

1          THE COURT:  Inside the house.

2          MR. LYNCH:  No question, Judge.  This case pertains

3    to a new affidavit --

4          THE COURT:  Drafted by the lawyers inside the house;

5    right?

6          MR. LYNCH:  With outside counsel.

7          THE COURT:  But it's drafted with the assistance of

8    lawyers.

9          MR. LYNCH:  I do not disagree with that.

10         THE COURT:  And it is alleged to be fraudulent.

11         MR. LYNCH:  It is alleged to be fraudulent.  That

12   almost identical affidavit by -- I don't know -- four federal

13   courts has been held to be a valid affidavit.  His allegations

14   in just saying, oh, I have a RICO case and they didn't file a

15   motion to dismiss is not prima facie evidence of fraud.

16         THE COURT:  You know, the problem, Mr. Lynch, you

17   need to come to the reality that your client has some troubles.

18         All right, Mr. Bennett, he says that all of these

19   affidavits -- that this affidavit, the one you are relying on,

20   has been approved as appropriate by four different federal

21   courts; is that right?

22         MR. LYNCH:  Judge, just for the record, I'm not

23   saying word for word.

24         THE COURT:  No, no.  That's what you said.

25         MR. LYNCH:  No, Judge.

1          THE COURT:  You said this affidavit, and you held it

2   up.

3          MR. LYNCH:  No, Judge --

4          THE COURT:  Mr. Lynch, do you want to correct it?

5          MR. LYNCH:  I do want to correct it.

6          THE COURT:  All right.

7          MR. LYNCH:  What I'm saying is the substance of this

8   affidavit saying you can have an affidavit with someone that

9   has personal knowledge of business records, not of the debt, of

10  business records, and I've got four cases right here in front

11  of me and I can hand up to the Court, and I'm not saying the

12  affidavits are word for word the same.  They're not.

13         MR. BENNETT:  They're not Midland affidavits.

14         MR. LYNCH:  They're not Midland affidavits.

15         MR. BENNETT:  He's just arguing, Judge, that some

16  courts have said that a business record's affidavit can meet

17  certain standards.  No court has ever ruled that Midland's

18  affidavit, which varies only slightly from the one that was --

19         THE COURT:  Excuse me.  Mr. Lynch, I understood from

20  your statement that you meant that a court had ruled Midland's

21  affidavits were sufficient.  So from now on, please choose your

22  words carefully.

23         MR. LYNCH:  Okay, Judge, and I did not mean to

24  indicate that.

25         THE COURT:  But you did indicate that whether you

1  intended to or not.

2          MR. LYNCH:  I apologize.

3          THE COURT:  I don't think you would misrepresent

4  anything to the Court, but I'm telling you, I pay attention to

5  what you all say and rely on it.

6          MR. LYNCH:  I apologize.

7          THE COURT:  Now, all right, let's go.

8          MR. BENNETT:  Judge, on Exhibit A, we had withdrawn

9  subsequent to this and noted in Document 124, the second motion

10  to compel, requests six and seven.

11          THE COURT:  Requests six and seven are out; is that

12  right?

13          MR. BENNETT:  Yes, Your Honor.

14          THE COURT:  All right.

15          MR. BENNETT:  Eight.

16          THE COURT:  What about eight?

17          MR. BENNETT:  Judge, the defendant refuses to give --

18  with respect to eight, we have asked for, and the defendant has

19  been investigated and is currently being investigated by

20  multiple attorneys general and has produced to those various

21  attorneys general offices documents that we are asking for, the

22  origins of the affidavit, other explanations.

23          If the defendant is going to claim or represent, for

24  example, to the North Carolina Attorney General's office that

25  this is what our affidavit process is, and they have a witness

1    who is the general counsel in this case that is explaining it

2    entirely differently, we are entitled to discover that

3    substantive --

4              THE COURT:  Have they provided what's in request

5    number eight?

6              MR. BENNETT:  No, sir, they've not.

7              THE COURT:  Is it objected to on the privilege log

8    they filed on October 17th?

9              MR. BENNETT:  No, sir.  And I believe that they

10   withdrew any privilege basis for an objection.  Their current

11   position simply says they'll agree to produce

12   non-consumer-specific, non-state-specific documents that were

13   produced to government agencies or the FTC to the extent they

14   are also implicated by the claims and defenses pled in this

15   action.

16             Midland does not agree to withdraw its objections.

17   Their position is it's continuing of a relevance objection.

18   They're saying that what they would have told North Carolina is

19   not relevant to Virginia.

20             THE COURT:  All right.  Let me hear their position.

21   There's no privilege issue because they've withdrawn the

22   privilege.

23             MR. ANTHONY:  Your Honor, I think a couple points.

24             THE COURT:  Not relevant is your objection; is that

25   right?

1        MR. ANTHONY:  I'm sorry?

2        THE COURT:  Your objection is a lack of relevance.

3        MR. ANTHONY:  It is, but I think it's also important

4  -- to the best of our knowledge, all of the information that

5  has been provided to any regulatory agency that relates to the

6  current affidavit process had been produced.  We would agree to

7  produce that, and we are continuing to see if there's anything

8  else that has to be produced.

9        THE COURT:  Are you drawing a distinction between the

10  past affidavit and the current affidavit?

11        MR. ANTHONY:  Yes, sir.

12        MR. BENNETT:  We alleged they are identical,

13  substantively identical.  They move a comma.  That is

14  previously -- they said, I have personal knowledge that this

15  debt is owed.

16        Now it says, I have personal knowledge this debt is

17  owed or of the business records, and then the explanation that

18  you don't see in the affidavit from the PowerPoint we have

19  forced from them says, when you say you have personal knowledge

20  of the account records, you're not saying you have personal

21  knowledge of the account records.  You're saying you have

22  personal knowledge of this screen you look at, and there is no

23  substantive distinction.  We think in fact --

24        THE COURT:  Doesn't that depend upon -- the validity

25  of that statement depend upon what was on the screen?

1              MR. BENNETT:  We know what was on that screen,

2    though.  No business records are on that screen.  They've

3    defined business record to mean a variable within a field.  So,

4    for example, Gilbert James, Gilbert, in its definition, is a

5    business record.  James is defined as a business record as

6    opposed to credit card application is a business record,

7    account payment history is a business record.

8              THE COURT:  None of that is a business record.

9    That's a name.  There's no business record that has anything to

10   do with that.

11             MR. BENNETT:  Yes, sir, we agree.

12             THE COURT:  The issue, I suppose, would be whether

13   what is on their screens constitute a business record, I would

14   think.

15             MR. BENNETT:  It's not screens.  It's a specific one

16   screen that its affiant uses.  It's called an affidavit

17   validation screen.  The affidavit is generated from the local

18   Virginia debt collectors or the debt collectors in whatever

19   state.  It spits out of the computer every morning at Midland,

20   and then they get a stack, the affiant gets a stack of these

21   that are randomly -- like ten percent goes to this affiant, and

22   then that affiant's job is to look on the affidavit that's

23   already printed with their name and all the

24   I-have-personal-knowledge, get the account number that's

25   printed out, input it onto this one screen, and then about

1  eight fields, the field I just described, name, address, and so

2  forth pops up.  Their job, according to the procedure, is to

3  make sure that the name that's on that screen is the name

4  that's in the affidavit.

5         THE COURT:  So the question would become whether

6  that's a business record or not.

7         MR. BENNETT:  Sorry?

8         THE COURT:  That is a question as to whether or not

9  that is or is not a business record, but I don't have to decide

10 that to decide whether it's discoverable, do I?

11        MR. BENNETT:  No, sir, you don't.

12        THE COURT:  Your objection is you don't want to

13 produce this as to the past affidavits.

14        MR. ANTHONY:  Yes.

15        THE COURT:  But you have agreed to produce them as to

16 all of the current affidavits.

17        MR. ANTHONY:  Not only that, but to the best of our

18 knowledge, we have done so.

19        THE COURT:  Is that correct?  Have they produced them

20 as to the current affidavits?

21        MR. BENNETT:  If by that they mean zero records have

22 been produced -- they produced zero in response to this

23 request.  That is --

24        THE COURT:  They said everything has been produced

25 that's been provided to any of these agencies, et cetera.  He

1    says you didn't produce any documents.  There's something amiss

2    there.

3              MR. BENNETT:  The point is that they have not

4    produced --

5              THE COURT:  I was asking Mr. Anthony.  You represent

6    they haven't produced anything, you say you have.  How am I to

7    decide that?

8              MR. ANTHONY:  Well, Your Honor, for example, we have

9    other requests from Mr. Bennett that ask for things like your

10   affidavit training process, your FCRA manuals, all of these

11   things that describe the current affidavit process.  They were

12   already asked for by other request --

13             THE COURT:  Let me make clear what you are going to

14   produce.  Objection to relevance is overruled as to the old

15   one.  You produce everything, and you produce -- I'm sure that

16   your client kept a record of what it produced to each agency or

17   office that it produced to.  You -- and if you produced it to

18   ten different attorney generals, then you produce it to Mr.

19   Bennett in all ten of those, for example.  Do you understand?

20             You will produce everything that was produced in the

21   form it was produced, numbers and everything, to the attorney

22   general of this state, that state, that state, any government

23   agency, the FTC, on this topic, the creation, use, or signing

24   of collection affidavits with the exclusion of documents that

25   pertain solely to specific consumer.  Now do you understand the

1   objection to number eight has been overruled?

2          MR. ANTHONY:  Your Honor, please note our objection

3   to the Court's ruling, but just to be clear, we are not being

4   told by the Court, nor is Mr. Bennett asking for anything that

5   is consumer-related to a particular individual other than Mr.

6   James; correct?

7          THE COURT:  What does your exclusion mean in Exhibit

8   A, Mr. Bennett?  That sounds to me like what you asked for.

9          MR. BENNETT:  If Ms. Smith or John Doe wrote to the

10  North Carolina attorney general and said, I have a problem with

11  Midland and there was an exchange about John Doe, we're not

12  asking for that.  We've explained that in the meet-and-confer.

13  We are simply asking for these --

14         THE COURT:  Mr. Bennett, are you asking -- if they

15  produced to a state agency affidavits used with respect to John

16  Doe, are you asking about that affidavit?

17         MR. BENNETT:  No, sir.  Not the John Doe specific.

18  We are asking for --

19         THE COURT:  You mean not with John Doe's name in it.

20         MR. BENNETT:  Yes, sir.

21         MR. ANTHONY:  That's my understanding.

22         THE COURT:  I cannot believe that you're doing that,

23  because I would think that would make their job very difficult,

24  but if they're happy with that limitation, then you can live

25  with it.  Are you happy with that limitation?

1          MR. ANTHONY:  It is what it is, Your Honor.  There

2     are obviously privacy issues that are involved in that --

3          THE COURT:  There are no privacy issues involved with

4     that.  All you have to do is white out the name of the person,

5     put in a letter or number that says A, one, two, three, or C,

6     or whatever it is, and then keep a record of it in the event --

7     so that we know exactly who those people are in the event we

8     need to have them.  There isn't any privacy issue that cannot

9     be addressed.

10         MR. ANTHONY:  But Mr. Bennett's not asking for that.

11    We understand the Court's ruling, and we will honor the Court's

12    ruling.  Please note our objection to that.

13         THE COURT:  Request number nine.

14         MR. BENNETT:  Judge, we can address the -- nine

15    through 11 are similar, but we've withdrawn 11, so nine and

16    ten, ask for narrowly defined chunks of the specific

17    defendant's employee email Outlook boxes.  That is, we've taken

18    the deposition of these witnesses --

19         THE COURT:  Do you have a time frame on this?  I

20    don't see any time frame on this thing.

21         MR. BENNETT:  Judge, we don't have a time frame --

22         THE COURT:  Suppose they've been dealing with Brandon

23    Black -- when did your company start business?

24         MR. ANTHONY:  It's been more than a couple years,

25    Your Honor.

1          THE COURT:  Well, how long has it been?

2          MR. BENNETT:  Judge, we've already agreed --

3          MR. ANTHONY:  Ten or 15 years, Your Honor.

4          THE COURT:  Suppose that in 2000 they were

5    communicating with Brandon Black.  Are you asking for that, or

6    have you -- I don't see any time limit in this one.

7          MR. BENNETT:  Well, Judge --

8          THE COURT:  Yes or no?  Time limit or not?

9          MR. BENNETT:  There is not a time limit other than

10   that it wouldn't be on their email Outlook box.

11         THE COURT:  I don't understand that.

12         MR. BENNETT:  Well, we're not asking for them to

13   scour all the records in the history of the company.  We are

14   saying --

15         THE COURT:  Usually the way you limit that is for

16   emails dated on or after a date and on or before another date.

17   That's how you do it.

18         MR. BENNETT:  Yes, sir, but each of these employees

19   worked for a very narrow window of time over the last, really,

20   three or four years.  None of them are long-term employees.

21         THE COURT:  That's fine, but I look at this, and I

22   hear --

23         MR. BENNETT:  Yes, sir.

24         THE COURT:  Have you agreed to a time with them?

25         MR. BENNETT:  We have not.

```
1              THE COURT:  Are you willing to agree --
2              MR. BENNETT:  Yes, sir, we are.
3              THE COURT:  What time limit are you going to agree
4    to?
5              MR. BENNETT:  We would agree to July 1, 2009, through
6    the present.  January 1, I'm sorry, 2009, through the present.
7              THE COURT:  All right, any objection to that?
8              MR. ANTHONY:  Your Honor, assuming we take the rest
9    of that, we would agree --
10             THE COURT:  Assuming what?
11             MR. ANTHONY:  Assuming we agree on the other scope of
12   the searches which we have some other objections to, we would
13   say July 1 is a more appropriate date.  Midland did not even
14   get Mr. James's account until mid July, 2009.
15             THE COURT:  But the conduct respecting the affidavits
16   can be reflected in what was going on with respect to
17   affidavits before then.  So I don't understand what your limit
18   is.  What's the period covered by the suit?
19             MR. BENNETT:  It's not a class action, but we're
20   alleging it's an ongoing, continuing scheme, racketeering
21   scheme that goes back into the 2006 period.  We've already
22   agreed to January 1, '09, in some of our other compromises, so
23   I'm trying to be consistent, but we certainly would want --
24             THE COURT:  That period is acceptable, it's
25   reasonable.  It's pertinent and probative of the state-of-mind
```

1   components of the RICO charges and the validity vel non of the

2   processes.  What other objections are there to request number

3   nine?

4           MR. ANTHONY:  Your Honor, there's a couple.  One of

5   them has to do with the subject matter of this.  If you look at

6   request from number nine, continuing on, for example, number 11

7   has no subject matter.

8           THE COURT:  11 he's withdrawn.  11 is out.  I'm

9   interested in nine and ten.

10          MR. ANTHONY:  Your Honor, if you look at ten --

11          THE COURT:  Are there any other objections to nine?

12          MR. ANTHONY:  Yes.  Search term and privilege.

13          THE COURT:  Search term is affidavit within the

14   subject or body of the email.

15          MR. ANTHONY:  Correct.

16          THE COURT:  And any of the following individuals in

17   the to, from, cc, or bcc fields.

18          MR. ANTHONY:  Your Honor, they're in the affidavit

19   business.  It's part of what they do, so we've got to cull

20   through all of this to figure out if there's anything that

21   might tie in to what their claims are.  We've offered five

22   different variations of that to attempt to narrow that scope

23   which would narrow that scope --

24          THE COURT:  You have to show -- is your objection

25   it's burdensome?

1          MR. ANTHONY:  It is.

2          THE COURT:  What is the basis for your showing that

3    it's burdensome?

4          MR. ANTHONY:  We provided an affidavit to the Court

5    that would be approximately 54,000 emails and approximately

6    1,100 attorney hours to review it.  That's burdensome.

7          MR. BENNETT:  Judge, it would take an hour to cut

8    that onto a CD.  Their concern is they want to pre-edit those

9    which is something they should have raised either with me or

10   with the Court during the privilege log period.

11         THE COURT:  Have these been objected to as

12   privileged?

13         MR. BENNETT:  They've not been listed, even described

14   as a category such as emails, has not been included within the

15   privilege log.  It's worked for us.  We're the ones that have

16   to go through and sort it out.

17         THE COURT:  Do you think it's okay for them to look

18   at them first before they turn them over so they can understand

19   if there's anything privileged in there?  For example, there

20   may be something that doesn't -- if it has to do with the

21   affidavit process, it may not be privileged, but it may be

22   something else such as advice about how to do something in a

23   lawsuit that is involved in an affidavit, and I would think

24   they have a right to look at it.  Wouldn't you?

25         MR. BENNETT:  That's an issue --

```
1              THE COURT:  Why is it 54,000 documents and a thousand
2    hours of lawyer time?  What does lawyer time go for these days?
3    $400 an hour, $200 an hour, what?
4              MR. BENNETT:  It depends on the lawyer, Your Honor.
5              MR. ANTHONY:  That's Mr. Bennett's rate.
6              MR. BENNETT:  Judge, this is an issue that should
7    have been included within the basis for the privilege objection
8    or some other indication.  This information, in fact, the
9    amount of time that they're claiming itself was not even raised
10   until late December, and the distinction between producing --
11             THE COURT:  Did they object to it as burdensome?
12             MR. BENNETT:  Only within a long litany of it's
13   burdensome, it's irrelevant, it's overbroad, it's privileged,
14   it's confidential, just generic paragraph.  There was no
15   explanation that this is going to cause us to have to review
16   this.
17             We certainly, Judge -- there is, to the extent that
18   it is privileged outside this case, they still have certain
19   clawback rights that they can avail themselves of, and they can
20   designate these as protected.
21             THE COURT:  What's the damage to the plaintiff in
22   this case?
23             MR. BENNETT:  Judge, the significance of his damages?
24   His damage is that his credit was destroyed, that he was sued,
25   that he's had to defend that --
```

1            THE COURT:  What is the amount?  They have between

2    250 an hour, 250,000, and 400,000 in costs to get this to you.

3            MR. BENNETT:  His damages are not $400,000, Judge, in

4    terms of actual damages.  We think that the damage, the award

5    should be higher than that because of the exemplaries, but we

6    wouldn't represent to the Court that his actual damages are

7    going to be of the magnitude.  We challenge the assertion of

8    this number, and the defendant --

9            THE COURT:  Assertion of what number?

10           MR. BENNETT:  Well, Judge, you have --

11           THE COURT:  A thousand hours or 54,000 documents?

12           MR. BENNETT:  Yes.  Well, or even 54,000 documents.

13           THE COURT:  Which do you challenge, or both?

14           MR. BENNETT:  Both of them.  They're email chains,

15   so, for example, one -- well, they've not been described so we

16   don't know except that typical email production is -- for

17   example, they have produced recently a handful of emails

18   exchanged with a third-party bank that came and inspected their

19   facility, and of those emails, they were scheduling dinner and

20   pickup at the airport, and each time an individual sent a

21   response, which is, yes, Joe, that looks great for me, that was

22   one email.

23           To the extent that their assertion is it will take X

24   number of hours to review all of these emails, they have to at

25   least tender to you or provide to us in a meet-and-confer

1    process some explanation of why that would be so.  They haven't

2    described any emails, they haven't identified the existence of

3    the email box.

4              Take, for example, the Nancy Kohls, which is request

5    ten, I asked her at her deposition, do you use personal -- how

6    do you keep your email.

7              Outlook is the answer.

8              And do you use this for your personal use?

9              No.

10             Do you have folders, and, for example, some of these

11   individuals like Rita Melconian, I asked her at her deposition,

12   how do you organize your folders, and she indicated she does it

13   by state or she does it by firm at different points of time,

14   and so at a minimum, the defendant could have suggested in a

15   meet-and-confer, discuss any of the information that they're

16   suggesting now in their brief or in the letter immediately

17   before it, they could have suggested, well, look, we've checked

18   Rita Melconian's email box, she has five folders, one of them

19   says, you know, what fonts affidavits should be in or something

20   that clearly might not bear on something that material to us.

21   They could have suggested that to us, and we could have met and

22   conferred.

23             The question is would there have been a less

24   burdensome alternative on the defendant that the defendant

25   could have availed itself of by negotiating, by meeting and

1    conferring with us, and by discussing this prior to October --

2         THE COURT:  That is a question, that is a factor, but

3    you filed what you filed.  They deal with it as filed, and I

4    test it if you all aren't able to resolve it by comparing what

5    you have filed against the showing they have made, so I didn't

6    see any showing as to why it would take a thousand hours,

7    though.  I'll let Mr. Anthony address that.

8         MR. ANTHONY:  Your Honor, we attached to our

9    opposition, we attached a declaration from Mr. Rose, the 54,000

10   email records that were there.  We also referenced the -- if we

11   were to use the modified search terms that we proposed, what

12   that would produce, and this is based upon personal knowledge

13   about what it would take to assimilate all of those.  Based on

14   our experience, as we put in our papers, roughly 50 documents

15   an hour.  That's how -- it was simply a math that went along

16   with that.

17        One of the things that we're not completely certain

18   of, and would I disagree with Mr. Bennett, you know, there's a

19   concept of emails, but then there are attachments that go along

20   with that, too, so we don't know the full scope of the

21   attachments of the emails that would go along with this.  We

22   don't know the extent of where there's duplication, we don't

23   know the extent of where there's privilege.

24        THE COURT:  Well, if you haven't done any looking at

25   those emails, how could you make any objection based on that?

1    You have to look at some of them.

2          MR. ANTHONY:  Your Honor, I'm very confident that,

3    again, taking the request as it originally was given to us,

4    that there were irrelevant information in the email box for

5    Nancy Kohls.  Mr. Bennett asked for every email in her inbox.

6    He withdrew that.

7          We have the same thing for Rita Melconian.  He's

8    withdrawn that.  At the time we made the objections, that was

9    what the request was, and now we're here -- to use an example,

10   number nine, number nine asks for an affidavit.  We attempted

11   to negotiate with Mr. Bennett, and what he said was, no,

12   affidavit is it.  So we did what we're supposed to, figure out

13   what the burden is --

14         THE COURT:  I'm sorry, I'm coughing over you.

15         MR. ANTHONY:  We took what...

16         THE COURT:  He's narrowed it to what appears on

17   Exhibit A.  Are you agreeable to that?

18         MR. ANTHONY:  I'm sorry?

19         THE COURT:  He's narrowed it as to nine and ten,

20   requests nine and ten as to what appears on Exhibit A to his

21   paper; do you agree to that?

22         MR. ANTHONY:  It is my understanding that that's what

23   he has narrowed it to, Your Honor.

24         THE COURT:  I say, do you agree to that?

25         MR. ANTHONY:  We do not.

1          THE COURT:  What is your objection to it as narrowed?

2          MR. ANTHONY:  As narrowed, as is evidenced by the

3   affidavit, it would require the production of 54,000-plus

4   emails with attachments that would require, our best estimate,

5   1,100 hours to assimilate those, to review those, to figure out

6   privilege, all those kinds of things, and we believe that that

7   burden of hundreds of thousands of dollars is unfair, and

8   particularly where we can -- we've agreed to provide

9   alternative search terms which we think are reasonable --

10          THE COURT:  What are they?

11          MR. ANTHONY:  They are outlined in his statement,

12  Your Honor.  We have affidavit within three of polic,

13  p-o-l-i-c, with an asterisk.

14          THE COURT:  Police?

15          MR. ANTHONY:  Yes, sir, because there's an issue of

16  identity theft and reporting -- I'm sorry, policy, reporting

17  about the policies, affidavit within three of procedure

18  asterisk, affidavit within three of form, affidavit within

19  three of template.

20          THE COURT:  What is wrong with that?

21          MR. BENNETT:  First --

22          THE COURT:  What's wrong with those?

23          MR. BENNETT:  I haven't seen the documents, but the

24  defendant is carving out -- it's choosing terms to avoid, we

25  believe, the production of documents that would be useful and

```
1   harmful and crafting search terms that are irrational.  That
2   you would do within three of policy, basically what they're
3   saying is only the use of affidavit policy, affidavit
4   procedure, affidavit form, affidavit template, or the full
5   name, Gilbert James.  Mr. James wouldn't matter, for example.
6              So it has to be -- it's this narrow, crafted, and
7   what their objection is is privilege which is the discussion we
8   should have had in October.
9              THE COURT:  No.
10             MR. BENNETT:  The burden -- the reason they're saying
11  burden --
12             THE COURT:  We're not dealing with privilege now.
13  We're dealing with burden.
14             MR. BENNETT:  No, sir, Judge.  The burden, there are
15  two burdens.  The first burden is the actual production and
16  giving them to us.  They're not claiming that's a difficult
17  burden.  Putting it on a DVD or CD and giving it to us is not a
18  challenge.
19             THE COURT:  They're not.  What they're saying is that
20  in order to first review them to determine whether they're
21  privileged.
22             MR. BENNETT:  That's the privilege objection, Judge,
23  and they should have said early on -- they could have said in
24  October, emails.
25             THE COURT:  But they didn't.
```

1    MR. BENNETT:  They didn't.

2    THE COURT:  Okay.

3    MR. BENNETT:  Completely waived it, and they didn't

4    even raise this discussion.  Even Mr. Rose, I never heard of

5    the man.  He wasn't disclosed as a witness.  His information

6    wasn't provided in the meet-and-confer process.

7    THE COURT:  Who?

8    MR. BENNETT:  The affiant that they're using to

9    claim.

10   THE COURT:  I just didn't understand what you were

11   saying.  All right, I see.  Anything else?

12   MR. BENNETT:  No, sir.

13   MR. ANTHONY:  No, Your Honor.

14   THE COURT:  The objection to the request number nine

15   and ten as narrowed in Exhibit A to the papers filed is

16   overruled.  The production will be as required there.

17   MR. ANTHONY:  Your Honor, if I may, I don't want to

18   beat the horse again.  This is wrong.  This is a significant

19   undertaking, and I understand the Court's rationale here, but

20   I'm thinking our client, because of virtue of getting sued, has

21   the benefit of having to spend $400,000 on a goose chase to

22   satisfy Mr. Bennett, and that's wrong.  It doesn't satisfy

23   requirements of Rule 26.

24   THE COURT:  I think it does.  Your client has been

25   using an affidavit that flatly is wrong and has been determined

1    to be wrong; right?  It was.  And now it's using another kind

2    of affidavit.  It changed, and there's significant information

3    to be had in these files pertaining to what you knew, what you

4    were doing that has to do with the state of mind of your client

5    in, A, what it was doing, and, B, changing to what it was doing

6    and how that change is significant.

7            From what I've been able to tell, there's not a whole

8    lot of difference between the original affidavit and the ones

9    being used at this time, but I'm not sure of that.  There may,

10   in fact, be reasons why the people who prepared this thought

11   that it was significant, and it may be important in the outcome

12   of the case.  So I think it is, A, relevant; B, reasonably

13   calculated to lead to the discovery of admissible evidence; and

14   C, it is not unduly burdensome although it, the burden, is not

15   insignificant.  I think that's the ruling in number nine and

16   ten.

17           Number 12.

18           MR. ANTHONY:  Please note our objection, Your Honor.

19           MR. BENNETT:  12 is similar but it's not simply

20   email, but it is also a much more narrow topic.

21           THE COURT:  How does all correspondence and all

22   email, how does that narrow -- I'm going according to how

23   you've narrowed it now.

24           MR. BENNETT:  Yes, sir.  Well --

25           THE COURT:  It is included within your original

1   request.

2          MR. BENNETT:  It is, except this is -- yes, sir.

3   Judge, we'll withdraw 12.

4          THE COURT:  12 is withdrawn.  14?

5          MR. BENNETT:  14 is withdrawn.

6          THE COURT:  14 is withdrawn.  16?

7          MR. BENNETT:  Is not withdrawn.  Judge, the defendant

8   has created entities such as one of the codefendants, Midland

9   Funding LLC, that its job --

10         THE COURT:  Aren't these matters of public record,

11  articles of organization and incorporation, bylaws?  Corporate

12  minutes are not.

13         MR. BENNETT:  Nor are operating agreements are not

14  between the entities.  That is, the public entity is Encore

15  Capital, but then they fund Midland Funding to purchase these

16  debts.

17         Particularly given the earlier discussion about the

18  RICO section that was of concern, 18 U.S.C. 1962, the flow of

19  the money between and into companies and the creation of those

20  companies is certainly relevant.

21         THE COURT:  Are you alleging money laundering as a

22  predicate to the RICO?

23         MR. BENNETT:  No, Judge, but 1962 makes it unlawful

24  to use ill-begotten proceeds, racketeering proceeds, and put

25  them into another business, and we've alleged that that was

1    done.  The predicate acts are mail and wire fraud, but

2    that's --

3              THE COURT:  What is the objection to producing these

4    documents, Mr. Anthony?

5              MR. ANTHONY:  They've been produced.

6              THE COURT:  They've been produced?  Well, then, why

7    isn't that moot, Mr. Bennett?

8              MR. BENNETT:  Okay, well, Mr. Anthony represents that

9    there are no -- the only thing that's been produced -- no

10   corporate minutes have been produced, no operating agreements

11   between the --

12             THE COURT:  Mr. Anthony, have you produced corporate

13   minutes and operating agreements?

14             MR. ANTHONY:  We have not produced the corporate

15   minutes.

16             THE COURT:  Have you produced the operating

17   agreements between these companies?

18             MR. ANTHONY:  Yes.  We've done the articles of

19   incorporation, the bylaws, the annual reports.

20             THE COURT:  How about the operating agreements?

21   Those are basically contracts between companies that say this

22   is what you'll do and this is how much I'll pay you and these

23   are the terms we'll use, et cetera, that are often used in

24   related corporations.  Have they been produced?

25             MR. ANTHONY:  Yeah.  The nomenclature that they use

1    are servicing agreements, Your Honor, and they have been

2    produced.

3              THE COURT:  So those have been produced except for

4    the corporate minutes.  Why do you need the corporate minutes?

5    Why are all their corporate minutes to be produced?

6              MR. BENNETT:  Well, Judge, in part, in addition --

7              THE COURT:  You didn't put any limits on the

8    corporate minutes.

9              MR. BENNETT:  We haven't, but they're -- we assume

10   they are annual minutes.  The defendant hasn't suggested that

11   it's a burden.

12             THE COURT:  What is the basis for the objection to

13   producing corporate minutes?

14             MR. BENNETT:  Confidentiality, Judge.

15             MR. ANTHONY:  Relevance, confidentiality.

16             THE COURT:  Is that an objection that was made, is

17   relevance, as opposed to one you're talking about now?

18             MR. ANTHONY:  Let me check to make sure.

19             MR. BENNETT:  Yes, Judge.

20             THE COURT:  All right.  Relevance and confidentiality

21   are the two bases.

22             MR. BENNETT:  And privilege.

23             THE COURT:  We know where we stand on privilege.

24   Were they claimed in the privilege log?

25             MR. BENNETT:  They weren't, Judge.

1           MR. ANTHONY:  Your Honor, for the record, I know

2    we've had a lot of discussion about this, and I believe the

3    Court is clear, but just so that I can read in, we specifically

4    filed with our privilege log in a timely fashion, as we

5    understood was agreed with Mr. Bennett, a catch-all, "As

6    currently drafted, plaintiff's request for production are both

7    objectionable and seek the production of a substantial volume

8    of privileged information.  The Midland defendants have

9    objected to many of plaintiff's requests for production and

10   have therefore not logged documents that are implicated by

11   those objectionable requests.

12          "The Midland defendants will supplement these

13   responses to the extent required by the Federal Rules of Civil

14   Procedure and/or court order.  In particular, the Midland

15   defendants will appropriately log any privileged,

16   electronically stored information upon agreement with counsel

17   for plaintiff as to such reasonable search terms and other

18   limitations (e.g., time, custodians) and upon a subsequent

19   production of such documents."

20          From our perspective, we thought that was

21   appropriate, Your Honor.

22          THE COURT:  That is a unilateral alteration of

23   pretrial -- provisions of Pretrial Schedule A, and it doesn't

24   have any effect.  Just like we reserve the right to do whatever

25   we want to do in respect of expert reports doesn't have any

1   effect.  The unilateral statements by litigants do not change

2   the operative effect of duly promulgated orders and rules.  All

3   right.  All right, now --

4          MR. ANTHONY:  We disagree with that.

5          THE COURT:  How about the corporate minutes?  You

6   don't put any limitation on them, so I don't know why that's

7   not -- their objection to relevance is not sustainable.  You

8   haven't put any limitation on it at all the best I can tell.

9          MR. BENNETT:  Judge, we would ask January 1, 2007,

10  through the present.

11         THE COURT:  But you haven't put any limits on the

12  substance.  That's everything --

13         MR. BENNETT:  The defendant hasn't suggested it's a

14  particular burden.

15         THE COURT:  This is something you could have done a

16  long time ago, Mr. Bennett.  Sustained.  Objection to corporate

17  minutes is sustained.  The others are moot because they've been

18  provided.  Moot by compliance as to -- we're dealing with

19  request number 16 as modified in Exhibit A.  Everything but the

20  corporate minutes have been provided, and, therefore, they are

21  moot by compliance, and the corporate minutes, the objection is

22  sustained.  All right.

23         MR. BENNETT:  We will withdraw 17.

24         THE COURT:  I would think so.  23?

25         MR. BENNETT:  We would withdraw 23.

```
 1              THE COURT:  Withdrawn.  24?

 2              MR. BENNETT:  Withdrawn.  25, withdrawn.  26,

 3     withdrawn.  27 is not withdrawn.  Judge --

 4              THE COURT:  "Produce all documents that detail or

 5     describe your procedures for compliance with 15 U.S.C. Section

 6     1681s-2(b) since January 1, 2008."  What is the objection?

 7     Have you provided those?

 8              MR. ANTHONY:  To the best of our knowledge, we've

 9     provided all the policy and procedure manuals we have on that.

10              THE COURT:  It doesn't say policy and procedures

11     manual.  It says, all documents that detail or describe your

12     procedure.  So one category of them would be the procedure

13     manuals, but there could be communications respecting the

14     development of the procedure manuals as well I would assume.

15              MR. BENNETT:  Yes, sir.  In fact, Judge, we learned

16     in the Alabama jury trial, Fair Credit jury trial I tried

17     against this defendant, that Midland now subscribes to this

18     automated system where when the credit reporting agency dispute

19     comes in, Midland's computer automatically verifies.  So

20     there's no live interaction or human being so involved, and

21     they haven't given us any documents that pertain to that.

22              THE COURT:  What does that have to do with anything

23     in this case?

24              MR. BENNETT:  Yes, sir, we have the conventional Fair

25     Credit Reporting Act dispute claim that's in here.  That's what
```

1    these next couple pertain to.  We've limited it by time.

2              THE COURT:  What is the objection to that?

3              MR. ANTHONY:  The point was that we thought we had

4    produced that.  We're certainly happy to go back and check to

5    see if there's something Mr. Bennett thinks that we have that

6    we haven't produced, but there's not been a purposeful

7    withholding of this information.

8              THE COURT:  It's moot by compliance.

9              MR. BENNETT:  Judge, we don't have any -- we have one

10   partial manual, and we have nothing else.

11             THE COURT:  Do you have documents that discuss the

12   manual?

13             MR. ST. GEORGE:  Your Honor, we produced all of our

14   documents regarding the E-Oscar system which were multiple

15   manuals.  We have produced an un-redacted version of the manual

16   that I think you're describing.  We produced every version of

17   our employee manual that has anything relating to FCRA.  Again,

18   we might not be on the same page in terms of what we've

19   actually produced, but we're not aware of anything else.

20             THE COURT:  He says he's produced those things.  Do

21   you agree he produced what he just said?

22             MR. BENNETT:  We agree he has produced a manual --

23             THE COURT:  He says all, and you say a.  There's a

24   big difference.  I think it's a time to take a morning recess,

25   and you all can talk about this and perhaps some of these other

1    things.

2              It might be a good idea for you to start by making a

3    list of all the things that are withdrawn so we know the scope

4    of what we're going to be doing.  This animal is going to be

5    dead at the end of the day, whatever happens.  I'm tired of

6    fiddling with it.  It's something you all should have, and I

7    spent a good part, a good chunk of time last week reading this

8    stuff, and I'm really kind of taken aback that I have to be

9    doing it.

10             Part of the problem is that you paint with a broad

11   brush, and then you don't have any reasonable approach to

12   negotiate an end result so we do have to deal -- does the

13   privilege issue that's in number two, does that assert the

14   crime-fraud exception?

15             MR. BENNETT:  It does, Judge.

16             THE COURT:  Yes, okay.  All right.  We'll deal with

17   that, too, but let's get going and see what we can get

18   straightened out here.  We'll take a recess.

19

20             (Recess taken.)

21             (Luncheon recess.)

22

23             THE COURT:  All right.  We were going through a

24   document called in the brief, in docket number 99, that refers

25   to as in support of the motion of docket number 88.  A base

1    document called Exhibit A contains the disputed request for
2    production of interrogatory and the most recent positions, et
3    cetera.  So that's where we are.
4         And you had withdrawn a number of them.  We had
5    stopped with number 27, I think, or 28.  So where do we stand
6    on the rest of these requests?
7         MR. BENNETT:  Your Honor, if the Court please, I
8    think we worked to resolve a number of them, and if I could ask
9    to step -- for us to step back and ask the Court, we've been
10   going through Exhibit A, but the shortest list, shorter than
11   Exhibit A, is actually at Document 124.
12        THE COURT:  But that's not what we're doing.  We're
13   taking the first motion, and we were going through Exhibit A.
14   You refer to it on the page in your brief that's an unnumbered
15   page, on page eight of ten it looks like in the header that
16   shows the filing of docket number 99.  That's what I've been
17   going through.
18        MR. BENNETT:  Yes, Judge.
19        THE COURT:  Let's stay with that.  What do you
20   withdraw from there?  Where do we stand?  You all have to
21   understand something.  When you all file these papers, I don't
22   have the base of information that you all have.  I read them, I
23   try to use what's here as a tool to resolve things and get it
24   sorted out, and now you're telling me you've been talking --
25   are you telling me you've been talking about something other

1    than Exhibit A which is referred to on page eight out of ten?

2           MR. BENNETT:  No, Judge.  At the last status

3    conference, Your Honor suggested that I go through and in a

4    better fashion crystallize and organize the requests to which

5    there was dispute, and the most recent crystallization of all

6    of these disputes is in that document.

7           THE COURT:  And I don't have that.

8           MR. BENNETT:  It's actually the reply brief at 124.

9           THE COURT:  What do you mean, 124?

10          MR. BENNETT:  It's docket 124.  It's actually in the

11   reply brief, docket number 124.

12          THE COURT:  But clearly you are talking about --

13   we've been talking about a document that you handed me this

14   morning called Exhibit A.

15          MR. BENNETT:  That's right.  This is with respect to

16   the privilege, the documents that have been withheld -- that's

17   what Exhibit A is -- the documents that have been withheld

18   based on privilege that were not included in a privilege log,

19   and there are about five other requests.

20          THE COURT:  They also deal with relevance and a lot

21   of other things.

22          MR. BENNETT:  Yes, Judge.

23          THE COURT:  Listen, you've got to get your act

24   together.  I can't really spend a lot of time over things,

25   rehashing things that --

1          MR. BENNETT:  I understand, Judge.  I'm trying to --

2    we have negotiated through a large number of these.

3          THE COURT:  What are you negotiating from?

4          MR. ANTHONY:  Your Honor, if I may, to answer your

5    question, I believe that Mr. Bennett has withdrawn or will not

6    be enforcing numbers 28, 37, 39, 41.

7          THE COURT:  28.

8          MR. ANTHONY:  37, 39 --

9          THE COURT:  Wait a minute.  37.

10         MR. ANTHONY:  39 and 41.  We had nine other areas

11   that were open when we walked out of the door.  We worked out

12   resolutions of many of those.  We have a couple that are left,

13   and I've got the order.  If you want to go in the order, we can

14   tell you where we --

15         THE COURT:  I want to get it sorted out, and if you

16   settled something, then I just need to rule on what hasn't been

17   settled.  So let Mr. Anthony tell me what was done.  You tell

18   me if it's not right.  Number 30.

19         MR. ANTHONY:  The first issue that is open is for

20   item 2A.  That's a request for production of document.

21         THE COURT:  Where is this?

22         MR. ANTHONY:  If you use --

23         THE COURT:  Which request number are we talking

24   about?

25         MR. BENNETT:  We've used 2A and 2B because we

1  mis-numbered, Judge, and we had two twos.  2A is request number

2  two which is set out at 124, page six.

3           THE COURT:  But that's not what we're taking about.

4  He just told me you had withdrawn a set of numbers, and they

5  were on the document called Exhibit A which you handed me

6  earlier.  Now, do you agree that you're withdrawing those?

7           MR. BENNETT:  Yes, sir.

8           THE COURT:  Now, of the remaining ones, which ones

9  have you settled?  The fact you're using a different numbering

10  system, you can tell me later what that is, but which ones --

11  has 30 been settled by agreement?

12           MR. BENNETT:  The previous testimony?  You were going

13  to give us an answer.

14           MR. ANTHONY:  Your Honor --

15           THE COURT:  Request number 30 says, "Produce all

16  documents pertaining to or containing explanation(s),

17  instruction(s), or procedure(s) for your reporting of credit

18  information or investigation of credit information disputes."

19  That's what 30 is.

20           MR. BENNETT:  I'm sorry.  Yes.

21           THE COURT:  Is that resolved by agreement or not?

22           MR. BENNETT:  We resolved requests -- not all of whom

23  were on the privilege list.  Request 27, 30, 31, 37, and 44 are

24  all resolved.  Those are all the Fair Credit Reporting Act

25  related.

```
 1              THE COURT:  We're not going to call it the privilege
 2    list.  There isn't any privilege list here in front of me.
 3    There is a document called Exhibit A, and we are using that.
 4    Now, look, I'm going to stay here until Hades freezes over to
 5    get it straight if I have to, but I'm going to start suggesting
 6    that you all send for some dinner, because you're going out the
 7    door on the other side over there.
 8              Now, in the matter of request number 30, have you
 9    resolved it?  If so, how?
10              MR. BENNETT:  We have resolved that.
11              THE COURT:  How is it resolved?  One of you tell me.
12              MR. ANTHONY:  Your Honor, just while you were
13    writing, requests 27, 30, 31, 37, and 44 all fall within this
14    bucket.
15              THE COURT:  37 and 41 have been withdrawn.
16              MR. ANTHONY:  44.  I'm sorry.  I meant to say 44,
17    Your Honor.
18              THE COURT:  Is 41 not withdrawn?
19              MR. ANTHONY:  41 is withdrawn.  44 is not.
20              MR. BENNETT:  Correct.  37 is withdrawn.
21              MR. ANTHONY:  These are all ones that are asking
22    about Midland's FCRA compliance manuals, all of those kinds of
23    things.  We believe we've produced that information.  Mr.
24    Bennett has asked us to go back and look for some discrete
25    areas such as our emails to and from the CDIA, our automated
```

1  interface documentation, procedures to explain what a live

2  person does when they get an investigation, those types of

3  things, and we've agreed to produce those, to go back and see

4  if we have anything that falls within those buckets.

5           MR. BENNETT:  In addition to that --

6           THE COURT:  Wait a minute.  You were just talking

7  about what appears as a request number 27, 30, 31, and 44 on

8  Exhibit A; is that right?

9           MR. BENNETT:  Yes, Judge.

10          THE COURT:  All right.  And the basic resolution is

11  that you say you've produced them, defendant, and you say they

12  haven't produced all of them, so how is that a resolution?  You

13  say there are other things to be looked for.  So either they

14  have been all produced or they haven't been.

15          MR. BENNETT:  I believe what we -- we have negotiated

16  what Your Honor -- what we both would agree Your Honor's order

17  would be.  The first is that the defendant will be ordered to

18  produce the category of documents that Mr. Anthony just

19  described.

20          THE COURT:  That's 27, 30, 31, and 34.

21          MR. BENNETT:  With respect to the CDIA and batch

22  interface --

23          THE COURT:  Wait a minute.  Respecting what?

24          MR. BENNETT:  The CDIA communication.

25          THE COURT:  What is CDIA?

 1              MR. BENNETT:  The Consumer Data Industry Association.

 2              THE COURT:  What else?

 3              MR. BENNETT:  The investigation and training manuals

 4    for Fair Credit Reporting Act investigations, and the documents

 5    regarding --

 6              THE COURT:  Wait a minute.  And what?

 7              MR. BENNETT:  Documents regarding the automated batch

 8    interface system.

 9              THE COURT:  What is the automated batch interface

10    system?

11              MR. BENNETT:  It's a computer program that credit

12    bureaus sell that furnishers such as Midland can buy so that

13    the credit reporting agency computer and the Midland computer

14    handle the dispute process without a human being involved.

15              THE COURT:  Okay.  So are you in agreement with what

16    he just said, Mr. Anthony?

17              MR. ANTHONY:  Yes, Your Honor.

18              THE COURT:  As to exhibit -- as to request number 37,

19    30, 31, and 44 as outlined in Exhibit A, which constitute

20    narrowed requests on the part of the plaintiff, the

21    plaintiff -- the disputes over that are resolved by the

22    defendant's agreement to produce those documents respecting the

23    following categories:  The CDIA, the investigative and training

24    manual -- investigation and training manuals for the FCRA

25    investigations, and the documents regarding the automated batch

1    interface system; is that right, gentlemen?

2              MR. BENNETT:  That is the first category, and there's

3    the second category which is the defendant doesn't agree that

4    they would produce this, but as I understand, they would agree

5    Your Honor's earlier rulings on privilege would govern the

6    compliance memos limited to what management or legal department

7    employees have exchanged regarding Fair Credit Reporting Act

8    compliance.

9              MR. ANTHONY:  I'm not sure I agree with that, Your

10   Honor.

11             THE COURT:  That's pretty broad.  I don't know what

12   that means.

13             MR. ANTHONY:  And, Your Honor, I hate to correct you.

14   I think that we've been throwing a lot of numbers at you.  When

15   you read back the ruling, I think you inadvertently said 37

16   instead of 27.

17             THE COURT:  I intended to say 27, 30, 31, and 44.

18             MR. ANTHONY:  That's what I thought.

19             THE COURT:  That's category one.  He started talking

20   about category two being -- that you say is taken care of by

21   way of resolution -- compliance memoranda of some sort, and I

22   don't know what is meant by that.  Do you have an agreement, or

23   do you not?

24             MR. BENNETT:  I understood we did.  Management and

25   legal employees regarding the *Johnson* and state of the law --

1    MR. ANTHONY:  If we understand the request, Your

2    Honor, it's the knowledge of the senior management of Midland

3    of the *Johnson* case or similar kinds of things.

4    THE COURT:  What is the *Johnson* case?

5    MR. ANTHONY:  That's the *Johnson v. MBNA* case.  It's

6    a case from the Fourth Circuit, and we're okay with providing

7    that information.

8    THE COURT:  All right.  Now, what are you going to

9    provide?  Describe it so that it will get in the order.

10   MR. ANTHONY:  It will be documents in the possession

11   of senior management at Midland that --

12   THE COURT:  Does that include the law department?

13   MR. ANTHONY:  Yes.  That refer to --

14   THE COURT:  Is that all the Midland defendants?

15   MR. ANTHONY:  Yes.

16   THE COURT:  Okay.  Documents of senior management of

17   all the Midland defendants including the law department that do

18   what?

19   MR. ANTHONY:  That refer to the Fourth Circuit

20   decision in *Johnson v. MBNA*.

21   MR. BENNETT:  And we discussed --

22   THE COURT:  Is that right; *Johnson v. MBNA*?

23   MR. ANTHONY:  Correct.

24   MR. BENNETT:  And the legal requirements discussed

25   therein.

```
 1              MR. ANTHONY:  Yeah, that's fine.

 2              THE COURT:  What legal requirements, of what?

 3              MR. BENNETT:  It's the seminal case describing --

 4              THE COURT:  You said the legal requirements discussed

 5     therein.  Discussed where?

 6              MR. BENNETT:  In Johnson v. MBNA.

 7              MR. ANTHONY:  I think the point, Your Honor, is that

 8     it may say things that are in Johnson without saying Johnson.

 9              MR. BENNETT:  Johnson defines what a reasonable

10     investigation is.

11              THE COURT:  All right.

12              MR. ANTHONY:  Your Honor, the next item that I

13     have --

14              THE COURT:  Does that solve everything for 44, 31,

15     30, and 27 -- those are request numbers -- as posited in

16     Exhibit A?  Does that solve it?

17              MR. BENNETT:  Yes.

18              THE COURT:  Does that solve it?

19              MR. ANTHONY:  Yes, sir.

20              THE COURT:  All right.  Go ahead.  That leaves us

21     next with 33, 34, and 36.

22              MR. ANTHONY:  Your Honor, if I can, I think we were

23     trying to click through the ones that we had agreement on.  The

24     next one that I have as having agreement on is on number 20.

25              THE COURT:  I don't have number 20.  Number 20 is not
```

1    on this list.  I have 23 --

2              MR. ANTHONY:  It's on page 18, Your Honor.

3              THE COURT:  Page 18 of what?

4              MR. ANTHONY:  Of Exhibit A on the bottom.

5              THE COURT:  18 of Exhibit A?  There's no 18 of

6    Exhibit A.  18 has -- Exhibit A has four pages.  This is what

7    you handed me as Exhibit A.  I asked you what it was.  You

8    handed it to me.  We've been talking about it, reading from it,

9    and I don't have any 20 on it.

10             There are numbers in the 20s, but all those have been

11   withdrawn.  So what is number 20?  I don't see it.  Have you

12   got the same document I've got over here?

13             MR. BENNETT:  Judge, I understood that we were

14   negotiating through or arguing through the privilege motion.

15   That Exhibit A pertained to the privilege --

16             THE COURT:  I don't know what you are talking about,

17   the privilege motion.  We've been talking about your motion,

18   docket -- I don't understand why you cannot grasp this.  We

19   started off with your docket number 98 which is plaintiff's

20   motion to compel and sanctions pursuant to Rule 37.  In it, on

21   page eight, you have a reference to Exhibit A.  I asked you

22   what that was.  You handed it up to me.  It contains a number

23   of numbers under heading Roman numeral I which runs for two and

24   a half, two and three-quarters pages, and then Roman numeral

25   number II which runs for a page and a quarter.

1          That's what I have been talking to you all about

2    including the most recent discussion.  Now, what are we going

3    to do about -- what, if anything, have you agreed on -- get

4    that document in front of you -- request number 33, 34, 36 as

5    described in Exhibit A?

6              MR. BENNETT:  33 is withdrawn or 33 is resolved.

7              THE COURT:  How have you resolved it?

8              MR. BENNETT:  We withdraw it from the motion, Judge.

9              THE COURT:  You are withdrawing 33.  All right, 34.

10             MR. BENNETT:  The Court has just ruled on -- 34

11   should have been included within the ruling you've just made as

12   to the CDIA.

13             THE COURT:  So it ought to be 27, 30, 31, 34, and 44;

14   is that right?

15             MR. BENNETT:  Yes, Your Honor.

16             MR. ANTHONY:  Yes, Your Honor, I agree with that.

17             THE COURT:  All right.  I've just done that.  All

18   right, 36.

19             MR. BENNETT:  36 is previous testimony of the

20   defendant, and it relates also to interrogatory four which is

21   further below.  It's the same -- in a separate motion, but I

22   understand that -- the defendant, have you agreed?

23             MR. ANTHONY:  We have not yet agreed, Your Honor.

24   This is Mr. Bennett asking for all deposition testimony by

25   certain groups of individuals.  We have agreed to narrow the

1   scope of that to consumer claims which we thought was too

2   broad, and we have offered alternative proposals, but we've not

3   yet resolved that.

4          MR. BENNETT:  Judge, we're asking for the previous

5   affidavits or deposition testimony of the witnesses that have

6   been disclosed by the defendant in this case.

7          MR. ANTHONY:  In affirmative cases.

8          MR. BENNETT:  Yeah, in which they've testified in

9   affirmative consumer cases brought against the defendant.

10          THE COURT:  What is an affirmative consumer case?

11          MR. BENNETT:  As opposed to we've agreed not to ask

12   for counterclaim testimony.  So that if Midland had sued a

13   consumer, and the consumer counterclaimed against the

14   defendant --

15          THE COURT:  What if the consumer sued first?

16          MR. BENNETT:  That is an affirmative claim brought

17   against Midland, yes, sir.

18          THE COURT:  Is an affirmative claim also a claim

19   brought by Midland against a consumer?

20          MR. BENNETT:  Not in any counterclaims.

21          THE COURT:  No, that's different.  My question

22   relates to what Midland started off with in its case, it was

23   the plaintiff in the case.

24          MR. BENNETT:  Yes, sir.

25          THE COURT:  Is that included in this agreement or

1  not?

2          MR. BENNETT:  We do not have an agreement, Judge.

3          MR. ANTHONY:  We were attempting to articulate where

4  we were attempting to narrow the issues.

5          THE COURT:  All right.  Now, it seems to me that

6  first we need to determine the time frame.  What is the time

7  frame for number 36?

8          MR. BENNETT:  We have agreed to January 1, 2008, to

9  the present previously.

10          THE COURT:  And do you agree with that, the time

11  frame, Mr. Anthony?

12          MR. ANTHONY:  Assuming Your Honor would order that,

13  we think the time frame should be, you know, January 1, 2009,

14  to be consistent with what your order was earlier today.

15          THE COURT:  Why is it 2008 for this as opposed to

16  2009 for the earlier category, Mr. Bennett?

17          MR. BENNETT:  Well, Judge, because there were -- the

18  reason that we used 2009 before was because that was a uniquely

19  important time period when the affidavit process was being

20  transformed.  We know that it was being transformed.

21          We are using 2008 because it pushes us back basically

22  three years from when the case was filed and gives us a range

23  of time to have discussed or used or given depositions about

24  some of these issues.

25          There's no great additional burden to do it

1    January 1, 2008.  The reason that we used January 1, 2009,

2    before was because not just picking a time, but because we know

3    particular events that were covered by that that would not have

4    been present in '08, the construction of the affidavit process.

5              THE COURT:  I don't know what you're talking about.

6              MR. BENNETT:  Well, so, January 1, '08, is a fair

7    range --

8              THE COURT:  Why?

9              MR. BENNETT:  Because it gives us one year before the

10   actual collection efforts were made to our individual.

11             THE COURT:  Why would they be testifying about it if

12   there never had been any dispute about it until the process

13   began in '09?  I don't understand that.

14             MR. BENNETT:  We're trying to figure out what these

15   witnesses who the defendant might call at trial have previously

16   testified and said, not simply after this case but before.

17             THE COURT:  I understand that, but if, in fact, the

18   affidavit that started this process, which is one, as I

19   understand it, that has been replaced by one that they say is

20   different and that you say is not different, if that process

21   didn't begin until January of 2009, why would there ever be any

22   lawsuit calling for this testimony back in 2008?

23             MR. BENNETT:  With respect to the affidavit-related

24   claims, you are correct, Judge.  We also have the Fair Credit

25   Reporting Act claims, and we're asking for a three-year period

1    or January 1, '08, forward for those.

2           With respect -- if you were to limit this so that

3    previous testimony by employees related to the affidavit

4    process could be January 1 of '09, but we're trying to gather a

5    larger sample, and it's still a modest one, with respect to the

6    Fair Credit Reporting Act testimony.

7           THE COURT:  So the basic answer is there probably

8    isn't any respecting the affidavit process between 1/08 and

9    1/09.

10          MR. BENNETT:  Yes, Your Honor, correct.

11          THE COURT:  Do you agree with that?

12          MR. ANTHONY:  No, Your Honor.  I think that what

13   you're getting at are our concerns.  The way this is worded,

14   there's no time limitation, there's no subject matter

15   limitation.  We attempted to try to figure out some kind of

16   limitation.

17          Coming in today, the best we've gotten is consumer

18   claims, and there may be all kinds of consumer claims that have

19   nothing to do with what's involved here.  We proposed a further

20   narrowing of that that might theoretically be relevant to the

21   issues that are directly relevant here, and that wasn't

22   acceptable to him.  So we sort of are trying to define what are

23   these issues, and that's our concern, because we don't have

24   these --

25          THE COURT:  I asked you first about the time frame.

1    Is it correct that there were no lawsuits involving the

2    adequacy vel non or the legality vel non of the affidavits

3    between 1/08 and 1/09?

4              MR. ANTHONY:  I think regarding the new affidavit

5    process, absolutely, Your Honor.

6              THE COURT:  How about the old one?

7              MR. ANTHONY:  I can't vouch that to the Court.

8              THE COURT:  You don't know that.

9              MR. ANTHONY:  I don't know that.

10              THE COURT:  Well, the time period is January 1, '08,

11    to the present for this request.  Now, what you want is -- you

12    say, "for each fact witness or expert witness you believe may

13    have knowledge of any facts, events, or matters that are

14    alleged in plaintiff's complaint."  Your answer, "Anticipate

15    answer or defense" -- you can't do any anticipated answers.

16    Mark that out -- "and/or may have formed any opinion or

17    consulted with you about the facts or basis of this lawsuit or

18    any defense or allegation you have raised in this lawsuit,

19    produce a copy of the affidavit, deposition, transcript, or

20    report which contains the testimony or opinion of such witness

21    and which has previously been furnished to the Court or

22    opposing counsel in such case."  What does that mean?

23              MR. BENNETT:  Judge, we've already narrowed this in

24    multiple meet-and-confers to previous deposition and affidavit

25    testimony of the employees of Midland or Encore that have been

1   disclosed as witnesses in this case.

2         THE COURT:  Okay.  Well, what does the last clause

3   mean, "and which have been previously furnished to the Court

4   and opposing counsel"?

5         Why don't you take a stab in the future in trying to

6   write simply instead of all this convoluted nonsense that ends

7   up in a sentence with all these misplaced modifiers that's hard

8   to follow?  No wonder they objected to it.

9         MR. BENNETT:  Well, Judge, if we ask in plain

10  English, which is how all this years ago in my cases began,

11  then we have a lawyer's semantic genius that refers to our

12  request as too vague.  If we said, provide us all of your Fair

13  Credit Reporting Act compliance documents, that's too vague.

14  So then we have to say -- we start to modify it and carve it

15  out, and then --

16        THE COURT:  There's an easy way to do it, but the way

17  this one's written -- this hasn't got anything to do with

18  solving that problem, the question I asked about.  So as I

19  understand it, you all are prepared to accept as to number 36

20  for the period January 1, 2008, to the present, for anybody who

21  is going to be a fact or expert witness in the case; is that

22  right?

23        MR. BENNETT:  Or is disclosed as a potential fact or

24  expert by the defendant.

25        THE COURT:  So it's any Rule 26 witness, any witness,

1   fact or expert, disclosed under Rule 26, you want their

2   previous testimony, affidavits, or opinions, whether filed in

3   court or not; is that right?

4          MR. BENNETT:  Yes, sir.

5          THE COURT:  Do you understand that's what he wants?

6          MR. ANTHONY:  I do.

7          THE COURT:  Any objection to that?

8          MR. ANTHONY:  I think that has no scope to it, Your

9   Honor.  It has no subject to it.  Is that about --

10          THE COURT:  I haven't finished it yet.  I'm talking

11   about what it is we're going to get out.  We haven't gotten the

12   regarding yet.

13          MR. ANTHONY:  I'm with you so far.

14          THE COURT:  Is that okay so far?

15          MR. ANTHONY:  So far.

16          THE COURT:  The next question is respecting what, on

17   what topic?  On the topic of the allegations of the complaint?

18   If they are Rule 26 disclosed witnesses, which you just said

19   you're willing to go with, then they have to have some relation

20   to the complaint.  So that means you have to look at what

21   opinions they have given on the topic of what's in the

22   complaint.

23          MR. BENNETT:  Well, Judge, if they've previously

24   given a deposition -- and, by the way, we've already also

25   qualified that it would be in their capacity as an employee of

1    the defendant.  So if they were in a car accident --

2                THE COURT:  But about what?

3                MR. BENNETT:  -- or a divorce.  About anything at

4    all, Judge.

5                THE COURT:  About anything at all.  Is that really

6    where you want to go, because I'm going to summarily deny it

7    right now.

8                MR. BENNETT:  We said consumer claims is what we

9    previously --

10               THE COURT:  What kind of consumer claim do we have in

11   this case?  That's what you need to limit it to.

12               MR. BENNETT:  But, Judge, if there's a witness who

13   would testify about how she came to be employed by Encore, and

14   the same witness is going to be in play here, even if that

15   previous deposition doesn't have a consumer claim component, we

16   should be able to review it, and the big issue is --

17               THE COURT:  Why?  Because you want to find out how

18   she was employed?

19               MR. BENNETT:  It could lead to the discovery of

20   admissible evidence.

21               THE COURT:  Like what?  How or why she's employed?

22               MR. BENNETT:  We don't start blindly --

23               THE COURT:  No, no, no.  Let's take the example you

24   used.

25               MR. BENNETT:  Yes, sir.  When did you start working

1    there, how much do you get paid, what is your job, what do you

2    do every day for Midland, how long have you been in that

3    position, that's testimony that --

4           THE COURT:  What possible warrant is there to make it

5    that broad?  It looks to me like that if it involves -- if the

6    previous testimony, whether by affidavit -- or opinion, whether

7    by testimony or written opinion or report in the ordinary

8    course of business or given to a State Corporation Commission

9    or somebody else, if it involves something that's involved in

10    this suit, then you are entitled to that, and I think Mr.

11    Anthony would be prepared to give you that.

12           MR. BENNETT:  Judge, they haven't been prepared to

13    give me anything, and the problem is --

14           THE COURT:  That's because you're asking for the

15    moon.  I'm about ready just to say you're not going to get

16    anything else ever, and then discovery is over, and that's the

17    end of it.  Now, you have to be reasonable.  I, perhaps, may

18    have gone too far trying to sort this thing out, but here's

19    what you're going to get.  You're going to get previous reports

20    or opinions or testimony of anybody identified in Rule 26

21    disclosures as a fact or a person who has knowledge of the

22    facts or as an expert that they have given during the period I

23    have identified on the topics of the allegations of this case.

24    That seems to me to be sufficient.  Can you live with that?

25           MR. ANTHONY:  Yes, sir.

```
 1              THE COURT:  All right, that's it.  That's what it
 2    will be.
 3              MR. BENNETT:  Okay.
 4              THE COURT:  Now, if you have some reason down the
 5    road to believe they're lying about what date they got
 6    employed, then maybe you can deal with something as ephemeral
 7    as that, but that's how we resolved number 36.
 8              MR. ANTHONY:  That also would relate to interrogatory
 9    four, Your Honor?
10              THE COURT:  And interrogatory four.  That brings us
11    to request 45.
12              MR. BENNETT:  We withdraw 45, 47, and 48.
13              THE COURT:  They are withdrawn.  Now we're into
14    interrogatories, and we cover here interrogatory one, two,
15    five, six, and ten in this Exhibit A.
16              MR. BENNETT:  Yes, sir.  One, I think we've agreed to
17    a narrowing through multiple meet-and-confer sessions, if I can
18    bring the Court up to speed, and I think we may have somewhat
19    of an agreement.  Mr. Anthony would have to articulate it.
20              We have agreed to two categories of third-party --
21    I'm sorry.  For interrogatory one, the defendant has agreed to
22    provide two additional components to its answer that were
23    currently not in its most recent supplementation.  That is they
24    will provide the description of the particular work that the
25    employees performed.
```

1          If you will look at interrogatory one, the last part

2     of the sentence, "as well as specific work they performed," and

3     they will provide the date range for that work.

4               THE COURT:  Agreed?

5               MR. ANTHONY:  Your Honor, it is with one slight

6     clarification.  I think that this ties in with interrogatory

7     two, because it was a similar sort of agreement.  I think Mr.

8     Bennett's request actually had more to do with interrogatory

9     two, but we've agreed to supplement the additional information

10    that he's requested.

11              THE COURT:  As to both interrogatory two and one; is

12    that right?

13              MR. ANTHONY:  I think we did it as to one, and he

14    really was aiming at two, but the idea is for us to supplement

15    that, and we agree to do so.

16              THE COURT:  Do you agree with what he said?

17              MR. BENNETT:  I do.

18              THE COURT:  So there's no dispute over one.

19              MR. ANTHONY:  That's been resolved, Your Honor.

20              THE COURT:  How is it resolved?

21              MR. ANTHONY:  We've agreed to supplement, to the

22    extent we need to do so, our answers to number one and number

23    two to the extent that they don't otherwise include the date

24    range and specific work.

25              THE COURT:  All right.  You agree that's an accurate

 1  statement, Mr. Bennett?

 2          MR. BENNETT:  Yes, sir.

 3          THE COURT:  Then number one and number two are

 4  resolved.  All right, interrogatory number five.

 5          MR. BENNETT:  Withdrawn.  Or the motion is withdrawn

 6  with respect to interrogatory five.

 7          THE COURT:  Number six?

 8          MR. BENNETT:  Judge, six, interrogatory six is

 9  withdrawn -- the motion with respect to interrogatory six is

10  withdrawn.

11          MR. ANTHONY:  That is resolved, Your Honor.  That is

12  a request that Mr. Bennett made for the supplementation of the

13  net worth of Midland.  It's contained in documents.  We've

14  agreed to --

15          THE COURT:  Wait a minute.  Interrogatory six is not

16  anything to do with net worth.

17          MR. BENNETT:  Right, Judge.

18          MR. ANTHONY:  I can't read my own writing, Your

19  Honor.  I'm sorry for that.

20          THE COURT:  Interrogatory six, you are withdrawing

21  the motion as to that.

22          MR. BENNETT:  And with respect to interrogatory ten,

23  Your Honor.

24          THE COURT:  That's withdrawn, the motion is

25  withdrawn?

1          MR. BENNETT:  The motion is withdrawn as to ten.

2          THE COURT:  Now, that takes care of all of what's on

3   Exhibit A.  All right, have we got agreement on -- you handed

4   me something else called plaintiff's request for production of

5   documents which is Exhibit B to one of these papers, I think,

6   and I don't know what that's got to do with anything.

7          MR. BENNETT:  I was providing that because it had a

8   request that wasn't on Exhibit A.  Exhibit A, if you look at

9   the headings --

10          THE COURT:  Excuse me.  Have we resolved now

11   plaintiff's motion to compel, docket number 98?

12          MR. BENNETT:  We have not.

13          THE COURT:  Is there anything else that remains to be

14   resolved?

15          MR. BENNETT:  There is, Judge.

16          THE COURT:  Where in the brief that you are talking

17   about in number 99 do I address that?

18          MR. BENNETT:  Well, in the reply brief --

19          THE COURT:  That's docket number 124; right?

20          MR. BENNETT:  Yes, Judge.

21          THE COURT:  All right, I have that.

22          MR. BENNETT:  Page six --

23          THE COURT:  Is that page six of 27?

24          MR. BENNETT:  Yes, sir.

25          THE COURT:  It says there are 17 remaining categories

1    in dispute.  Is that what you are talking about?

2            MR. BENNETT:  Yes, sir.

3            MR. ANTHONY:  Your Honor, if I may, there are a

4    couple of these items that we have resolved, too.

5            THE COURT:  And "these items" meaning the 17?

6            MR. ANTHONY:  Yes, sir.  The ones other than what you

7    just went through.

8            THE COURT:  Wait a minute.  He's now referring me to,

9    in the reply brief, a list of 17 items that I certainly hope

10   don't overlap on Exhibit A.

11           MR. BENNETT:  They don't.

12           THE COURT:  So 17 items, and you're saying these have

13   been resolved.

14           MR. ANTHONY:  Let me go through, Your Honor.  If

15   you'll turn to page 17 of docket number 124.

16           MR. BENNETT:  Can we go in the order, or do you just

17   want to do resolved?

18           THE COURT:  Let's start -- if we're going to do this

19   list, let's start and tell me which ones are out of the

20   discussion.  Let's eliminate those first that they're

21   withdrawn.  Let's take the withdrawals first.  Then we will go

22   to the resolved ones, and we'll take them in numerical order.

23           So we have a category under the 17, "Documents

24   exchanged with third parties regarding defendant's affidavit

25   process," request for production number two; is that pendent or

1    resolved or withdrawn?

2              MR. BENNETT:  I believe it's resolved.

3              THE COURT:  Number two, "All documents exchanged

4    between any of your employees and Bank of America, Target

5    Receivables Corporation, or any other third party regarding

6    your process for creating, preparing, and/or signing collection

7    affidavits."

8              MR. BENNETT:  There were two categories of this that

9    have been discussed and resolved by Your Honor's order.  That

10   is, we're not withdrawing it.  First, there's a private

11   appointed -- a private retired judge who in this Ohio case has

12   been appointed as a special master to evaluate the affidavit

13   process of the defendant, and we've asked for --

14             THE COURT:  Is this state court or federal court?

15             MR. BENNETT:  Federal court.

16             THE COURT:  Who is the judge?

17             MR. BENNETT:  Judge Katz, Senior Judge Katz in the

18   Northern District of Ohio.  He's not the retired judge.  I'm

19   sorry.  He's the class action presiding judge.  It's a state --

20   Judge, I'm sorry.  I think it is -- retired judge is a state

21   judge, the private judge.

22             THE COURT:  I don't need to know any of this.  All I

23   need to know right now is have you all resolved request for

24   production number two.

25             MR. ANTHONY:  Your Honor, there are two issues here.

1    The first is the information that's provided to the special

2    master.  We disagree with the Court's rulings earlier, but

3    based upon what the Court's rulings were earlier as it dealt

4    with other AGs and that type of thing, we think this would be

5    encompassed within that.

6            So we've agreed that that order would incorporate

7    that and would require us to produce that information to the

8    special master.  That's the first component of that ruling.  So

9    it's reflective of -- that that would be tied in to your

10   ruling.

11           THE COURT:  All right.

12           MR. ANTHONY:  The second component to that is there

13   are some -- there were questions about communications by

14   Midland with some of its other -- people that it buys contracts

15   from, those kinds of things, and among them specifically was

16   Bank of America.

17           Mr. Bennett issued a subpoena duces tecum to Bank of

18   America.  Among Bank of America's responses were, we're

19   reluctant to produce certain kinds of documents because there's

20   an existing nondisclosure agreement as between Bank of America

21   and Midland.  We have said to Mr. Bennett, we will not use that

22   as a basis to withhold the production subject to the fact that

23   they are subject to the protective order entered in this case.

24           MR. BENNETT:  We actually -- Bank of America has

25   Delaware counsel.  We have met and conferred about their

1   subpoena response, and he represented to me in our telephone

2   conference that the defendant's attorneys, which I'm certain

3   and has been confirmed is not the Virginia attorneys, have told

4   them not to produce this information asserting -- don't provide

5   the documents to us in response to our subpoena because of this

6   mutual nondisclosure agreement.  Bank of America says they will

7   produce these documents if they -- if it's okay with Midland

8   and Encore.

9            I sent a letter last week to Mr. Anthony, or an

10  email, I believe Friday.  Mr. Anthony was speaking to his

11  clients.  Certainly it's not the Virginia folks that are

12  telling them not to produce it.

13           THE COURT:  It's not the Virginia counsel?

14           MR. BENNETT:  Not the Virginia counsel.

15           THE COURT:  Who is telling them?

16           MR. BENNETT:  They said the defendant's attorneys.

17           THE COURT:  Which attorneys?  Where?

18           MR. BENNETT:  I don't have the answer to that

19  question.

20           THE COURT:  I don't know what to do, but the simple

21  answer to that is that Midland and Encore can produce the

22  documents themselves.

23           MR. ANTHONY:  I think that's where the rub is, Your

24  Honor.  We've produced what we think are the documents.  In an

25  abundance of caution, Mr. Bennett issued a subpoena duces tecum

```
 1   to Bank of America as well, and we're saying that we will not
 2   use the nondisclosure agreement as a basis to force Bank of
 3   America not to produce those documents.
 4          THE COURT:  You hereby give permission to Bank of
 5   America to produce the requested documents in Delaware.
 6          MR. ANTHONY:  Provided that they are produced under
 7   the protective order in this case, Your Honor, because there
 8   are some documents we think we haven't seen.
 9          THE COURT:  Is that satisfactory with you?
10          MR. BENNETT:  It does, except it would be as to all
11   of these third-party --
12          THE COURT:  We're talking about right now the Bank of
13   America.  You can't talk about the other third parties in the
14   same breath you are talking about what's going on involving the
15   Bank of America in Delaware.  We're talking about one topic at
16   a time.
17          MR. BENNETT:  Yes, Your Honor.
18          THE COURT:  Do you agree with what he just said?
19          MR. BENNETT:  With respect to Bank of America, yes.
20          THE COURT:  Okay.  Now, that's all we were dealing
21   with, was Bank of America.  So the answer is Midland and Encore
22   -- the Midland defendants will produce the requested
23   communications to the Bank of America.  Over what time period?
24          MR. BENNETT:  It was in 2011, so we could just say
25   2011.
```

1          THE COURT:  All right, in 2011, and so -- and the

2  Midland defendants agree to advise its counsel in Delaware that

3  it has no objection to the production of these documents

4  provided that they are made subject to the protective order

5  that's been entered in this case; is that right?

6          MR. ANTHONY:  I think that's right except its counsel

7  is Bank of America's counsel; correct?

8          THE COURT:  No.  It is Bank of America's counsel who

9  is being told that your client's counsel has barred the use of

10  this.

11          MR. ANTHONY:  My obligation is to communicate to Bank

12  of America's counsel.

13          THE COURT:  And to your client's counsel in the

14  Delaware subpoena issue.

15          MR. ANTHONY:  We're on the same page.  I just wanted

16  to make sure, Your Honor.

17          THE COURT:  There are other third parties regarding

18  your process for creating, preparing, and signing collection

19  affidavits.

20          MR. BENNETT:  Yes, Judge.

21          THE COURT:  Who else do you want to include in there?

22          MR. BENNETT:  HSBC.

23          THE COURT:  Who?

24          MR. BENNETT:  HSBC.

25          THE COURT:  And what else?

1          MR. BENNETT:  Target Receivables.

2          THE COURT:  That is a specific entity in your

3     question.

4          MR. BENNETT:  Correct, Judge.  And Capital One.

5          THE COURT:  And do you persist in objection to

6     producing those, or do you agree to produce those?

7          MR. ANTHONY:  Your Honor, two parts.  We believe

8     we've produced what it is that Midland has.  As it deals with

9     HSBC, Target, or Capital One, what I've told Mr. Bennett is we

10    are happy to honor the same commitment that we did with Bank of

11    America, that we would not strictly enforce a confidentiality

12    agreement provided that these documents were produced under the

13    protective order.

14         What I told Mr. Bennett I can't -- I don't know if

15    HSBC or Capital One or Target has some other reason or basis

16    for objecting to them, but it's not the disclosure reason.

17    We're not the reason why they're holding that back.

18         THE COURT:  Midland and Encore will produce the

19    communications with HSBC, Target Receivables, and Capital One

20    respecting -- in 2011 again; right?

21         MR. BENNETT:  Yes, Judge.

22         THE COURT:  Respecting the creation, preparation,

23    and/or signing of collection affidavits, and counsel here will

24    inform -- counsel for the Midland defendants here will inform

25    counsel for Target Receivables, HSBC, and Capital One that it

1    wants the documents produced by those entities, and it doesn't

2    want to enforce any confidentiality aspect to the agreement

3    with those entities; is that correct?

4            MR. ANTHONY:  I think that's correct.  The only thing

5    I would caveat, Your Honor, is I don't believe I know who the

6    counsel is for Target.

7            MR. BENNETT:  We don't know either yet.

8            MR. ANTHONY:  We don't know that, so I don't know who

9    to affirmatively --

10           THE COURT:  If I were going to tell you that tomorrow

11   morning you could get Target Receivables' $150 million annual

12   account and legal business, do you think you or Mr. Lynch or

13   Mr. St. George could find the name of the general counsel of

14   Target Receivables and get that person on the phone?

15           MR. LYNCH:  Mr. Lynch could.

16           THE COURT:  Mr. Lynch could in a minute.

17           MR. ANTHONY:  You know I would do my best, Your

18   Honor.

19           THE COURT:  None of you would let Mr. St. George get

20   near the thing at that time.

21           MR. ANTHONY:  I didn't want -- I will certainly do my

22   best, Your Honor.  I just didn't want there to be something on

23   the record that -- I don't know who that person is, but we'll

24   certainly do our best.

25           THE COURT:  That solves request for production two.

1    I haven't gotten very far so far.  Draft and final affidavit

2    manuals is B.

3              MR. BENNETT:  That's done, Judge.  We resolved that.

4    You've already ruled on that.

5              THE COURT:  And they are to be produced.  Are we in

6    category C?

7              MR. BENNETT:  C, Judge.

8              THE COURT:  "Communications with Dominion Law and

9    Glasser and Glasser or any other law firm that collects Midland

10   funding accounts in the State of Virginia since January 1,

11   2006, to the present."  On any subject?

12             MR. BENNETT:  Judge, we had actually narrowed it, but

13   this is the entirety of the issues regarding their privilege

14   log.  They have provided a privilege log.  We don't contend it

15   was untimely.  We contend that the matters so described do

16   not -- the evidence that they wouldn't be privileged and that

17   they would have been waived for the additional reasons that we

18   have outlined in our previous brief --

19             THE COURT:  No, you can't say things like that to me

20   anymore ever again, because I don't understand what you're

21   talking about.  You can tell me something like this if you'd

22   like to:  This is a matter that is addressed in plaintiff's

23   motion to overrule defendant's privilege objections and to

24   compel discovery responses and unobstructed witness testimony.

25   Is that the motion that it dealt with?

```
 1              MR. BENNETT:  That is, Your Honor.

 2              THE COURT:  Then we defer that unless you all have

 3     reached agreement until we hear argument on that; right?

 4              MR. BENNETT:  Yes, Your Honor.

 5              THE COURT:  Okay.  Use the correct name of the

 6     pleading and the docket number so there isn't any

 7     misunderstanding.  There's so many different pleadings that you

 8     all have filed here that are sort of interrelated that it's

 9     very hard to understand the shorthand you all use.

10              Next one is category D, "Communications regarding the

11     two-third computer system (YGC and XDocs) used to manage

12     third-party collections," request for production.

13              MR. BENNETT:  Yes, sir.  There are two components to

14     this.

15              THE COURT:  Have you agreed?

16              MR. BENNETT:  In part we have.  The defendant has

17     agreed to produce all of the documents that are not within

18     their privilege log which would include at least contracts

19     between these third parties, YGC and XDocs.

20              THE COURT:  I don't want to know what it includes.

21     All documents not within the privilege log, does it meet the

22     request?

23              MR. BENNETT:  Is that a fair description, counsel?

24              MR. ANTHONY:  I think that's fair, Your Honor.

25              THE COURT:  All right.
```

```
 1              MR. BENNETT:  And we have a dispute about the

 2    privilege log that Your Honor would be addressing when we go

 3    back to the matter we've just heard.

 4              THE COURT:  What is the second thing you've agreed

 5    to?

 6              MR. BENNETT:  That's it.  The other we've not agreed

 7    is the issues within the privilege log.

 8              THE COURT:  Number E.

 9              MR. BENNETT:  E you've already ruled on, Your Honor.

10              THE COURT:  It's encompassed in what?

11              MR. BENNETT:  E is a request you've already dealt

12    with that was on Exhibit A.

13              THE COURT:  Which one?  It's encompassed within which

14    one?  Request number eight in Exhibit A?

15              MR. BENNETT:  Yes, Judge.

16              THE COURT:  Do you agree, Mr. Anthony?

17              MR. ANTHONY:  I agree that you have already ruled on

18    that over my objections.

19              THE COURT:  And is that the right request, Request 8

20    in Exhibit A?

21              MR. ANTHONY:  Yes.

22              THE COURT:  All right.

23              MR. BENNETT:  Category F you've already ruled on.

24              THE COURT:  Which one?

25              MR. BENNETT:  Requests in Exhibit A.
```

1          THE COURT:  Which one?

2          MR. BENNETT:  Request nine, ten, and 12.

3          THE COURT:  You withdrew 12.

4          MR. ANTHONY:  I will agree with that, Your Honor.

5    You've already ruled on that earlier over our objections.

6          THE COURT:  But it's nine and ten only because he

7    withdrew 12.  Do you agree, Mr. Bennett?

8          MR. BENNETT:  Yes, Judge.

9          THE COURT:  Do you agree that's the correct request

10   in Exhibit A, nine and ten, that it's encompassed within that,

11   Mr. Anthony?

12         MR. ANTHONY:  That's my understanding.

13         THE COURT:  But 12 is no part of it.

14         MR. BENNETT:  Correct, Judge.

15         THE COURT:  We have a whole bunch of requests for

16   production.  I mean, I don't understand the system now.  You've

17   got E that we just did.  Now let's go -- F you just did, and

18   now there are a whole bunch of F before you get to G.  Where is

19   G?

20         MR. BENNETT:  No, it's -- actually in the bottom of

21   page 15 of 27, it is H.

22         THE COURT:  Where is G?

23         MR. ANTHONY:  Bottom of page 14, Your Honor, of

24   docket 124, Your Honor.

25         MR. BENNETT:  The heading was orphaned, Your Honor,

1   but you overruled our -- or you sustained, rather, the

2   objections and denied our motion with respect to 16.

3            THE COURT:  Corporate governance documents?

4            MR. ANTHONY:  This was the discussion we had, Your

5   Honor, about the articles of incorporation, the corporate

6   minutes, and whatever you ruled on earlier today.

7            THE COURT:  Yes, but I just excluded corporate

8   minutes.

9            MR. ANTHONY:  Correct.  It's just on this list, too.

10           THE COURT:  And what you told me was you produced all

11  the other materials, request number 16 in Exhibit A; is that

12  right?

13           MR. ANTHONY:  That is correct, Your Honor.

14           THE COURT:  And you have produced everything but the

15  corporate minutes, and I've sustained the objection to that.

16           MR. ANTHONY:  That's our recollection, Your Honor.

17           THE COURT:  All right.  Now we're in H.

18           MR. BENNETT:  We've withdrawn the issue in H and the

19  request in H, number 17, as a subject of the motion.  I, we've

20  narrowed this agreement to one document.

21           THE COURT:  "Documents from the seller of the James

22  account"; this is one document?

23           MR. BENNETT:  Yes, Judge.

24           THE COURT:  What is it?

25           MR. BENNETT:  There is a contract between Capital One

1    and the defendant by which the portfolio is sold and

2    transferred, and it governs that sale and transfer, and the

3    defendant does not agree to produce the un-redacted version of

4    that.  They redacted major parts of it.

5           Our position is we have a protective order in this

6    case.  The defendant should produce it.  The defendant did the

7    same thing in the Alabama trial and then at trial had to

8    produce the un-redacted version of that contract which is in

9    now the public file.

10          THE COURT:  It's in the public file in Alabama?

11          MR. BENNETT:  It is, but it's a different -- it's

12   Dell, it's similar.  This is the one with Capital One, the

13   James account, and the other accounts --

14          THE COURT:  What you need to do is be more precise,

15   because you just told me that this document was already in the

16   public file, and it's not.  It's the same kind of document that

17   the Court has previously ordered production.  What is wrong

18   with producing the contract?

19          MR. ST. GEORGE:  Your Honor, we've produced the

20   contract as well as every other document we got from James.

21   The dispute regards solely the redactions.  Our position is

22   that we've redacted pricing and other sensitive information.

23   It's just, frankly, irrelevant to this case.

24          I have, if the Court would like to consider it, the

25   un-redacted and redacted versions if you're inclined to review

1    the un-redacted versions.

2              THE COURT:  How much redaction is there?

3              MR. ST. GEORGE:  There's redactions on probably half

4    of the page, I would say.

5              THE COURT:  That's an awful lot to be reviewing.

6              MR. BENNETT:  We have a protective order in place,

7    Judge, including an attorney-eyes-only provision if it's that

8    secretive, but the pricing information, for example, was part

9    of the jury's calculation of punitive damages.  There was a

10   long discussion --

11             THE COURT:  Where?

12             MR. BENNETT:  In the Alabama trial, I'm sorry.  So

13   pricing information is certainly relevant.  They buy this for

14   pennies and, thus, they cannot afford --

15             THE COURT:  You mean they buy them for pennies --

16   they bought this from whom?

17             MR. BENNETT:  From Capital One.

18             THE COURT:  So this is a purchase agreement; right?

19             MR. BENNETT:  It's a purchase agreement, yes, sir.

20             THE COURT:  By which the Midland defendants buy what?

21   The accounts?

22             MR. BENNETT:  They buy a set of portfolio of

23   accounts.  The agreement governs what documents they're allowed

24   to ask for from Capital One, how much they paid for these.

25   They have to buy media if they want after the fact to come back

1    and get old account statements.

2              THE COURT:  Buy what?

3              MR. BENNETT:  Media.  The account statements, bills,

4    the like.  Our client was an identity theft victim.  Capital

5    One had previous disputes in which he had disputed this before

6    it was sold.  Capital One has provisions within the contract

7    that disclaim any liability to Midland because of those types

8    of issues.

9              There are major -- in the Dell contract, there were

10   chunks that the defendant had redacted that outlined ongoing

11   litigation regarding the purchase and sale of these debts by

12   Midland.  There's a lot of information that was redacted in the

13   *Brim* case we learned once we saw --

14             THE COURT:  Is that the Alabama case?

15             MR. BENNETT:  Yes, sir.  But we have a protective

16   order.  There's no basis to withhold it.  There's no risk to

17   the defendant.  They haven't shown any competitive disadvantage

18   or harm by providing the complete document, and I don't believe

19   that it's a remarkable request that we would like to see the

20   contract by which this defendant claimed our client was

21   obligated.

22             THE COURT:  Anything else?

23             MR. BENNETT:  No, sir.

24             THE COURT:  All right, objection is overruled.

25   Provide it.  It will be subject to the protective order, of

1    course.  You can designate it attorney's eyes only if you want

2    to.  All right, J.

3           MR. BENNETT:  Judge, I believe we have an agreement.

4    The defendant would be ordered -- the request would be

5    narrowed, and the defendant would be ordered to produce an

6    electronic version of the training and instruction manual or

7    program used for the affidavit validation program.

8           THE COURT:  Do you agree, Mr. Anthony?

9           MR. ANTHONY:  To the extent that we have that, yes,

10   Your Honor.

11          THE COURT:  Do you have it in writing but don't have

12   it electronically?

13          MR. ANTHONY:  I think from the point of our

14   perspective, Your Honor, we've not withheld anything, and so

15   Mr. Bennett has asked for a couple of different ways to ask for

16   the same thing, and we've agreed that if we have that, such as

17   a webinar or some sort of electronic walkthrough, that we'd

18   produce that, and so I just didn't want the Court to have any

19   impression that we withheld information that we think is

20   relevant.  He's asked for us to go back and check, and we've

21   agreed to do that.

22          MR. BENNETT:  The defendant says we don't have a

23   paper manual, we have screen prints.  We have asked for the

24   electronic version of it.

25          THE COURT:  So the defendant agrees to produce the

1    electronic versions of its training and instruction manual for

2    the affidavit verification process if there is such; is that

3    right?

4              MR. ANTHONY:  Yes.

5              THE COURT:  All right, that resolves number J.

6              MR. BENNETT:  K and L, Your Honor, we have resolved

7    by agreement.  These are the requests 27, 30, 31.

8              MR. ANTHONY:  34 and 44 that you resolved just a

9    short while ago, since the break, from the FCRA compliance

10   information.

11             THE COURT:  It's encompassed by the ruling on

12   requests 27, 30, 31, 34, and 44 in Exhibit A; right?

13             MR. ANTHONY:  That's correct, Your Honor.

14             THE COURT:  And the same is true of L; is that right?

15             MR. BENNETT:  Yes, Judge.

16             THE COURT:  All right, M.

17             MR. BENNETT:  M you have also resolved.  This is the

18   previous testimony of employees, request 36 in interrogatory

19   four.

20             MR. ANTHONY:  You got this, Your Honor, through

21   interrogatory four when we talked about that a few minutes ago.

22             THE COURT:  You all keep talking about interrogatory

23   number four, but there is no interrogatory number four that is

24   referred to on Exhibit A.

25             MR. ANTHONY:  This is -- Your Honor, you're right.

1   It's when we started this afternoon, we started --

2          THE COURT:  Yes, I know.  When we were talking about

3   number 36, you said you were talking about request number 36

4   and interrogatory number 44, and we discussed how you were

5   going to comply with those two things; right?

6          MR. BENNETT:  Yes.

7          MR. ANTHONY:  Yes.  You are right, Your Honor.  When

8   we came back from the break, you started with the

9   interrogatories, and then we've gone to request for production

10  to make sure we haven't missed any, and so your ruling on

11  interrogatory four about the prior statements is encompassed in

12  their request for production 36 where they're asking for the

13  document portion of it.

14         THE COURT:  So it is encompassed by the ruling I made

15  respecting request 36 in Exhibit A which includes interrogatory

16  four.

17         MR. ANTHONY:  That's correct.

18         THE COURT:  All right.  Okay.  And we have N.

19         MR. BENNETT:  N, we would withdraw for the purposes

20  of the motion request 38, and we have an agreement with respect

21  to seven.  The defendant will provide us a statement of the net

22  worth of the defendants.

23         MR. ANTHONY:  That is correct, Your Honor.

24         THE COURT:  For each year?  For each of those years?

25         MR. ANTHONY:  Yes.  Just to be clear, Your Honor,

1    there's a net worth calculation only for one of the entities,

2    and we've stipulated that the net worth of the other two is

3    incorporated in, so I don't want to give the impression that

4    we're going to be giving nine net worth figures --

5         THE COURT:  You mean it's a consolidated financial

6    statement?

7         MR. ANTHONY:  I'm sorry.

8         THE COURT:  You mean it's a consolidated financial

9    statement?  Is that what you are providing, is a --

10         MR. ANTHONY:  We have provided the annual reports for

11    the parent, and Mr. Bennett has requested that we take the

12    number and take it out of the document and put it into our

13    interrogatory answer, and we've agreed to do that.

14         THE COURT:  You agree?

15         MR. BENNETT:  We agree with that, Judge.  In

16    answering your question, they haven't consolidated the

17    financial statement, but in the answer that they're providing

18    by agreement is not the consolidated number.  It includes a

19    stipulation that the net worth as to the parent, as to the

20    consolidated net worth number is the net worth number that is

21    applicable for the two subsidiary codefendants.

22         THE COURT:  Do you agree?

23         MR. ANTHONY:  Yes.

24         THE COURT:  All right.  So you are filing an

25    interrogatory answer that provides a statement of net worth for

1    each year for the parent and a statement that the parents and

2    the two subsidiaries is the same figure; right?

3              MR. ANTHONY:  It's all incorporated into one number,

4    that's correct, Your Honor.

5              THE COURT:  Right, okay.  O.  What about O?

6              MR. BENNETT:  I think this is -- I think it's the

7    only issue remaining.  The others, you'll see in a moment, were

8    resolved already, but we are at disagreement.  We had asked for

9    a list of previous lawsuits.  This Court has ordered that in

10   multiple occasions, as have multiple judges in our district.

11             In fact, this Court has ordered it in the case *Snyder*

12   *v. Experian* in which Troutman Sanders was counsel and has

13   ordered it in a case, Mr. Duff v. Sherman --

14             MR. ANTHONY:  Also ordered it in the *Schneider v.*

15   *Midland*, a case in which Troutman Sanders was not then

16   defending, but --

17             THE COURT:  Defending.

18             MR. BENNETT:  Defending Midland in that case.  But

19   the Fourth Circuit has, in fact, in *Dalton* -- we cited the

20   language in our brief, and it's cited again at page 24 of 27 at

21   docket 124, the Fourth Circuit's *Dalton* decision includes as

22   factors to consider whether a Fair Credit Reporting Act

23   violation was willful, whether or not the defendant has

24   received complaints, whether there have been complaints by

25   other consumers alleging similar conduct.

```
 1              THE COURT:  First, number 43 says, "produce the
 2     complaint," and interrogatory says, "and identify every suit."
 3              MR. BENNETT:  Yes, sir.  The response in the
 4     meet-and-confer process and, in fact, Mr. Rose includes --
 5     their employee includes an affidavit that says, we may have as
 6     many as a thousand lawsuits against us, and we would have to
 7     sort out which of them were Fair Credit Reporting Act (s)(2)(B)
 8     claims.
 9              Our response was, we'll pay for the copy costs, you
10     give us a copy of the thousand, and we'll sort out which
11     ones -- we'll read them and see which ones are Fair Credit
12     Reporting Act or not.
13              THE COURT:  For what period?
14              MR. BENNETT:  Judge --
15              MR. ERAUSQUIN:  Judge, if I may, the last time I
16     asked you to rule on this, you said that the appropriate period
17     was three years prior to the acts complained of which was your
18     ruling in Schneider v. Midland.
19              THE COURT:  Which would begin when?  What would a
20     date be for this case?
21              MR. BENNETT:  It would be April 2008, Judge.
22              THE COURT:  Mr. Anthony, your position?
23              MR. ST. GEORGE:  Your Honor, I'll address it.
24              THE COURT:  All right.
25              MR. ST. GEORGE:  We've produced in our opposition a
```

1    declaration of Paul Rose who is in-house at Midland.  He

2    attested that Midland has no system by which they can search

3    for claims, let alone specific pleadings such as a complaint.

4         So strict compliance with the request would require

5    Mr. Rose or one of his paralegals to go into the system and

6    drag out the complaint for each document and then review to see

7    if that complaint has a 1681(s)(2)(B) as well.

8         We recognize the marginal relevance of this

9    complaint, and we think it's outweighed by the burden that Mr.

10   Rose has attested to.  We also offered to stipulate that we

11   have been sued under this subsection within the past three

12   years to provide the sort of notice that we think Mr. Bennett

13   is looking for.

14        For that reason, we think the marginal relevance of

15   the request is outweighed by the burden of even retrieving this

16   information.

17        THE COURT:  All right.  How do you deal with the fact

18   they are willing to pay for copies of every complaint?  You

19   don't have to review it.  You can just -- you just produce it,

20   they'll pay for the copy, and then they'll review it and see

21   what it says.

22        MR. ST. GEORGE:  Well, there's still the process that

23   we would have to go in in order to get the complaints in the

24   first instance, and we think that the relevance would just be

25   overcome by the stipulation we're willing to do in that regard.

 1          THE COURT:  Surely you have files on all this

 2   material.

 3          MR. ST. GEORGE:  Somewhere within the Midland server,

 4   probably scattered in multiple locations, we could go and get

 5   the files, but there's no central repository for all this

 6   information.  That's what is, perhaps, the most burdensome

 7   component of all this, is even getting that information in the

 8   first place with 1,100 complaints scattered throughout

 9   Midland's servers.

10          THE COURT:  All right.

11          MR. BENNETT:  It suggests that they're randomly saved

12   on a server.  It's an incredible assertion.  It's certainly not

13   what Mr. Rose says.  All Mr. Rose said to substantiate burden

14   is 1,100 of these, and we'll have to review them all.  He

15   doesn't say they're scattered throughout the universe of the

16   computer world.

17          MR. ST. GEORGE:  Your Honor, Judge, I've talked to

18   Mr. Rose extensively, and in paragraph eight of his

19   declaration, he says, "The defendants do not maintain a

20   database of documents relating to third-party litigation that

21   is searchable according to claims asserted in this action."

22   It's my understanding that Midland's system -- whatever

23   particular attorney at Midland might be working on a case might

24   have their own locations to be saved, but there is no central

25   database that houses all this information.

1          THE COURT:  All right.  Anything else?

2          MR. BENNETT:  No, sir.

3          THE COURT:  The objection is overruled.  They are to

4    provide from the period April 1, 2008, to the present.  Part

5    two, what's the filing date of this case, April 1, 2011?

6          MR. ST. GEORGE:  April 7th, Your Honor.

7          THE COURT:  All right, April 7, 2011, a copy of each

8    complaint filed in every lawsuit in which it's been sued for an

9    alleged violation of 15 U.S.C. Section 1981(s)(2), and if it

10   does that, then it doesn't have to answer the interrogatory.

11   The cost of copying those complaints and shipping them to the

12   plaintiff will be borne by the plaintiff.  All right?

13         MR. BENNETT:  That concludes the remaining issues.

14   Judge, with respect to P, you have already ruled on that.  That

15   is interrogatories one and two we discussed with respect to the

16   Exhibit A resolutions.

17         THE COURT:  Request number what?

18         MR. BENNETT:  It's interrogatories one and two at the

19   bottom of Exhibit A, or end of it, second to last page.

20         THE COURT:  All right.  And how about --

21         MR. BENNETT:  Q, we've agreed to withdraw as a basis

22   of our motion interrogatory nine which is the issue in Q.

23         THE COURT:  So that's withdrawn.

24         MR. BENNETT:  Yes, sir.  All right, now, that brings

25   us to the privilege issue in number, motion -- do you all need

1    a break?

2           MR. LYNCH:  Just a quick break, two minutes or five

3    minutes.

4           THE COURT:  There's no such thing as two minutes or

5    five minutes.  We'll try for ten.

6

7           (Recess taken.)

8

9           THE COURT:  Just so the record is straight, while we

10   had this discussion this morning and this afternoon, we were

11   working off a document that the plaintiff handed me, this

12   Exhibit A.  It was Exhibit A, and its docket number is 94-1

13   filed 12/14/11 and has four pages.  And then we also were

14   working, in part, on the reply brief of the plaintiff in the

15   motion to compel and for sanctions, docket number 124,

16   beginning with the headings on page six of 27 and going through

17   page 27.  And the categories are listed alphabetically therein,

18   and there's some numbers in between, but we had those

19   discussions, and that's what they are related to and that's

20   what the orders will be tied to and the obligations are tied

21   to.  All right.

22          MR. BENNETT:  Yes, Your Honor.

23          THE COURT:  So everybody understands.

24          MR. ANTHONY:  That's our understanding, Your Honor.

25          THE COURT:  All right, now, we are now dealing with

1    docket number 93, plaintiff's motion to overrule defendant's

2    privilege objections and to compel discovery responses and

3    unobstructed witness testimony.

4           Now, as I understand it, you are, in essence, arguing

5    that the crime-fraud exception, which I have said is a misnomer

6    in earlier opinions, which operates to bar both claims of

7    attorney-client privilege and work product privilege, has been

8    established, and it is that that constitutes the waiver of the

9    privilege as to which privilege is claimed on the privilege

10   log; is that correct?

11          MR. BENNETT:  That is one of the three reasons that

12   we believe that the privilege log should not govern or the

13   privilege should not avail to these documents.

14          THE COURT:  What are the others?

15          MR. BENNETT:  Well, the first is we don't believe

16   these documents are properly attorney-client privilege by their

17   nature and description.  The second is that, again, the

18   misnomer, but the tort crime fraud waiver, and the third is the

19   subject matter waiver which is that defendant has produced

20   significant evidence for its benefit in this case that -- or

21   within the same subject matter that necessarily relate to the

22   documents and related deposition testimony.

23          THE COURT:  And we're dealing here, by the way, for

24   the record, with docket number 93, and its briefs are number

25   94.  The response -- I don't have the docket number for the

1    response.

2              MR. LYNCH:  It should be 107, Judge.

3              THE COURT:  107, and then the reply is 121.  Now, are

4    you saying by your first argument that the documents are not

5    subject to attorney-client privilege, that the only privilege

6    being claimed is the attorney-client privilege, not the work

7    product privilege?

8              MR. BENNETT:  With respect to those documents within

9    the privilege log that we challenge, they're only identified as

10   attorney-client privilege.  The work product is -- we don't

11   challenge that, but it's --

12             THE COURT:  Which documents are you challenging?

13             MR. BENNETT:  Does the Court have document 107-5?

14             THE COURT:  No, I don't think so.  Do you have a copy

15   of it?  Anybody have a copy of 107-5?

16             MR. BENNETT:  I can look as I need to over Mr.

17   Lynch's shoulder.

18             THE COURT:  Okay, go ahead.

19             MR. BENNETT:  I'm sorry.  There were two filed.  I

20   don't need a copy.  It's also 94-3.  We filed it as an exhibit,

21   and then the defendant did.

22             THE COURT:  Okay.  It's the same document?

23             MR. BENNETT:  It is, Your Honor.

24             THE COURT:  All right.  What is your theory as to

25   why -- you say none of these documents that are labeled AC,

1   which is attorney-client privilege, are privileged at all.

2            MR. BENNETT:  Correct, Judge.

3            THE COURT:  Why?

4            MR. BENNETT:  Judge, these are not the -- these

5   documents do not contain, despite their description, the

6   exchange of advice, legal advice between -- Dominion Law or

7   Glasser and Glasser is the law firm that, in theory, would be

8   giving advice to the defendant or providing -- there would be

9   communications from the defendant provided to the third-party

10  attorneys by which those third-party attorneys would then be

11  providing advice.

12           By the description of each of these, these are

13  documents -- first of all, these are all documents that are

14  coming from Midland to the attorneys, not vice versa.  They're

15  not work product documents, they're not disclosed with work

16  product --

17           THE COURT:  There's no claim of work product.

18           MR. BENNETT:  Right, Judge.

19           THE COURT:  On the particular documents you are

20  talking about.

21           MR. BENNETT:  Correct, Judge.  So these are

22  communications coming from Midland to the law firm which means

23  there are some circumstances where those communications could

24  be privileged if they're communications by which the client is

25  seeking advice or providing information that would form the

```
 1    basis of the advice, but that's not what any of these, by their

 2    description, entail.  These are instructions by Midland to

 3    these third parties about how to operate the computer

 4    procedures, how to create --

 5              THE COURT:  Instructions to what third parties?

 6              MR. BENNETT:  Well, for example, number one --

 7              THE COURT:  A third-party law firm.

 8              MR. BENNETT:  The third-party law firm.  These are

 9    the instructions by Midland to the third-party law firm telling

10    that third-party law firm how to conduct the collection

11    business for Midland.

12              THE COURT:  Well, they claim work product privilege

13    as to that.  Which --

14              MR. BENNETT:  They haven't claimed that, Judge.

15              THE COURT:  Which documents are you talking about?

16              MR. BENNETT:  One through nine.  Now, they claim work

17    product on ten.

18              THE COURT:  As best I can tell, the column in the

19    last column on the right has a W.

20              MR. BENNETT:  That says withheld.  If you look at the

21    top, whenever they say WP, it's work product.  The W means

22    they've withheld it versus R, they might have redacted it.

23              THE COURT:  I see, okay.  All right, so these are

24    instructions from the company to its law firms about its credit

25    management firm manual, provide instructions in connection with
```

1  collection actions.

2        MR. BENNETT:  Yes, sir.  So, for example, the

3  instructions telling Dominion Law how they can create and

4  request an affidavit, mechanically how they go into the

5  computer system, log in, input the data that the affiant will

6  then later sign.

7        The descriptions here don't evidence any solicitation

8  of advice, solicitation by Midland for advice from the

9  third-party law firm, nor any transmittal of information to the

10  third-party law firm; nor, in fact, are there communications

11  internally between -- it's not even a matter of Encore advising

12  itself or the legal department at Encore giving legal advice to

13  its own employees.

14        THE COURT:  We're dealing with one through nine now.

15        MR. BENNETT:  Yes, sir.  So the first basis is that

16  these aren't properly attorney-client privilege.  There's

17  nothing --

18        THE COURT:  All right.

19        MR. BENNETT:  -- about them that seems to include

20  legal advice.  The fact is it has -- there's a lawyer -- the

21  word lawyer is involved in the relationship, but that's it.

22        THE COURT:  All right.

23        MR. BENNETT:  That is the first basis.

24        THE COURT:  All right, crime-fraud exception.

25        MR. BENNETT:  Judge, the defendant has already

1   testified, and this deposition is part of the record, Nancy

2   Khols' deposition, in which the defendant testified that the

3   affidavit process is fully initiated by the third-party law

4   firm.  Encore tells the third-party law firm, here is the

5   procedure.

6           The third-party law firm then inputs the affidavit

7   information, it spits out 7:45 in the morning from the Midland

8   computer.  A stack of these are sent around to the affiants who

9   sign them and then take them and a notary notarizes them or

10  reads them and then later signs them in a stack with the notary

11  notarizing them.

12          They send them back to the third-party law firm.  The

13  third-party law firm then attaches the exhibits, the statement

14  of account which is necessary in Virginia to get a default

15  judgment, never seen, of course, by the affiant, but then the

16  Dominion Law firm or Glasser and Glasser law firm staple and

17  attach the statement of account as if it's part of the

18  affidavit, and they present these affidavits, fully aware of

19  the deceit that we think, allege that they are perpetrating,

20  both in terms of they know the substance of the affidavit is

21  false, and they know that the claim, certainly the statement of

22  account is something the affiant would be declaring and then

23  presenting this to the courts as well as using it to send as a

24  collection tool to the consumers like Mr. James.

25          We also, independent of that, Judge -- that's the

1    RICO claim, but as this Court has previously said, it really is

2    a tort crime-fraud exception, and so if nothing else, the fact

3    is that the conduct that is alleged here is, at a minimum,

4    violative of the Fair Debt Collection Practices Act, and it

5    is --

6              THE COURT:  Does that make it a fraud, a tort, or a

7    crime?

8              MR. BENNETT:  It makes it a tort, and we also have

9    abuse of process, and we attached a string of cases.  This

10   Court had some discussion when there was the manipulation of

11   evidence in one of your previous cases, that the judicial --

12   the involvement of lawyers in improper conduct before or within

13   the judicial system triggers this same exclusion.  And, in

14   fact, it's a misnomer in two ways.

15             It's not simply crime-fraud, but it's also not an

16   exception, but, rather, it isn't subject to privilege.  It's

17   the burden of the movant or of the party seeking to withhold

18   the evidence to establish that it is properly privileged, and

19   the -- if it's subject to the tort crime-fraud exception, then

20   it's never privileged in the first place which is why it's a

21   misnomer as an exception.

22             THE COURT:  All right.  What evidence do you have

23   that what they were doing is prima facie evidence of a tort

24   crime or fraud?

25             MR. BENNETT:  Well, Judge, we've attached the Nancy

1  Khols deposition.  It's actually been filed in multiple

2  pleadings.  I guess the defendant's position is that we didn't

3  attach it as an exhibit in this motion.  We have established

4  that this is what their procedure is.

5       THE COURT:  Has some court held this is an unlawful

6  procedure?

7       MR. BENNETT:  Judge, yes.

8       THE COURT:  Who?  What court?

9       MR. BENNETT:  The *Brent* decision out of the Northern

10  District of Ohio held that it's unlawful for an affiant or for

11  the debt buyer to have an affiant claim to have knowledge of an

12  underlying indebtedness when it doesn't have -- when the

13  affiant doesn't actually have knowledge of the underlying

14  indebtedness.

15       The defendant's response you already heard which is

16  we've changed our affidavit because now we claim -- we add the

17  comma or business records.  But even in this instance, the

18  evidence is that they aren't familiar with the business records

19  unless the business records mean something other than the

20  records of the business.

21       That is -- the Kohls deposition, the witness

22  testified, for example, that -- her definition, as has been

23  taught to her by Midland, is that a business record is the name

24  Gilbert within the field.  She doesn't ever review the actual

25  account statements, credit card agreements, account history,

1  disputes, communications, none of it.  She reviews this one

2  screen.

3          The only issue then is whether or not it would be

4  sufficient to survive an unopposed -- to make an unopposed

5  prima facie case that it could violate the FDCPA, constitute

6  abuse of process, or constitute a RICO violation.

7          THE COURT:  All right, anything else?

8          MR. BENNETT:  With respect to that basis, no, Judge.

9          THE COURT:  Waiver.

10          MR. BENNETT:  The subject matter waiver, Judge, the

11  defendant -- in fact, the defendant has produced the actual

12  operating agreement between Dominion Law and itself but has

13  redacted parts of it.  It has included within that Dominion Law

14  agreement, included much of the discussion that would be within

15  these documents here, much of the evidence that apparently

16  would be in these same type of documents regarding how Dominion

17  Law is supposed to conduct itself.

18          For example, we now know from the un-redacted part of

19  the agreement that Dominion Law is instructed that if any

20  consumer who receives one of these affidavits contests the

21  Midland case, they are instructed to nonsuit or dismiss the

22  case.  Dominion Law is instructed not to try to prove a case.

23          We know that because of the un-redacted parts that

24  made it through the discovery process of the Dominion agreement

25  or operating agreement that Midland has provided to Dominion.

1    In many of the matters here, the defendant has testified about

2    the way that Midland would request an affidavit, how -- the

3    Kohls deposition, how Midland would proceed to put in the

4    information that would then become -- that would output as an

5    affidavit for the employee at Midland to swear was their work

6    and to sign. We know that the process --

7             THE COURT: That was done for their benefit, you say?

8             MR. BENNETT: Well, no, Judge, but when the affiant

9    says, I reviewed the documents and then there's an account

10   statement attached to that affidavit, Dominion Law is the

11   entity that after the fact attaches that account statement.

12   It's actually a Dominion Law printout. We know that testimony,

13   and that is -- that is the same type of evidence --

14            THE COURT: What is the selective disclosure for

15   tactical purposes? One is the operating agreement they

16   produced for their own reason you say.

17            MR. BENNETT: Yes, sir.

18            THE COURT: Why did they do that?

19            MR. BENNETT: Well, because parts of that would

20   establish what would be a more innocent relationship with

21   Dominion.

22            THE COURT: All right. And then the testimony, did

23   they do that?

24            MR. BENNETT: The testimony in the Nancy Kohls

25   deposition testimony, their witness testified that -- well, for

1    example, their witness testified that she did not know or --

2    and she's the one who would know, as to how it is or why

3    Dominion Law would be attaching these account statements to the

4    affidavits as if they had come from her.

5         And so we should be able to discover what Dominion

6    was told about attaching account statements in the creation and

7    use of these affidavits.  Midland is claiming innocence,

8    blaming its -- Dominion Law in the testimony that it so far

9    offered.

10         It has produced witnesses that have described the

11   affidavit process as it's officially created but then refuse to

12   talk about the -- how Dominion Law actually would implement

13   that idealized procedure that Dominion describes.

14         THE COURT:  Talked about what?

15         MR. BENNETT:  Well, described here is what our

16   affidavit procedure is on paper.  We see from documents that

17   that's not how it results.  Dominion Law is a critical cog, a

18   major -- not just an existing but at the core of creating the

19   affidavit process.  They are the entity that actually requests

20   and inputs all the data at the instruction of Midland into the

21   Midland computer, and so to say that we can't discover the

22   Dominion side of evidence and we should only look at the

23   official policy statements, essentially almost press release

24   type testimony of the defendant about how it abides by the law,

25   it's created a better affidavit process, doesn't do what it did

1  before, and not allowing us to delve into and discover the

2  mechanics of the current affidavit process puts a hand tied

3  behind our back while the defendant is unfettered in its

4  selective use of testimony.

5          THE COURT:  Anything else?

6          MR. BENNETT:  No, sir.

7          THE COURT:  All right.  Who is going to argue?

8          MR. LYNCH:  I'm going to argue it, Judge.  Judge, I

9  think it goes without saying that the issue of a waiver of a

10  privilege, especially when you're talking about something like

11  the crime-fraud exception, is a serious matter, and what I'd

12  like to start with is something that we believe was unfair in

13  this process.

14          Opposing counsel, to support the crime-fraud

15  exception, has to have more than just allegations, has to have

16  evidence, and there's good law on that that we've cited in our

17  briefs.  When they filed their motion, Judge, they didn't

18  attach one document, not a deposition transcript, not this

19  collection agreement between Midland and Dominion Law

20  Associates, nothing.  Didn't attach one piece of paper, one

21  ounce of evidence at all.

22          So when we had to reply to their motion on the

23  crime-fraud exception and to overrule privileges, they didn't

24  assert any evidence and just wrote a story in their brief.

25          So we responded as good as we could in our brief in

1    opposition, but they've got the burden to show that the

2    crime-fraud exception applies, and how can you file a motion on

3    that issue without any supporting evidence?  We believe you

4    can't just put your supporting evidence in the reply brief.

5    You had the burden --

6              THE COURT:  It's in the reply brief, isn't it?

7              MR. LYNCH:  What, Judge?

8              THE COURT:  They had attached a whole lot of

9    information to the reply brief.

10             MR. LYNCH:  Some in the reply brief, but I don't

11   think they've cited the exact testimony from Nancy Kohls at

12   all.  That's one procedural -- when you're dealing with

13   something this serious, we're entitled to see exactly what

14   evidence they're relying on, evidence, not a brief written by

15   Mr. Bennett and Mr. Erausquin telling a story.

16             What is the page in Nancy Kohls' deposition that

17   they're relying on, what is the document that they're relying

18   on to show the crime-fraud exception.  This is a very serious

19   issue to accuse a company and sue them for RICO for a

20   crime-fraud exception.

21             THE COURT:  Your client's conduct has been held to be

22   unlawful in the *Brent* case according to them as respects an

23   affidavit that is very similar to this one according to them.

24   Do they show anything about the similarity of the affidavits in

25   the papers?

1          MR. LYNCH:  Not at all, Judge, and guess what we did

2     in our opposition brief which is 107, and it's page 14.  We did

3     a side-by-side comparison of the affidavits.  Mr. Bennett stood

4     in front of this Court and said there was like a comma

5     difference between the affidavits.  There's a huge difference

6     between these affidavits, and we've got a side-by-side

7     comparison.

8          In the affidavit that was held by the *Brent* court to

9     be unlawful, the affiant, Judge, was saying they had personal

10    knowledge of the account and all the financial information, and

11    when the judge ruled in *Brent* that that affidavit was unlawful,

12    the judge did give some guidance in the opinion about, you

13    know, what a correct affidavit would be, and now there's a --

14    the judge has heard from the earlier discovery they've

15    appointed somebody to kind of monitor the process.

16          But if you look at the new affidavit, Judge, which is

17    on page 14 of document 107, the new affidavit says they have

18    personal knowledge after looking at essentially the business

19    records or documents reflecting the business records, and as

20    I've mentioned earlier in the hearing, Judge, that type of

21    affidavit has been approved by other federal courts relating to

22    other companies, and I'm not saying they are word for word the

23    same affidavits, Judge, but that type of affidavit.

24          THE COURT:  From what I've heard you all say about

25    these things, and nobody seems to dispute it, what is being

1    attested to is familiarity with the business record isn't the

2    business record.  In other words, they are not familiar with

3    any such thing as a business record.  They're familiar with a

4    computer screen, but they're not familiar with any business

5    record that makes a difference about these affidavits, i.e.,

6    the statement of accounts.

7              It's one thing to say I know what people's names are.

8    It's another to say what the substance of the claim is, and

9    that's the problem I'm having.

10             MR. LYNCH:  You'd have to see the actual manual

11   validation database.  That database is part of Midland's

12   business records.  That's how they have their account

13   statements, and it all is -- the interface is the business

14   records.

15             The affiant is looking at the business record, has

16   access to all the documents, and has all the information in

17   front of them when they complete the affidavit.  And that was

18   from Nancy Kohls' deposition.  This notion that there's just a

19   computer screen that just only has a name on it is not

20   accurate.  This manual validation program is updated every day.

21             THE COURT:  Where is the information about the

22   account, the substance of the account?

23             MR. LYNCH:  It's part of the manual validation

24   program.  It's updated nightly.  This document, Judge, every

25   day -- if someone paid the night before, if they paid $30 the

1  night before, that page reflects the $30 that was paid.  So the

2  balance changed.  It is the most accurate, up-to-date business

3  record that Midland has on an account.

4          THE COURT:  They say that that's provided by the law

5  firm, not by your firm.

6          MR. LYNCH:  Not at all.  That is contrary to Nancy

7  Kohls' deposition.

8          THE COURT:  If that's true, it wouldn't be your

9  business record then.

10          MR. LYNCH:  I understand.  This affiant, Judge, I

11  agree with you, has to look at a Midland business record.  I

12  completely agree with the Court.  That's what Nancy Kohls

13  testified in her deposition.

14          What's unfair is that Mr. Bennett can just stand up

15  and talk about what he believes the evidence is without citing

16  anything at all.  Where in Nancy Kohls' deposition did Nancy

17  say before she signed the affidavit she looked at Dominion

18  Law's business records and not Midland's manual

19  validation program?

20          THE COURT:  That's just what he said, wasn't it,

21  about ten minutes ago?

22          MR. LYNCH:  That's what he's saying.  Where's the

23  evidence of that?  We can't respond when he can just get up and

24  say anything he wants in a brief, and you look at Nancy Kohls'

25  deposition, she relies on -- Judge, it's called the manual

1   validation database.  That's a Midland computerized interface,

2   and, again, looking at the form affidavit --

3            THE COURT:  If you don't know what the truth of that

4   is, if that's just some cocked-up figure that has no basis to

5   it in your business records, you can't create a business

6   record, a legitimate business record out of whole cloth.

7            I can say, well, Mr. Lynch owes $1,000, Mr. Anthony

8   owes $5,000, and Mr. St. George owes $150.  I can do that --

9   unless I have something behind that to know that that's true,

10  those mere conclusions are not business records, and -- as I

11  understand the law.  Do you take a different view?

12           MR. LYNCH:  My understanding of a business record has

13  to be something that Midland keeps in the ordinary course of

14  business that reflects the details on accounts, and that's

15  something they've got to use on every single account.  It's a

16  document that they use over and over and over and over again as

17  part of the ordinary course of business to have certain

18  information.

19           For example, if I, Judge, went on my law firm's

20  computer database, and I pulled up Midland, and I wanted to

21  check and see what the accounts in my firm's database about how

22  much Midland owed Troutman Sanders, I would think that that

23  would be a --

24           THE COURT:  The mere fact that you have it doesn't

25  cut it.  The mere fact you have a piece of paper with it on

1    there doesn't cut it.  If you look at 803(6), it says, "A

2    memorandum, report, record, or data compilation, in any form,

3    of acts, events, conditions, opinions, or diagnoses, made at or

4    near the time by, or from information transmitted by, a person

5    with knowledge, if kept in the course of a regularly conducted

6    business activity."

7         So you all have left out about three steps of the

8    matter and are relying, it seems to me to be, on the one thing,

9    and that is whether you keep these things in the regular

10   course.

11        MR. LYNCH:  Well, Judge, if a payment came in on a

12   particular account, let's say the Gilbert James account,

13   someone in accounting would post it on that account.  The next

14   morning, the manual validation program shows that reflection in

15   the business records, and that's what the person is looking at.

16        They are looking at the most up-to-date information

17   on an account.  That is no different than if you pulled up --

18   for any business, you pulled up something that's updated

19   nightly.  It just said in the rule, Judge, it had to be -- the

20   record had to be updated at or near the time.

21        THE COURT:  Person with knowledge.  So somebody has

22   to have knowledge of the underlying account before you can use

23   the underlying account data as information.  Somebody -- you

24   have to show that somebody who knows that John Lynch owes

25   $1,500 actually put that in to some document that you all use

1    in the regular course of business, and that's what you haven't

2    established.  You don't -- Ms. Kohls doesn't understand that,

3    doesn't know it, doesn't have any basis for knowing it

4    according to them.

5              MR. LYNCH:  Judge, what she's signing in the

6    affidavit is she has knowledge of the business records.  What

7    she says, makes statements here, and based upon personal

8    knowledge of those account records maintained on plaintiff's

9    behalf.

10             THE COURT:  If she has knowledge of something that

11   isn't in a business record, it doesn't count.

12             MR. LYNCH:  I understand.

13             THE COURT:  That's the problem, and that's what Mr.

14   Bennett says she doesn't have, and she testified to that.

15             MR. LYNCH:  We would have loved to have seen the

16   deposition where she said she wasn't relying on a business

17   record.

18             THE COURT:  I've looked at the brief, and I don't

19   find any transcript of it.

20             MR. LYNCH:  Judge, how do we respond on a crime-fraud

21   exception in a waiver of a subject matter issue on privilege

22   when zero evidence is produced, zero?

23             THE COURT:  Well, you did.  It might have been wise

24   not to file anything and challenge it and strike it for lack of

25   information.  You did respond, and then they challenged you.

1    So is the information here or not?

2              MR. LYNCH:  I don't think the information is here at

3    all, and we haven't had any opportunity to build a record and

4    attack what they've claimed as the evidence, because we still

5    haven't seen the evidence.

6              Judge, one other point that was made about these

7    documents on the privilege log, one through nine, I guess

8    it's one through nine --

9              THE COURT:  Yeah, that's what we're talking about.

10   It's only one through nine.

11             MR. LYNCH:  He talked about a selective waiver.  It's

12   called a collection agreement which is, you know, similar to an

13   engagement letter, and opposing counsel keeps talking about

14   Dominion Law as a third-party law firm.  It's a law firm.  It

15   would be no different than Midland hiring us, my firm or any

16   other firm, and it was an engagement letter that we did not

17   redact any of the business terms.

18             We did redact Exhibit B which had instructions on

19   case handling, and I think it's completely privileged, Judge,

20   that if a client is telling an attorney about what to do in

21   litigation if something happens, this is the tact or position

22   we want you to take in litigation, that is privileged.

23             THE COURT:  Well, you disclosed one part of the

24   agreement to which an incorporated part was attached for your

25   own benefit, and you can't withhold a part of it without --

1   that may hurt you, according to him, and that is generally the

2   Fourth Circuit's rule.  So how come you don't fall within it?

3         MR. LYNCH:  Well, Judge, my understanding is you can

4   redact portions of a document that are privileged, and that's

5   all we did.  Exhibit B was privileged.  We did not believe the

6   rest of the collection agreement, which was the engagement

7   letter between the law firm and Midland, was privileged.

8         The other documents in one through nine that we

9   claimed a complete privilege on, you can tell from the title of

10  the document --

11        THE COURT:  Mr. Lynch, there's a memo in there, and I

12  tell you that I'm going to retain you, and by the way, we have

13  an automobile accident case, and you have in there, well, Payne

14  told me that he -- the police report says Payne didn't do this,

15  Payne didn't do that, he didn't run the red light.  Attached to

16  that particular document, part of your analysis in that

17  document is the statement that Payne makes where Payne says,

18  well, I ran the red light or I didn't know what color it was.

19  You can't keep that out and use the other part, can you?

20        MR. LYNCH:  I think you can redact anything that you

21  believe is privileged.  It's not an all-in or all-out on a

22  document.  That's my understanding, Judge.

23        THE COURT:  You can redact from a non-privileged

24  document something that's privileged; is that your point?

25        MR. LYNCH:  My point is this was an engagement letter

1  between Midland and the collection law firm, and the Exhibit B

2  was privileged.

3          THE COURT:  But an engagement letter is not

4  privileged; is that right?

5          MR. LYNCH:  I've produced engagement letters in fee

6  petitions --

7          THE COURT:  These, are these engagement letters

8  privileged?

9          MR. LYNCH:  We took the position that they were not,

10  Judge.

11          THE COURT:  Thank you.  Anything else?

12          MR. LYNCH:  Judge, I guess the other nine documents

13  which we put on the privilege log in their entirety --

14          THE COURT:  The other nine, you mean one through

15  nine?

16          MR. LYNCH:  One through nine, Judge.

17          THE COURT:  That's all we're dealing with.

18          MR. LYNCH:  Yeah, one through nine, Judge.  Those are

19  specific instructions that a client is giving a law firm about

20  how they want their litigation on collection accounts to occur.

21  How in the world is that not privileged?  I get told by clients

22  every day about how to conduct -- you know, if something

23  happens, we want you to do X, Y, and Z, and we have a

24  collaborative back and forth about that, but we do have

25  engagement letters in our law firm and other documents that

1    we're given instructions specifically on handling of litigation

2    matters, and essentially, while they're not identical because

3    it's in the collection context, those are privileged

4    instructions from a client to a law firm.

5          THE COURT:  What law says that instructions from a

6    client to law firm about how the lawyer is supposed to conduct

7    himself is privileged as opposed to information passed by a

8    client to the law firm for the purpose of getting advice from

9    the law firm?  It seems to me that that's a fairly significant

10   difference if you read the Fourth Circuit cases.

11         MR. LYNCH:  I mean, these documents had facts and

12   opinions that they wanted their attorneys to know to prosecute

13   collection cases with instructions that if certain things

14   occurred, this is the direction they were given, and I do

15   believe that directions from a client to a law firm are

16   privileged.

17         THE COURT:  But is there a case that says that,

18   because I didn't actually see that in your papers.  I see cases

19   where they're passing -- you cite cases where clients are

20   passing along information, and the client says, I need some

21   legal advice on this, is this okay.

22         Clearly that's a privileged communication, but this

23   is a different situation.  This is telling the lawyer how to do

24   something.  I'm unfamiliar with any case that says that.

25         MR. LYNCH:  Judge, I can't represent that the cases

1    we cited said that explicitly.  I also can't say explicitly

2    that every one of the documents -- they are passing along

3    information as well.  Some of it's intertwined, Judge.

4              THE COURT:  All right.  Thank you.  Anything else,

5    Mr. Bennett?

6              MR. BENNETT:  Again, not to make the argument, but --

7              THE COURT:  What did you say?  Run that up the

8    flagpole again.

9              MR. BENNETT:  I can theoretically -- there are

10   circumstances in which telling your lawyers how you want a case

11   litigated could be privileged.  That is work product.  That is

12   not, to the extent that you're not soliciting attorney advice,

13   attorney-client privilege.

14             The challenge we had about the deposition objections

15   was similar.  It was just the general objection privilege as if

16   it's a magical word.

17             THE COURT:  It doesn't work, because they are

18   different rules.

19             MR. BENNETT:  Judge, additionally, if I may, this is

20   the actual document that the discussion has been about, or a

21   sample of one, the validation screen.

22             THE COURT:  The what?

23             MR. BENNETT:  Validation screen.

24             THE COURT:  Let me see it.

25             MR. BENNETT:  I have put the bracket, and it's Bates

```
1    number MJ 407.  I have put -- this is a sample, a John Q.

2    Sample sample.  I put my handwriting around the part that would

3    come up --

4              THE COURT:  Is this what would come up on a computer

5    screen?

6              MR. BENNETT:  Yes, sir.

7              THE COURT:  A paper copy of what would appear on the

8    screen.

9              MR. BENNETT:  That's right.  The affiant would get

10   the stack of affidavits that come in from Dominion Law and

11   every other entity that that person is responsible for.  They

12   would take the account number, they would put it in that top

13   empty box at the top, and at the bottom they would hit -- or

14   they would hit enter, and then this screen would be populated

15   with the part that I put the blue circle around, and their job

16   is simply to take the affidavit and check boxes to make sure

17   that Dominion Law's affidavit where it says John Q. Sample --

18   that's the name of the person, John Q. Sample.  John Q. Sample,

19   check, and that is it.  She testified --

20             THE COURT:  Balance 1,000.

21             MR. BENNETT:  Yes, sir.

22             THE COURT:  That's what it says.

23             MR. BENNETT:  That would be what it would say.

24             THE COURT:  So suit balance, 1,100.  What's wrong

25   with that?  Why isn't that a business record?
```

1    MR. BENNETT:  It's not, Judge.  It's an output.  It

2    doesn't -- the purpose of the business record itself is to

3    validate the examination of underlying data that because of the

4    Rules of Evidence we find to be -- have indicia of reliability,

5    that it's an ordinary course of business, a company keeps

6    certain types of documents.

7    THE COURT:  If this is to qualify as a business

8    record, somebody has to come in here and testify where that

9    $1,000 came from and how it got on there.  Somebody has to come

10   in here and testify about how all this other stuff came to be

11   on there; right?

12   MR. BENNETT:  It cannot be a business record, Judge,

13   even then, because that is only created the moment the

14   affidavit -- the affiant inputs the data.  That's not kept in

15   the ordinary course of business.

16   THE COURT:  It's a document prepared for litigation.

17   MR. BENNETT:  It is.  That's all it is.

18   THE COURT:  I understand.

19   MR. BENNETT:  Now, Judge, with respect to the

20   contract that Mr. Lynch suggests that they have not waived

21   anything substantively, but starting at Bates number 1038

22   through 1054, I believe, 1055, this is the document -- if I may

23   present this to Your Honor.

24   THE COURT:  All right.

25   MR. BENNETT:  There is some redacting.  They still

1   redacted the amount of money that Dominion is paid in the

2   exhibit.  They've redacted the insurance coverage.

3            THE COURT:  Where is this referred to in your briefs?

4            MR. BENNETT:  Judge, well, that is the part that is

5   exhibit -- that is the document that Exhibit B to the

6   collection agreement --

7            THE COURT:  Where is it referred to in your briefs?

8            MR. BENNETT:  It's referred to within our brief when

9   we outline the subject matter waiver.  That is the Dominion Law

10  contract.  All these documents have been labeled confidential.

11  Thus, if we were to file them again, we'd have to file a motion

12  to seal until the Court has ruled.

13           THE COURT:  Such is life.  Anything else?

14           MR. BENNETT:  Yes, Your Honor, Judge.  All right,

15  you've heard me enough.

16           THE COURT:  It looks to me as if there's probably a

17  fairly strong case for a finding that there has been a -- that

18  there's a fraud-crime exception that applies here and that

19  there's been a waiver and, indeed, that much of this may not

20  even be privileged.

21           However, what I have in support of those propositions

22  are articulations of counsel without any real support for them

23  for the principle predicates in making that judgment.  And

24  while I believe the plaintiff probably can make a showing, I do

25  not believe that that showing has been made in the way that it

1  needs to be made here.

2         It is, indeed, a serious proposition that, A,

3  something is not privileged or somebody has waived a privilege

4  or to find some company has engaged in a crime-fraud exception,

5  a conduct that would animate the crime-fraud exception, so I am

6  going to deny the motion number 93 with leave for the plaintiff

7  to file a motion with its documentation so that the defendant

8  can know what shots are being taken at it and so that the

9  defendant can respond, and the reply will join issue with it,

10  and attached to those things need to be -- those papers need to

11  be exhibits that show and prove that which is asserted

12  conclusorily in the arguments of counsel.

13         So I would ask you for your dates and when you can do

14  that, but that needs to be done, I think.  Plaintiff's motion

15  for protective order and sanctions relating to refusal to

16  answer deposition questions based on privilege assertions is

17  exactly the same thing, isn't it?

18         MR. BENNETT:  Judge, may we withdraw that without

19  prejudice?

20         THE COURT:  It's withdrawn without prejudice.

21         THE LAW CLERK:  Judge, which number is that?

22         THE COURT:  Just a minute.  I'll get it.  That is

23  number 96; is that right?  And the brief is 97, and the

24  response is unnumbered.  I don't have that.  The reply is 120.

25  Number four in my notebook is the defendant's motion to compel,

1   and we've dealt with that at the outset, did we not?

2          MR. ANTHONY:  We did, Your Honor.

3          THE COURT:  Mr. Bennett, I view the finding that

4   somebody has waived the privilege, particularly in the Fourth

5   Circuit, and that crime-fraud exception -- crime-fraud

6   exception opens the door.  So does the waiver.

7          Waiver opens the door because it's a broad subject

8   matter waiver, and one of the things -- that has to be fairly

9   well documented before I'm willing to find it, even though it

10  appears to me from what you say, and I'll take your word as an

11  officer of the court that you can prove what you say and that

12  you believe there's a reason for it, it appears as if you can

13  established both a crime-fraud exception and a waiver, but Mr.

14  Lynch is correct.

15         They have to be able to know exactly what you're

16  talking about, what does it, and then I have to have that

17  information addressed by you in your reply, and in that

18  fashion, then I can make an informed decision about this most

19  serious of matters, and so I'll give you an opportunity to do

20  it.

21         MR. BENNETT:  Thank you, Judge.

22         THE COURT:  Defendant's motion to enforce protective

23  order, number 38.

24         MR. BENNETT:  Your Honor, may I --

25         THE COURT:  Is that just the flip side of some of

1    these motions?  Do I need to deal with that?

2         MR. ANTHONY:  Your Honor, it's not -- I think in real

3    simple format in a couple sentences, there's documents that

4    were produced.  There's no allegation that they weren't

5    produced.

6         Mr. Bennett is attempting to have a designation that

7    has been marked as confidential not marked as confidential.

8    From our perspective, we think we've established the

9    appropriate requirements and provided the appropriate evidence

10   for them to be so marked.

11        THE COURT:  How many of them are there?

12        MR. BENNETT:  Every document the defendant has

13   produced from the defendant.

14        THE COURT:  What?

15        MR. BENNETT:  They marked every document that's not

16   specific to my client confidential.

17        THE COURT:  Okay.  That's grounds for abuse of the

18   protective order.

19        MR. ANTHONY:  Your Honor, I'm not sure that's

20   accurate.

21        THE COURT:  I don't whether it's accurate or not.

22   I'm going to tell you right now, that's grounds for abuse of

23   the protective order.  I have no intention of going through all

24   that and dealing with that if everything has been so

25   designated.  So I'm going to give you time to go back through

1   every document that you've designated as confidential, and it

2   better be confidential, and just because they think it may be

3   something that is embarrassing is not a ground to make it

4   confidential, or hurtful is not confidential.

5   　　　　　It has to be a trade secret or some other reason to

6   warrant confidentiality, and if, in fact, I have to litigate a

7   case where every document you produce is marked as

8   confidential, then you lose the motion.  That's what's going to

9   happen, because that's an abuse.  There's no way on earth,

10   based on all the years of experience that I've seen, that

11   everything can be confidential.

12   　　　　　MR. ANTHONY:  I think that's an exaggeration --

13   　　　　　THE COURT:  Well, I understand.  I don't know whether

14   it's fact, it's true or not, but that's an assertion by a

15   representative of the court, and you say you don't know whether

16   it's true, so I'm going to give you a chance to go back and

17   see.

18   　　　　　What about this number 47, motion to enforce

19   protective order respecting deposition testimony, is that the

20   same thing?

21   　　　　　MR. ANTHONY:  That is the same thing.

22   　　　　　THE COURT:  They've designated everybody's deposition

23   confidential?

24   　　　　　MR. BENNETT:  They have.

25   　　　　　THE COURT:  Same rule.

 1              MR. ANTHONY:  Your Honor, we have not designated

 2       every line and page of these depositions.  Mr. Bennett knows

 3       that's not true.

 4              MR. BENNETT:  That's correct, they have not.  We've

 5       outlined in full detail in our brief what we have, and, Judge,

 6       this is not simply -- and I recognize that Your Honor has the

 7       Gilbert James case.  That's what's before you, and that's your

 8       charge.  I understand that, but we are also representing now

 9       168 Midland consumers in a case now pending before Judge

10       Doumar, 100 before Judge Spencer, and --

11              THE COURT:  Why not give them this case?

12              MR. BENNETT:  You are the very first, and you're the

13       furthest.  Those are just starting, but we'd like to be able to

14       use -- we've offered the defendant, let us at least take the

15       documents that we discover here and move them to be governed by

16       the protective order in the Atkins case so that --

17              THE COURT:  What is the Atkins case?

18              MR. BENNETT:  That is the Judge Spencer case, and

19       we've asked to use in the -- we have now Virginia Circuit Court

20       cases where the consumer counterclaims so we can try to keep

21       them out of federal court.

22              THE COURT:  What?  Now you're talking about something

23       I really don't --

24              MR. BENNETT:  There are comparable cases that are

25       pending in state circuit courts and state general district

1    courts now as counterclaims.  Midland is suing consumers, still
2    using affidavits.  We have represented those individuals.
3            THE COURT:  Why do you want to keep them out of
4    federal court?
5            MR. BENNETT:  Well, we like federal court, but we
6    don't want you growing weary with our Encore/Midland
7    litigation, Judge.
8            THE COURT:  The altruism of it all strikes me as
9    wonderful.
10           MR. BENNETT:  Some of these, judgment has been
11   entered for 5,000 in the counterclaim from general district
12   court, so it's now in Circuit Court.  We've asked to use the
13   Nancy Kohls deposition under the same type of protective order
14   which we used verbatim, adapted it into a state process, and
15   the defendant refuses to let the protective bubble of the
16   protective order in this case be shared with protective bubbles
17   in these other cases, and that's, in part, our motivation.
18           It's a legitimate motivation, albeit certainly not
19   one that engenders a lot of sympathy from the judge that has to
20   hear these motions, Your Honor, but the Nancy Kohls deposition,
21   we've outlined every line that they have designated within our
22   brief.  That's -- we would ask the Court to consider.
23           I don't want to make Your Honor have to decide it,
24   the issues, given how weary this case will have made Your
25   Honor, but the longer that that process goes on, the more

1  difficult it is for us in the Adkins case where discovery is

2  now starting, for example, to use this evidence.

3          MR. ANTHONY:  Your Honor, that, to us, is the point.

4  We had a protective order entered in this case which is

5  document number 37.  We received discovery requests from Mr.

6  Bennett.  We had 26(a)(1) disclosures.  We have articulated to

7  the Court that we believed that those productions have been

8  overbroad in many respects.  We've had some disagreements as to

9  the degree to which we have complied with that, and I can

10  represent to the Court that we have, at all times, tried in

11  good faith to do what it is as officers of this court, knowing

12  Your Honor, on how to do that, and we've done that.

13          In connection with that protective order, there is a

14  particular paragraph, Your Honor, that prohibits exactly what

15  it is that Mr. Bennett wants to do.  "The parties agree that

16  any information or documents produced in discovery in this case

17  shall not be used, be required to be produced or admissible, in

18  whole or in part, in any other legal or administrative

19  proceedings."

20          So we've relied upon this protective order that the

21  parties entered into, that the Court signed, to produce whole

22  hosts of documents ranging from everything within our system,

23  you now ordering about old affidavit process, all of these

24  things, and Mr. Bennett wants you to take the confidentiality

25  designation off of these so that he can go use them in another

1   legal proceeding that's contrary expressly to this.

2           That's not right.  We have relied on this.  If the

3   shoe were on the other foot, you would dress me up and down if

4   I were to do that.  If I were to take a document that I was

5   expressly told you cannot use this in another proceeding, and I

6   were to come in here and say, Judge, you know what, I want to

7   get these documents so I can use them in another proceeding,

8   you'd say, well, good luck in the other proceeding.

9           So I understand the Court's admonition about

10  reviewing the confidentiality designations.  We made them in

11  good faith.  I will commit to the Court we will go back and

12  look at them again to make sure of that, but to what end?

13  There's been no, to my knowledge, complaint by Mr. Bennett

14  about having any difficulty in how he proceeds to litigate this

15  case --

16          THE COURT:  I'm going to refer these two motions to a

17  special master and let you all split the costs of them as to

18  whether there's any confidentiality or not.  Don't you ever

19  present another confidentiality agreement to me that has that

20  provision in it.

21          Protective orders have overwhelmed the federal

22  courts, and they have resulted, in essence, in litigation being

23  conducted in secret, and the Fourth Circuit abhors that, the

24  Supreme Court abhors it, and there is a significant body of law

25  that is gathering against the sealing of documents from one

1   case to the other at the end of the case, and it's going to

2   affect how we're going to do protective orders in the future,

3   because there's something wrong when all the litigation is

4   under seal because it's thought to be confidential.

5         I'm beginning to find that the notions of what people

6   have as confidential, what they believe is confidential is

7   really startling.  I propose Mr. Craig Merritt at Christian

8   Barton has done this very thing for me in another litigation

9   where precisely this was at issue, only what was at issue was

10   that they had claimed attorneys'-eyes-only litigation, and it

11   was DuPont against Kolon.

12         The lawyers for DuPont were McGuireWoods and Crowell

13   Moring, and the lawyers for Kolon were LeClair Ryan and SNR

14   Denton and Paul Hastings and Janofsky.  Mr. Jeff Randall is the

15   lead counsel.  Mr. Dana Finberg dealt with this, I think in

16   part, and Mr. Rhodes Ritenour from LeClair Ryan was there.

17         I don't really know who it was that dealt with it

18   from the standpoint of McGuireWoods and Crowell Moring.  Mr.

19   Riopelle was the lead counsel.  You all can call them and see

20   if you don't think that that procedure worked well and it was

21   economical and advise me whether you have any objection to

22   that, and you will each pay half of the cost.  We'll have to

23   assess whether at the end of the case one party has to

24   reimburse the other, and that way we'll get it done.

25         If there is, however, an order that says that you

1  don't do certain things, i.e., can't use it somewhere else,

2  then there has to be -- because that's an order, and it is an

3  order that is in the nature of a contract that people bargained

4  over, it has to be enforced by its plain terms, it seems to me.

5  So the real issue, from my standpoint, is whether or not the

6  testimony is confidential.

7          That's what I'm asking the special master to decide,

8  not interpreting the protective order.  That's my job, and I

9  don't want that to go to the special master, but whether or not

10  particular documents are or are not confidential and testimony

11  is or is not confidential is something I think can be

12  officially done by Mr. Merritt.

13          He did it before.  His fees were reasonable, and

14  because he has experience, I thought maybe -- I think maybe it

15  will help you all in the economic end of things, too.

16          MR. ANTHONY:  We appreciate the suggestion, Your

17  Honor.

18          THE COURT:  I need for you to let me know by Monday

19  if you have a problem, or let me know if you agree.  You can

20  just send a letter stating you agree or disagree.

21          I don't know whether that firm has any connection

22  with anybody in any of these industries.  I don't have any

23  knowledge whether he can take it.  I'm going to ask him if he

24  has a problem.  I'll give him the docket number of this case

25  and go from there.

1          MR. ANTHONY:  Yes, sir.

2          THE COURT:  Is there anything else that needs to be

3     done at this time?  Does that take care of all the motions?

4          MR. ANTHONY:  Your Honor, the only thing that I think

5     that we have that's outstanding, and Mr. Bennett can correct me

6     if I'm wrong, the Court had suggested to us that we get

7     together to try to come up with as orderly of a scheduling plan

8     as we could, and we have done that, and there's been, I think,

9     agreement on all of it except for, if my memory is right, three

10    points, so I don't know if the Court wants to deal with those

11    now.

12         I can anticipate that, particularly in light of some

13    of the productions that were ordered today, we, frankly, don't

14    know what the timetable is going to be, for example, of the

15    affidavits or how long it's going to take us to get those

16    documents and do the review and the things that we would

17    ordinarily do, but it's not going to be an overnight deal.

18    That was prior to us --

19         THE COURT:  I think it's premature to decide this

20    issue at this time.

21         MR. ANTHONY:  Yes, sir.

22         THE COURT:  I'll hear from you later.  I will tell

23    you that we will not be using April 24th for the final pretrial

24    conference because of something I have to do.  I'm sorry.

25         MR. ANTHONY:  Thank you, Your Honor.

1            THE COURT:  So you can take that out of there, but

2    let's have your renewed brief on the attorney-client privilege

3    issue for documents number one through nine on the privilege

4    list.  Mr. Bennett, when do you want to file that?

5            MR. BENNETT:  Can I have one week, Your Honor?

6            THE COURT:  You can have a week if you want it, and I

7    want it done right.

8            MR. BENNETT:  Yes, sir.  One week.  I guess I will

9    also readdress my argument as to whether or not these were

10   privileged in the first place?

11           THE COURT:  You are starting all from scratch.  You

12   can address, A, whether they are privileged and support that;

13   B, whether there's a crime-fraud exception; and C, whether

14   there's a waiver, and you need to support that with the

15   evidence from the record, and I can tell you, if I need to

16   review anything *in camera*, you need to tell me -- I would

17   assume that what I would need to review *in camera* are these

18   nine documents.  Do you have those nine documents?  How

19   voluminous are they?

20           MR. ST. GEORGE:  Your Honor, I have all of them.

21   Some of them are fairly voluminous.  I'm trying to think back.

22   Probably aggregate it would be somewhere around 300, 400 pages.

23           THE COURT:  Put them in notebooks separately labeled

24   by document number that correspond with the privilege claim.

25   Also same thing on the collection agreement.

1          MR. ST. GEORGE:  Sure.

2          THE COURT:  Or the Exhibit B to the collection

3  agreement, I think, and then submit -- send them over here.

4  One copy is all we need, and they need to be filed under seal,

5  Mr. St. George, and do an order that they are temporarily filed

6  under seal pending resolution of the forthcoming motion

7  respecting privilege.

8          And so when do you want to file your response -- yes,

9  Mr. Bennett?

10          MR. BENNETT:  May I have until a week from Wednesday

11  instead a week from today?

12          THE COURT:  What is the date of the month?

13          MR. BENNETT:  Judge, it would be --

14          THE COURT:  Let's see, today is the --

15          THE CLERK:  Today is the 23rd.  Next Wednesday would

16  be February 1st.

17          THE COURT:  February 1, you file yours.  When are you

18  going to file your response?

19          MR. LYNCH:  February 13th.  I think that's a Monday.

20          THE CLERK:  It is.  That's a Monday.

21          THE COURT:  Is that what you want?

22          MR. LYNCH:  I would greatly appreciate it, Judge.

23          THE COURT:  I don't care.  You asked if it's a

24  Monday.

25          MR. LYNCH:  Wednesday, February 15th, would be great.

1          THE COURT:  You just must have consulted with he who

2    must do the work.

3          MR. LYNCH:  I was getting comments on the side,

4    Judge, no question.

5          MR. BENNETT:  I can't delegate, so I'm saying don't

6    do it on a Monday.

7          THE CLERK:  Wednesday, February 15th.

8          THE COURT:  You file your reply on February 22.

9          MR. LYNCH:  Thank you, Judge.

10          MR. ANTHONY:  Your Honor, I guess the only other

11    thing I can think of is that we obviously want to move things

12    along as the Court has instructed.  I think that I'm going to

13    need to figure out the timetable to produce something.  I don't

14    know whether you want to order something.  I don't know what is

15    feasible.

16          THE COURT:  Well, I think the first thing to do, Mr.

17    Anthony, is knowing what has happened, go figure it out, and

18    let's have a conference call and talk about it after you have

19    more -- I mean, I can pick a date.  That will be arbitrarily

20    done, and I generally find that all that does is precipitate

21    problems, so I'm going to try to do it --

22          MR. ANTHONY:  We'll do that and get back to Your

23    Honor as quickly as we can with what the timetable is and if

24    there's any issues that we haven't discussed that need to be

25    raised in regard to that.

1          THE COURT:  Why don't you get back to me on Monday,

2    the same time you get back to me about Mr. Merritt.

3          MR. ANTHONY:  That's fine.  We can do that.

4          THE COURT:  You know you're not going to be here

5    April 24th, but once you have an idea about how long it will

6    take to get all this accomplished, you will then be in a

7    position to set an interstitial schedule, and we can revise the

8    pretrial conference date.

9          MR. ANTHONY:  One last point, and I know everybody is

10   tired --

11         THE COURT:  I'm not going to ask it again if there's

12   anything else.  You talk about a dumb question.

13         MR. ANTHONY:  I don't want us to have any issues that

14   are -- that we don't talk about.  I'm just envisioning, because

15   our understanding of the Court's ruling as it dealt with the

16   production of the 54,000 records, it actually looks like it

17   might be less than that because I think the time frame is

18   different than what was originally articulated, is going to

19   include, my guess, privileged information.

20         It would be our plan that when we produce whatever

21   those documents are, that we would produce a privilege log with

22   those, but I don't want there to be some confusion with that.

23         MR. BENNETT:  We would object to that, Judge.  The

24   privilege was waived.  It was not even described as emails in

25   the privilege log.  We've argued this already at length.

1          MR. ANTHONY:  We would disagree, Your Honor.  The

2     request the Court ruled on was different than the request that

3     was made.  The request that was ruled on, as you remember, was

4     it had no time limitation, was going back, Your Honor pointed

5     out to us, ten or 15 years ago, and it would be ridiculous for

6     us to have to put together, you know, a privilege log of

7     documents going back 15 years ago.

8          THE COURT:  If you want to file a privilege log, you

9     can file a privilege log so you've got it in the record as to

10    what it is, and if you want to object to it, you can object to

11    it.  File whatever you need to file to take care of it.

12         MR. ANTHONY:  Thank you, Your Honor.

13         THE COURT:  I may have already ruled on it.  I'm not

14    going to rule on it today because I don't know what they're

15    going to come up with.  I think they are dead in the water, but

16    I'm not going to foreclose it since I don't know what they're

17    going to come up with.  Understand?

18         MR. BENNETT:  Yes, Your Honor.

19         THE COURT:  This better be a good privilege log

20    sufficient to allow him to test it.

21         MR. ANTHONY:  Yes, sir.

22         MR. BENNETT:  Even the timing of it now, having this

23    at the end of the case instead of the beginning, and this is

24    the argument --

25         THE COURT:  I absolutely understand all that, Mr.

1    Bennett.  I just -- I'm going to give them a chance, and

2    they're going to have to move with alacrity.  We're not talking

3    about -- tell your client we're not talking about a delay.

4    We're talking about an expedited process.

5              MR. ANTHONY:  We understand that, Judge.

6              THE COURT:  And then we'll deal with that when it

7    comes up.  They may choose not to file any privilege log with

8    respect to it.  In addition to that -- I doubt they will, but

9    it looks to me like they could preserve the privilege.  They

10   say they've preserved it, and let them preserve it.  Then I'll

11   rule on it.

12             MR. ANTHONY:  Thank you, Your Honor.

13             THE COURT:  What's got you perplexed?

14             MR. BENNETT:  Judge, the entirety of the argument

15   regarding the emails was focused really on the burden regarding

16   privilege, our argument that there isn't privilege because they

17   never disclosed even the category, the word email as a subject

18   within a privilege log, and the local rule and the Court

19   order --

20             THE COURT:  Your brief will be short then, won't it?

21             MR. BENNETT:  Yes, Judge.

22             THE COURT:  Do you want to order the transcript now?

23             MR. BENNETT:  Please.

24             MR. ANTHONY:  Yes.

25             THE COURT:  All right.

1

2                    (End of proceedings.)

3

4

5          I certify that the foregoing is a correct transcript

6  from the record of proceedings in the above-entitled matter.

7

8

9  _____              _____
   P. E. Peterson, RPR                Date
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25