1    17th.

2           THE COURT:  Did they file one by October 17th?

3           MR. BENNETT:  They filed a privilege log by

4    October 17th.

5           THE COURT:  And is this document on it?

6           MR. BENNETT:  No, Judge.

7           THE COURT:  Wait.  That's the rule.  Sorry.  All

8    right, let's go.  I also think, after reading this brief,

9    reading the papers, there's been a prima facie showing of an

10   exception to waive the privilege.  It's a crime-fraud issue,

11   isn't it?  RICO is a crime.

12          You have the lawyers inhouse that are participating

13   in the crime, according to the allegations and the showing

14   that's been made, because they drafted these documents that are

15   allegedly the misrepresentations that were made to courts all

16   over the country.  Why isn't that a waiver of the privilege

17   even if you have a privilege, Mr. Anthony?

18          MR. LYNCH:  I can address that, Judge.  One

19   fundamental issue in this case, and Mr. Bennett brought it up

20   during the initial pretrial conference, and we probably should

21   have been more specific about it.  There was an affidavit, and

22   attorney generals are investigating Midland about the old

23   affidavit.  There was a class action in Ohio pertaining --

24          THE COURT:  And it was drafted by lawyers.

25          MR. LYNCH:  It was drafted by lawyers.

1          THE COURT:  Inside the house.

2          MR. LYNCH:  No question, Judge.  This case pertains

3    to a new affidavit --

4          THE COURT:  Drafted by the lawyers inside the house;

5    right?

6          MR. LYNCH:  With outside counsel.

7          THE COURT:  But it's drafted with the assistance of

8    lawyers.

9          MR. LYNCH:  I do not disagree with that.

10         THE COURT:  And it is alleged to be fraudulent.

11         MR. LYNCH:  It is alleged to be fraudulent.  That

12   almost identical affidavit by -- I don't know -- four federal

13   courts has been held to be a valid affidavit.  His allegations

14   in just saying, oh, I have a RICO case and they didn't file a

15   motion to dismiss is not prima facie evidence of fraud.

16         THE COURT:  You know, the problem, Mr. Lynch, you

17   need to come to the reality that your client has some troubles.

18         All right, Mr. Bennett, he says that all of these

19   affidavits -- that this affidavit, the one you are relying on,

20   has been approved as appropriate by four different federal

21   courts; is that right?

22         MR. LYNCH:  Judge, just for the record, I'm not

23   saying word for word.

24         THE COURT:  No, no.  That's what you said.

25         MR. LYNCH:  No, Judge.

1    THE COURT:  You said this affidavit, and you held it

2 up.

3    MR. LYNCH:  No, Judge --

4    THE COURT:  Mr. Lynch, do you want to correct it?

5    MR. LYNCH:  I do want to correct it.

6    THE COURT:  All right.

7    MR. LYNCH:  What I'm saying is the substance of this

8 affidavit saying you can have an affidavit with someone that

9 has personal knowledge of business records, not of the debt, of

10 business records, and I've got four cases right here in front

11 of me and I can hand up to the Court, and I'm not saying the

12 affidavits are word for word the same.  They're not.

13    MR. BENNETT:  They're not Midland affidavits.

14    MR. LYNCH:  They're not Midland affidavits.

15    MR. BENNETT:  He's just arguing, Judge, that some

16 courts have said that a business record's affidavit can meet

17 certain standards.  No court has ever ruled that Midland's

18 affidavit, which varies only slightly from the one that was --

19    THE COURT:  Excuse me.  Mr. Lynch, I understood from

20 your statement that you meant that a court had ruled Midland's

21 affidavits were sufficient.  So from now on, please choose your

22 words carefully.

23    MR. LYNCH:  Okay, Judge, and I did not mean to

24 indicate that.

25    THE COURT:  But you did indicate that whether you

1   intended to or not.

2           MR. LYNCH:  I apologize.

3           THE COURT:  I don't think you would misrepresent

4   anything to the Court, but I'm telling you, I pay attention to

5   what you all say and rely on it.

6           MR. LYNCH:  I apologize.

7           THE COURT:  Now, all right, let's go.

8           MR. BENNETT:  Judge, on Exhibit A, we had withdrawn

9   subsequent to this and noted in Document 124, the second motion

10  to compel, requests six and seven.

11          THE COURT:  Requests six and seven are out; is that

12  right?

13          MR. BENNETT:  Yes, Your Honor.

14          THE COURT:  All right.

15          MR. BENNETT:  Eight.

16          THE COURT:  What about eight?

17          MR. BENNETT:  Judge, the defendant refuses to give --

18  with respect to eight, we have asked for, and the defendant has

19  been investigated and is currently being investigated by

20  multiple attorneys general and has produced to those various

21  attorneys general offices documents that we are asking for, the

22  origins of the affidavit, other explanations.

23          If the defendant is going to claim or represent, for

24  example, to the North Carolina Attorney General's office that

25  this is what our affidavit process is, and they have a witness

1    who is the general counsel in this case that is explaining it

2    entirely differently, we are entitled to discover that

3    substantive --

4              THE COURT:   Have they provided what's in request

5    number eight?

6              MR. BENNETT:   No, sir, they've not.

7              THE COURT:   Is it objected to on the privilege log

8    they filed on October 17th?

9              MR. BENNETT:   No, sir.   And I believe that they

10   withdrew any privilege basis for an objection.   Their current

11   position simply says they'll agree to produce

12   non-consumer-specific, non-state-specific documents that were

13   produced to government agencies or the FTC to the extent they

14   are also implicated by the claims and defenses pled in this

15   action.

16             Midland does not agree to withdraw its objections.

17   Their position is it's continuing of a relevance objection.

18   They're saying that what they would have told North Carolina is

19   not relevant to Virginia.

20             THE COURT:   All right.   Let me hear their position.

21   There's no privilege issue because they've withdrawn the

22   privilege.

23             MR. ANTHONY:   Your Honor, I think a couple points.

24             THE COURT:   Not relevant is your objection; is that

25   right?

1        MR. ANTHONY:  I'm sorry?

2        THE COURT:  Your objection is a lack of relevance.

3        MR. ANTHONY:  It is, but I think it's also important

4  -- to the best of our knowledge, all of the information that

5  has been provided to any regulatory agency that relates to the

6  current affidavit process had been produced.  We would agree to

7  produce that, and we are continuing to see if there's anything

8  else that has to be produced.

9        THE COURT:  Are you drawing a distinction between the

10  past affidavit and the current affidavit?

11        MR. ANTHONY:  Yes, sir.

12        MR. BENNETT:  We alleged they are identical,

13  substantively identical.  They move a comma.  That is

14  previously -- they said, I have personal knowledge that this

15  debt is owed.

16        Now it says, I have personal knowledge this debt is

17  owed or of the business records, and then the explanation that

18  you don't see in the affidavit from the PowerPoint we have

19  forced from them says, when you say you have personal knowledge

20  of the account records, you're not saying you have personal

21  knowledge of the account records.  You're saying you have

22  personal knowledge of this screen you look at, and there is no

23  substantive distinction.  We think in fact --

24        THE COURT:  Doesn't that depend upon -- the validity

25  of that statement depend upon what was on the screen?

```
 1            MR. BENNETT:  We know what was on that screen,
 2   though.  No business records are on that screen.  They've
 3   defined business record to mean a variable within a field.  So,
 4   for example, Gilbert James, Gilbert, in its definition, is a
 5   business record.  James is defined as a business record as
 6   opposed to credit card application is a business record,
 7   account payment history is a business record.
 8            THE COURT:  None of that is a business record.
 9   That's a name.  There's no business record that has anything to
10   do with that.
11            MR. BENNETT:  Yes, sir, we agree.
12            THE COURT:  The issue, I suppose, would be whether
13   what is on their screens constitute a business record, I would
14   think.
15            MR. BENNETT:  It's not screens.  It's a specific one
16   screen that its affiant uses.  It's called an affidavit
17   validation screen.  The affidavit is generated from the local
18   Virginia debt collectors or the debt collectors in whatever
19   state.  It spits out of the computer every morning at Midland,
20   and then they get a stack, the affiant gets a stack of these
21   that are randomly -- like ten percent goes to this affiant, and
22   then that affiant's job is to look on the affidavit that's
23   already printed with their name and all the
24   I-have-personal-knowledge, get the account number that's
25   printed out, input it onto this one screen, and then about
```

1    eight fields, the field I just described, name, address, and so

2    forth pops up.  Their job, according to the procedure, is to

3    make sure that the name that's on that screen is the name

4    that's in the affidavit.

5            THE COURT:  So the question would become whether

6    that's a business record or not.

7            MR. BENNETT:  Sorry?

8            THE COURT:  That is a question as to whether or not

9    that is or is not a business record, but I don't have to decide

10   that to decide whether it's discoverable, do I?

11           MR. BENNETT:  No, sir, you don't.

12           THE COURT:  Your objection is you don't want to

13   produce this as to the past affidavits.

14           MR. ANTHONY:  Yes.

15           THE COURT:  But you have agreed to produce them as to

16   all of the current affidavits.

17           MR. ANTHONY:  Not only that, but to the best of our

18   knowledge, we have done so.

19           THE COURT:  Is that correct?  Have they produced them

20   as to the current affidavits?

21           MR. BENNETT:  If by that they mean zero records have

22   been produced --- they produced zero in response to this

23   request.  That is --

24           THE COURT:  They said everything has been produced

25   that's been provided to any of these agencies, et cetera.  He

1    says you didn't produce any documents.  There's something amiss

2    there.

3         MR. BENNETT:  The point is that they have not

4    produced --

5         THE COURT:  I was asking Mr. Anthony.  You represent

6    they haven't produced anything, you say you have.  How am I to

7    decide that?

8         MR. ANTHONY:  Well, Your Honor, for example, we have

9    other requests from Mr. Bennett that ask for things like your

10   affidavit training process, your FCRA manuals, all of these

11   things that describe the current affidavit process.  They were

12   already asked for by other request --

13        THE COURT:  Let me make clear what you are going to

14   produce.  Objection to relevance is overruled as to the old

15   one.  You produce everything, and you produce -- I'm sure that

16   your client kept a record of what it produced to each agency or

17   office that it produced to.  You -- and if you produced it to

18   ten different attorney generals, then you produce it to Mr.

19   Bennett in all ten of those, for example.  Do you understand?

20        You will produce everything that was produced in the

21   form it was produced, numbers and everything, to the attorney

22   general of this state, that state, that state, any government

23   agency, the FTC, on this topic, the creation, use, or signing

24   of collection affidavits with the exclusion of documents that

25   pertain solely to specific consumer.  Now do you understand the

1    objection to number eight has been overruled?

2            MR. ANTHONY:  Your Honor, please note our objection

3    to the Court's ruling, but just to be clear, we are not being

4    told by the Court, nor is Mr. Bennett asking for anything that

5    is consumer-related to a particular individual other than Mr.

6    James; correct?

7            THE COURT:  What does your exclusion mean in Exhibit

8    A, Mr. Bennett?  That sounds to me like what you asked for.

9            MR. BENNETT:  If Ms. Smith or John Doe wrote to the

10   North Carolina attorney general and said, I have a problem with

11   Midland and there was an exchange about John Doe, we're not

12   asking for that.  We've explained that in the meet-and-confer.

13   We are simply asking for these --

14           THE COURT:  Mr. Bennett, are you asking -- if they

15   produced to a state agency affidavits used with respect to John

16   Doe, are you asking about that affidavit?

17           MR. BENNETT:  No, sir.  Not the John Doe specific.

18   We are asking for --

19           THE COURT:  You mean not with John Doe's name in it.

20           MR. BENNETT:  Yes, sir.

21           MR. ANTHONY:  That's my understanding.

22           THE COURT:  I cannot believe that you're doing that,

23   because I would think that would make their job very difficult,

24   but if they're happy with that limitation, then you can live

25   with it.  Are you happy with that limitation?

1          MR. ANTHONY:   It is what it is, Your Honor.   There

2     are obviously privacy issues that are involved in that --

3          THE COURT:   There are no privacy issues involved with

4     that.   All you have to do is white out the name of the person,

5     put in a letter or number that says A, one, two, three, or C,

6     or whatever it is, and then keep a record of it in the event --

7     so that we know exactly who those people are in the event we

8     need to have them.   There isn't any privacy issue that cannot

9     be addressed.

10          MR. ANTHONY:   But Mr. Bennett's not asking for that.

11     We understand the Court's ruling, and we will honor the Court's

12     ruling.   Please note our objection to that.

13          THE COURT:   Request number nine.

14          MR. BENNETT:   Judge, we can address the -- nine

15     through 11 are similar, but we've withdrawn 11, so nine and

16     ten, ask for narrowly defined chunks of the specific

17     defendant's employee email Outlook boxes.   That is, we've taken

18     the deposition of these witnesses --

19          THE COURT:   Do you have a time frame on this?   I

20     don't see any time frame on this thing.

21          MR. BENNETT:   Judge, we don't have a time frame --

22          THE COURT:   Suppose they've been dealing with Brandon

23     Black -- when did your company start business?

24          MR. ANTHONY:   It's been more than a couple years,

25     Your Honor.

```
 1              THE COURT:  Well, how long has it been?
 2              MR. BENNETT:  Judge, we've already agreed --
 3              MR. ANTHONY:  Ten or 15 years, Your Honor.
 4              THE COURT:  Suppose that in 2000 they were
 5    communicating with Brandon Black.  Are you asking for that, or
 6    have you -- I don't see any time limit in this one.
 7              MR. BENNETT:  Well, Judge --
 8              THE COURT:  Yes or no?  Time limit or not?
 9              MR. BENNETT:  There is not a time limit other than
10    that it wouldn't be on their email Outlook box.
11              THE COURT:  I don't understand that.
12              MR. BENNETT:  Well, we're not asking for them to
13    scour all the records in the history of the company.  We are
14    saying --
15              THE COURT:  Usually the way you limit that is for
16    emails dated on or after a date and on or before another date.
17    That's how you do it.
18              MR. BENNETT:  Yes, sir, but each of these employees
19    worked for a very narrow window of time over the last, really,
20    three or four years.  None of them are long-term employees.
21              THE COURT:  That's fine, but I look at this, and I
22    hear --
23              MR. BENNETT:  Yes, sir.
24              THE COURT:  Have you agreed to a time with them?
25              MR. BENNETT:  We have not.
```

1    THE COURT:  Are you willing to agree --

2    MR. BENNETT:  Yes, sir, we are.

3    THE COURT:  What time limit are you going to agree

4 to?

5    MR. BENNETT:  We would agree to July 1, 2009, through

6 the present.  January 1, I'm sorry, 2009, through the present.

7    THE COURT:  All right, any objection to that?

8    MR. ANTHONY:  Your Honor, assuming we take the rest

9 of that, we would agree --

10    THE COURT:  Assuming what?

11    MR. ANTHONY:  Assuming we agree on the other scope of

12 the searches which we have some other objections to, we would

13 say July 1 is a more appropriate date.  Midland did not even

14 get Mr. James's account until mid July, 2009.

15    THE COURT:  But the conduct respecting the affidavits

16 can be reflected in what was going on with respect to

17 affidavits before then.  So I don't understand what your limit

18 is.  What's the period covered by the suit?

19    MR. BENNETT:  It's not a class action, but we're

20 alleging it's an ongoing, continuing scheme, racketeering

21 scheme that goes back into the 2006 period.  We've already

22 agreed to January 1, '09, in some of our other compromises, so

23 I'm trying to be consistent, but we certainly would want --

24    THE COURT:  That period is acceptable, it's

25 reasonable.  It's pertinent and probative of the state-of-mind

1    components of the RICO charges and the validity vel non of the

2    processes.  What other objections are there to request number

3    nine?

4              MR. ANTHONY:  Your Honor, there's a couple.  One of

5    them has to do with the subject matter of this.  If you look at

6    request from number nine, continuing on, for example, number 11

7    has no subject matter.

8              THE COURT:  11 he's withdrawn.  11 is out.  I'm

9    interested in nine and ten.

10             MR. ANTHONY:  Your Honor, if you look at ten --

11             THE COURT:  Are there any other objections to nine?

12             MR. ANTHONY:  Yes.  Search term and privilege.

13             THE COURT:  Search term is affidavit within the

14   subject or body of the email.

15             MR. ANTHONY:  Correct.

16             THE COURT:  And any of the following individuals in

17   the to, from, cc, or bcc fields.

18             MR. ANTHONY:  Your Honor, they're in the affidavit

19   business.  It's part of what they do, so we've got to cull

20   through all of this to figure out if there's anything that

21   might tie in to what their claims are.  We've offered five

22   different variations of that to attempt to narrow that scope

23   which would narrow that scope --

24             THE COURT:  You have to show -- is your objection

25   it's burdensome?

```
1              MR. ANTHONY:  It is.

2              THE COURT:  What is the basis for your showing that

3    it's burdensome?

4              MR. ANTHONY:  We provided an affidavit to the Court

5    that would be approximately 54,000 emails and approximately

6    1,100 attorney hours to review it.  That's burdensome.

7              MR. BENNETT:  Judge, it would take an hour to cut

8    that onto a CD.  Their concern is they want to pre-edit those

9    which is something they should have raised either with me or

10   with the Court during the privilege log period.

11             THE COURT:  Have these been objected to as

12   privileged?

13             MR. BENNETT:  They've not been listed, even described

14   as a category such as emails, has not been included within the

15   privilege log.  It's worked for us.  We're the ones that have

16   to go through and sort it out.

17             THE COURT:  Do you think it's okay for them to look

18   at them first before they turn them over so they can understand

19   if there's anything privileged in there?  For example, there

20   may be something that doesn't -- if it has to do with the

21   affidavit process, it may not be privileged, but it may be

22   something else such as advice about how to do something in a

23   lawsuit that is involved in an affidavit, and I would think

24   they have a right to look at it.  Wouldn't you?

25             MR. BENNETT:  That's an issue --
```

```
1           THE COURT:  Why is it 54,000 documents and a thousand
2    hours of lawyer time?  What does lawyer time go for these days?
3    $400 an hour, $200 an hour, what?
4           MR. BENNETT:  It depends on the lawyer, Your Honor.
5           MR. ANTHONY:  That's Mr. Bennett's rate.
6           MR. BENNETT:  Judge, this is an issue that should
7    have been included within the basis for the privilege objection
8    or some other indication.  This information, in fact, the
9    amount of time that they're claiming itself was not even raised
10   until late December, and the distinction between producing --
11          THE COURT:  Did they object to it as burdensome?
12          MR. BENNETT:  Only within a long litany of it's
13   burdensome, it's irrelevant, it's overbroad, it's privileged,
14   it's confidential, just generic paragraph.  There was no
15   explanation that this is going to cause us to have to review
16   this.
17          We certainly, Judge -- there is, to the extent that
18   it is privileged outside this case, they still have certain
19   clawback rights that they can avail themselves of, and they can
20   designate these as protected.
21          THE COURT:  What's the damage to the plaintiff in
22   this case?
23          MR. BENNETT:  Judge, the significance of his damages?
24   His damage is that his credit was destroyed, that he was sued,
25   that he's had to defend that --
```

42

1          THE COURT:  What is the amount?  They have between

2    250 an hour, 250,000, and 400,000 in costs to get this to you.

3          MR. BENNETT:  His damages are not $400,000, Judge, in

4    terms of actual damages.  We think that the damage, the award

5    should be higher than that because of the exemplaries, but we

6    wouldn't represent to the Court that his actual damages are

7    going to be of the magnitude.  We challenge the assertion of

8    this number, and the defendant --

9          THE COURT:  Assertion of what number?

10         MR. BENNETT:  Well, Judge, you have --

11         THE COURT:  A thousand hours or 54,000 documents?

12         MR. BENNETT:  Yes.  Well, or even 54,000 documents.

13         THE COURT:  Which do you challenge, or both?

14         MR. BENNETT:  Both of them.  They're email chains,

15   so, for example, one -- well, they've not been described so we

16   don't know except that typical email production is -- for

17   example, they have produced recently a handful of emails

18   exchanged with a third-party bank that came and inspected their

19   facility, and of those emails, they were scheduling dinner and

20   pickup at the airport, and each time an individual sent a

21   response, which is, yes, Joe, that looks great for me, that was

22   one email.

23         To the extent that their assertion is it will take X

24   number of hours to review all of these emails, they have to at

25   least tender to you or provide to us in a meet-and-confer

1    process some explanation of why that would be so.  They haven't

2    described any emails, they haven't identified the existence of

3    the email box.

4         Take, for example, the Nancy Kohls, which is request

5    ten, I asked her at her deposition, do you use personal -- how

6    do you keep your email.

7         Outlook is the answer.

8         And do you use this for your personal use?

9         No.

10        Do you have folders, and, for example, some of these

11   individuals like Rita Melconian, I asked her at her deposition,

12   how do you organize your folders, and she indicated she does it

13   by state or she does it by firm at different points of time,

14   and so at a minimum, the defendant could have suggested in a

15   meet-and-confer, discuss any of the information that they're

16   suggesting now in their brief or in the letter immediately

17   before it, they could have suggested, well, look, we've checked

18   Rita Melconian's email box, she has five folders, one of them

19   says, you know, what fonts affidavits should be in or something

20   that clearly might not bear on something that material to us.

21   They could have suggested that to us, and we could have met and

22   conferred.

23        The question is would there have been a less

24   burdensome alternative on the defendant that the defendant

25   could have availed itself of by negotiating, by meeting and

1 | conferring with us, and by discussing this prior to October --

2 | THE COURT:  That is a question, that is a factor, but

3 | you filed what you filed.  They deal with it as filed, and I

4 | test it if you all aren't able to resolve it by comparing what

5 | you have filed against the showing they have made, so I didn't

6 | see any showing as to why it would take a thousand hours,

7 | though.  I'll let Mr. Anthony address that.

8 | MR. ANTHONY:  Your Honor, we attached to our

9 | opposition, we attached a declaration from Mr. Rose, the 54,000

10 | email records that were there.  We also referenced the -- if we

11 | were to use the modified search terms that we proposed, what

12 | that would produce, and this is based upon personal knowledge

13 | about what it would take to assimilate all of those.  Based on

14 | our experience, as we put in our papers, roughly 50 documents

15 | an hour.  That's how -- it was simply a math that went along

16 | with that.

17 | One of the things that we're not completely certain

18 | of, and would I disagree with Mr. Bennett, you know, there's a

19 | concept of emails, but then there are attachments that go along

20 | with that, too, so we don't know the full scope of the

21 | attachments of the emails that would go along with this.  We

22 | don't know the extent of where there's duplication, we don't

23 | know the extent of where there's privilege.

24 | THE COURT:  Well, if you haven't done any looking at

25 | those emails, how could you make any objection based on that?

1    You have to look at some of them.

2           MR. ANTHONY:  Your Honor, I'm very confident that,

3    again, taking the request as it originally was given to us,

4    that there were irrelevant information in the email box for

5    Nancy Kohls.  Mr. Bennett asked for every email in her inbox.

6    He withdrew that.

7           We have the same thing for Rita Melconian.  He's

8    withdrawn that.  At the time we made the objections, that was

9    what the request was, and now we're here -- to use an example,

10   number nine, number nine asks for an affidavit.  We attempted

11   to negotiate with Mr. Bennett, and what he said was, no,

12   affidavit is it.  So we did what we're supposed to, figure out

13   what the burden is --

14          THE COURT:  I'm sorry, I'm coughing over you.

15          MR. ANTHONY:  We took what...

16          THE COURT:  He's narrowed it to what appears on

17   Exhibit A.  Are you agreeable to that?

18          MR. ANTHONY:  I'm sorry?

19          THE COURT:  He's narrowed it as to nine and ten,

20   requests nine and ten as to what appears on Exhibit A to his

21   paper; do you agree to that?

22          MR. ANTHONY:  It is my understanding that that's what

23   he has narrowed it to, Your Honor.

24          THE COURT:  I say, do you agree to that?

25          MR. ANTHONY:  We do not.

1           THE COURT:   What is your objection to it as narrowed?

2           MR. ANTHONY:   As narrowed, as is evidenced by the

3    affidavit, it would require the production of 54,000-plus

4    emails with attachments that would require, our best estimate,

5    1,100 hours to assimilate those, to review those, to figure out

6    privilege, all those kinds of things, and we believe that that

7    burden of hundreds of thousands of dollars is unfair, and

8    particularly where we can -- we've agreed to provide

9    alternative search terms which we think are reasonable --

10          THE COURT:   What are they?

11          MR. ANTHONY:   They are outlined in his statement,

12   Your Honor.   We have affidavit within three of polic,

13   p-o-l-i-c, with an asterisk.

14          THE COURT:   Police?

15          MR. ANTHONY:   Yes, sir, because there's an issue of

16   identity theft and reporting -- I'm sorry, policy, reporting

17   about the policies, affidavit within three of procedure

18   asterisk, affidavit within three of form, affidavit within

19   three of template.

20          THE COURT:   What is wrong with that?

21          MR. BENNETT:   First --

22          THE COURT:   What's wrong with those?

23          MR. BENNETT:   I haven't seen the documents, but the

24   defendant is carving out -- it's choosing terms to avoid, we

25   believe, the production of documents that would be useful and

1  harmful and crafting search terms that are irrational.  That

2  you would do within three of policy, basically what they're

3  saying is only the use of affidavit policy, affidavit

4  procedure, affidavit form, affidavit template, or the full

5  name, Gilbert James.  Mr. James wouldn't matter, for example.

6           So it has to be -- it's this narrow, crafted, and

7  what their objection is is privilege which is the discussion we

8  should have had in October.

9           THE COURT:  No.

10          MR. BENNETT:  The burden -- the reason they're saying

11 burden --

12          THE COURT:  We're not dealing with privilege now.

13 We're dealing with burden.

14          MR. BENNETT:  No, sir, Judge.  The burden, there are

15 two burdens.  The first burden is the actual production and

16 giving them to us.  They're not claiming that's a difficult

17 burden.  Putting it on a DVD or CD and giving it to us is not a

18 challenge.

19          THE COURT:  They're not.  What they're saying is that

20 in order to first review them to determine whether they're

21 privileged.

22          MR. BENNETT:  That's the privilege objection, Judge,

23 and they should have said early on -- they could have said in

24 October, emails.

25          THE COURT:  But they didn't.

1          MR. BENNETT:  They didn't.

2          THE COURT:  Okay.

3          MR. BENNETT:  Completely waived it, and they didn't

4   even raise this discussion.  Even Mr. Rose, I never heard of

5   the man.  He wasn't disclosed as a witness.  His information

6   wasn't provided in the meet-and-confer process.

7          THE COURT:  Who?

8          MR. BENNETT:  The affiant that they're using to

9   claim.

10         THE COURT:  I just didn't understand what you were

11  saying.  All right, I see.  Anything else?

12         MR. BENNETT:  No, sir.

13         MR. ANTHONY:  No, Your Honor.

14         THE COURT:  The objection to the request number nine

15  and ten as narrowed in Exhibit A to the papers filed is

16  overruled.  The production will be as required there.

17         MR. ANTHONY:  Your Honor, if I may, I don't want to

18  beat the horse again.  This is wrong.  This is a significant

19  undertaking, and I understand the Court's rationale here, but

20  I'm thinking our client, because of virtue of getting sued, has

21  the benefit of having to spend $400,000 on a goose chase to

22  satisfy Mr. Bennett, and that's wrong.  It doesn't satisfy

23  requirements of Rule 26.

24         THE COURT:  I think it does.  Your client has been

25  using an affidavit that flatly is wrong and has been determined

1    to be wrong; right?  It was.  And now it's using another kind

2    of affidavit.  It changed, and there's significant information

3    to be had in these files pertaining to what you knew, what you

4    were doing that has to do with the state of mind of your client

5    in, A, what it was doing, and, B, changing to what it was doing

6    and how that change is significant.

7            From what I've been able to tell, there's not a whole

8    lot of difference between the original affidavit and the ones

9    being used at this time, but I'm not sure of that.  There may,

10   in fact, be reasons why the people who prepared this thought

11   that it was significant, and it may be important in the outcome

12   of the case.  So I think it is, A, relevant; B, reasonably

13   calculated to lead to the discovery of admissible evidence; and

14   C, it is not unduly burdensome although it, the burden, is not

15   insignificant.  I think that's the ruling in number nine and

16   ten.

17           Number 12.

18           MR. ANTHONY:  Please note our objection, Your Honor.

19           MR. BENNETT:  12 is similar but it's not simply

20   email, but it is also a much more narrow topic.

21           THE COURT:  How does all correspondence and all

22   email, how does that narrow -- I'm going according to how

23   you've narrowed it now.

24           MR. BENNETT:  Yes, sir.  Well --

25           THE COURT:  It is included within your original

1    legal proceeding that's contrary expressly to this.

2         That's not right.  We have relied on this.  If the

3    shoe were on the other foot, you would dress me up and down if

4    I were to do that.  If I were to take a document that I was

5    expressly told you cannot use this in another proceeding, and I

6    were to come in here and say, Judge, you know what, I want to

7    get these documents so I can use them in another proceeding,

8    you'd say, well, good luck in the other proceeding.

9         So I understand the Court's admonition about

10   reviewing the confidentiality designations.  We made them in

11   good faith.  I will commit to the Court we will go back and

12   look at them again to make sure of that, but to what end?

13   There's been no, to my knowledge, complaint by Mr. Bennett

14   about having any difficulty in how he proceeds to litigate this

15   case --

16        THE COURT:  I'm going to refer these two motions to a

17   special master and let you all split the costs of them as to

18   whether there's any confidentiality or not.  Don't you ever

19   present another confidentiality agreement to me that has that

20   provision in it.

21        Protective orders have overwhelmed the federal

22   courts, and they have resulted, in essence, in litigation being

23   conducted in secret, and the Fourth Circuit abhors that, the

24   Supreme Court abhors it, and there is a significant body of law

25   that is gathering against the sealing of documents from one