**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**GILBERT JAMES,**

        **Plaintiff,**

v.                                  **Civil Action No. 3:11cv00221**

**ENCORE CAPITAL GROUP, INC.,** *et al.*

        **Defendants.**

# DEFENDANTS' MEMORANDUM
# IN SUPPORT OF THEIR
# <u>MOTION FOR SUMMARY JUDGMENT</u>

David N. Anthony (VSB No. 31696)
Timothy St. George (VSB No. 77340)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile:  (804) 698-5118
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com

John C. Lynch (VSB No. 39267)
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone:  (757) 687-7765
Facsimile:   (757) 687-1504
john.lynch@troutmansanders.com

*Counsel for Defendants*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

STATEMENT OF UNDISPUTED FACTS ..............................................................................1

I.    Background ...............................................................................................................1

      A.    The Midland Defendants ...................................................................................1

      B.    James's Credit Card Account ............................................................................2

      C.    After Acquiring James's Account, Midland Repeatedly Attempts To
            Verify James's Identity Theft Claim, But James Refuses To Cooperate ............2

      D.    James Ignores Multiple Letters From MCM's Collection Counsel And
            "Forgets" To Show Up—Twice—For Trial, Resulting In Default
            Judgment.........................................................................................................3

II.   The Undisputed Facts Relating to James's Claim That Midland Filed a False and
      Misleading Affidavit Against Him ...........................................................................5

      A.    The Process By Which Midland Obtains And Maintains Account Records........5

      B.    The Process By Which Midland's Legal Specialists Validate And Execute
            Affidavits For Debt Collection Lawsuits..........................................................6

      C.    The Nancy Kohls Affidavit ..............................................................................8

III.  The Undisputed Facts Relating to James's Claim That A Dominion Lawyer
      Falsely Told Him That The Lawsuit Would Be Discontinued If He Provided An
      Identity Theft Affidavit ............................................................................................9

IV.   The Undisputed Facts Relating to James's Claim that Midland Violated the
      FDCPA By Suing Him In The Wrong Venue. ..........................................................9

V.    The Undisputed Facts Relating to James's RICO Claim ..........................................9

VI.   The Undisputed Facts Relating to James's Abuse of Process Claim ........................9

VII.  The Undisputed Facts Relating to James's FCRA Claim..........................................9

ARGUMENT......................................................................................................................10

I.    Midland Is Entitled To Summary Judgment On James's Affidavit Claims .................10

      A.    The Undisputed Evidence Shows That The Kohls Affidavit Was Truthful.......10

      B.    James Cannot Rely On The *Brent* Case To Create A Triable Issue ..................11

# TABLE OF CONTENTS
(continued)

**Page**

C. Numerous Cases Establish That Business Record Affidavits Are Acceptable ........................................................................................12

D. James's Contention That The Electronic Records Reviewed By Kohls Were Not "Business Records" Has No Merit .......................................13

E. James Cannot Establish An FDCPA Violation By Claiming The Kohls Affidavit Would Mislead A State Court Judge .................................16

F. There Are No Misrepresentations In The Kohls Affidavit, But Even If There Were, They Would Not Be Material ...........................................17

G. James's Other Claims Of "Deceptive" Conduct Are Without Merit..................17

    1. Attaching The "Summary Screen" To The Complaint Was Not Misleading ...........................................................................18

    2. Midland Did Not Falsely Represent It Would Dismiss The Debt Collection Lawsuit If James Submitted An ID Theft Affidavit ............18

    3. The "Servicemembers Civil Relief Act" Affidavit Was Not Deceptive .............................................................................19

II. Midland Is Entitled to Summary Judgment on Count Two..................................20

III. Count Three Fails Under § 1692e(11)'s Formal Pleading Exemption...........................21

IV. Count Five Must Be Dismissed Because James's Capital One Account Was Opened In Richmond...............................................................................22

V. James's RICO Claim Under Count Seven Must Be Dismissed .....................................23

A. James Cannot Establish Fraud...........................................................23

B. James Cannot Establish Causation ....................................................23

VI. Count Eight For Abuse Of Process Fails...............................................................24

A. Because The Affidavits Are Not "False," No Claim for Abuse of Process Lies .................................................................................25

B. Midland Had No Ulterior Purpose In Filing The Collection Action.................25

C. There Is No Evidence Of An Improper Use Of Process....................................26

# TABLE OF CONTENTS
(continued)

Page

VII.  Count Nine Must Be Dismissed Because Midland Conducted A Reasonable
Investigation Under the FCRA ..................................................................................27

    A.  Midland' Response To The Notice Of Dispute Was Objectively
Reasonable...........................................................................................................27

    B.  Even If A Violation Of § 1681s-2(B) Somehow Occurred, It Was Not
Willful..................................................................................................................29

Defendants Encore Capital Group, Inc., Midland Funding, LLC, and Midland Credit Management, Inc. (collectively, "Midland"), in support of their Motion for Summary Judgment against Plaintiff, Gilbert James ("James"), state as follows.

## INTRODUCTION

Gilbert James alleges that when Midland sued him to collect an unpaid debt, it submitted an affidavit that was "false and misleading" because the affiant, Nancy Kohls, lacked personal knowledge about his account.  James asserts that this affidavit (the "Kohls Affidavit") violates the FDCPA, constitutes the predicate acts of mail and wire fraud that form the basis of a RICO claim, and constitutes an abuse of process.  But, the Kohls Affidavit does not purport to be based on personal knowledge.  Instead, it is based on Kohls's review of Midland's records relating to James's account, and the undisputed facts demonstrate that all of the statements in the Kohls Affidavit are true.  Moreover, numerous federal courts have approved the same affidavit language that Plaintiff challenges here.[1]  Thus, Midland is entitled to summary judgment in its favor on all of James's claims that are predicated on the alleged falsity of the Kohls Affidavit.  Likewise, James's remaining claims under the Fair Credit Reporting Act and the Fair Debt Collection Practices Act are all based on allegations that have been disproven in discovery.

## STATEMENT OF UNDISPUTED FACTS

**I.      Background**

**A.      The Midland Defendants**

1.      Midland Funding and Midland Credit Management ("MCM") are wholly-owned subsidiaries of Encore, which is a publicly traded company.  Encore was the first entity in the industry to codify a Consumer Bill of Rights.  *See* **Exhibit A**.

---

[1] As detailed below, Midland adopted this form of affidavit at the suggestion of the federal judge before whom a nationwide class action that challenged its old affidavit process was pending.  *See Midland Funding, LLC v. Brent*, Case No. 3:08-cv-01434 (N.D. Ohio 2009).

2.      Through a written Servicing Agreement, MCM collects debts on behalf of Midland Funding.  **Exhibit B** ¶ 6.

### B.      James's Credit Card Account

3.      On September 15, 2008, a Capital One credit card account ending in -2987 was opened in James's name (the "James Account").  **Exhibit C;** *see also* **Exhibit D**.

4.      When the account was opened, James resided at 2111 North Ave., Richmond, VA 23222.  **Exhibit E** at p. 24.

5.      In 2009, James contacted Capital One and disputed that he opened the account.  **Exhibit F** at p. 3-4.  Capital One investigated and concluded that James opened the account.  *Id.*

### C.      After Acquiring James's Account, Midland Repeatedly Attempts To Verify James's Identity Theft Claim, But James Refuses To Cooperate

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████

7.      The portfolio included the James Account which, at the time of the sale, had an outstanding balance of $1,061.85.  Ex. C.

8.      After acquiring the debt, MCM engaged Collect America, Ltd., a third-party collection firm, to conduct collection activities on the James Account.  **Exhibit H**; **Exhibit I**.

9.      On June 22, 2009, a Collect America employee called James.  Ex. H at p. 7.  James told Collect America that he had not opened the account.  *Id.*  Collect America asked James to send any documentation that he might have substantiating that claim.  *Id.*

10.     On June 29, 2009, James faxed Collect America documentation relating to the investigation performed by Capital One, which concluded that James was responsible for the account.  *Id.* at p. 6.  Collect America informed James that this did not support his claim.  *Id.*

11.     On August 20, 2009, Collect America called James to discuss a payment plan for the account.  *Id.* at p. 2.  James again said he did not open the account, and he said he would provide proof when he found the "paperwork."  *Id.*  James never sent any paperwork.  *Id.*

12.     In October 2009, MCM resumed the collection efforts for James's account from Collect America.  *See* **Exhibit J**.

13.     On or about October 14, 2009, MCM sent James a letter, which informed James of the process for disputing ownership of the debt.  **Exhibit K**.

14.     On October 21, 2009, James called Kathleen Tomczik, an Account Manager at MCM, and said he did not open the account.  **Exhibit L** at 9; Ex. J at p. 2.  The account was then noted as "disputed" within MCM.  Ex. J at p. 2.

15.     In November 2009, MCM requested by telephone that James provide proof of his claim of identity theft.  Ex. L at 10.  James failed to do so.  *Id.*

16.     On November 29, 2009, MCM sent a letter to James noting the existence of his dispute and again requesting any documentation supporting his claim of identity theft.  **Exhibit M**.  MCM also noted that it had "requested that the three major credit reporting agencies change the status of this account to 'Disputed.'"  *Id.*  James did not respond to the letter or send any documentation supporting his identity theft claim.  **Exhibit N** (James Tr. p. 132:3-24).

**D.     James Ignores Multiple Letters From MCM's Collection Counsel And "Forgets" To Show Up—Twice—For Trial, Resulting In Default Judgment**

17.     In December 2009, MCM retained Dominion Law Associates ("Dominion") to explore filing a lawsuit to collect the James Account.  Ex. J at p. 2.

18.     On December 17, 2009, Dominion sent a letter to James seeking payment of the debt.  **Exhibit O**.  Similar letters from Dominion followed in January, February, and April 2010.  James did not respond to any of the letters.  **Exhibit P**.

19.     On April 7, 2010, Dominion filed a Warrant-in-Debt against James in Richmond General District Court, requesting judgment in the amount of $1,061.85. **Exhibit Q**. As of April 7, 2010, James had never provided any documentation substantiating his claim of identity theft. The Warrant-in-Debt, served on James, requested judgment in the amount of $1,061.85. *Id.*

20.     The Warrant-in-Debt attached three documents. The first was an affidavit from Dominion Law Associates attesting that James's name had been entered into the database of the Department of Defense where it was determined that he was not in military service. *Id.* at 2.

21.     The second attachment was the affidavit of Nancy Kohls ("Kohls"), a Legal Specialist at MCM, which attested to Midland's ownership of the James account. *Id.* at 3.

22.     The third attachment to the Warrant-in-Debt was a computer-generated "summary screen" of Midland Funding showing the outstanding balance on the James account. *Id.* at 3. The summary screen was not referenced within the Kohls Affidavit. *See id.* at 2-3.

23.     On May 7, 2010, James attended the return date on the Warrant-in-Debt. Trial was set for June 18, 2010. Ex. Q at p. 1.

24.     On May 13, 2010, James sent an "ID Theft Affidavit" to MCM. The ID Theft Affidavit stated that James's ex-wife, who died in November 2008, had opened the card in his name while he was living in Richmond, Virginia. **Exhibit R**. The ID Theft Affidavit was not notarized (as requested *and required* by MCM), failed to list any third party with knowledge of the claim, and conceded that James had no documentation supporting his claim. *Id.* at pp. 3-5. The ID Theft "Affidavit" was the only document James ever sent MCM regarding his identity theft claim. Ex. N (James Tr. p. 132:3-24).

25.     James did not appear for the June 18, 2010 trial. He testified in his deposition in this case that the reason he did not appear was that he "forgot." *Id.* (James Tr. p. 107:4-22).

26.     Because James did not appear, the trial date was continued until August 20, 2010. *Id.* But James failed to appear at that trial, too, because he again "forgot." *Id.*

27.     Consequently, on August 20, 2010, default judgment was entered against James in the amount requested on the Warrant-in-Debt. *See* Ex. Q.

28.     On August 26, 2010, Dominion Law Associates sent James a letter notifying him that judgment had been entered against him and requesting payment of the judgment. **Exhibit S**.

29.     James did not appeal the judgment, which became final. Va. Code § 8.01-129.

30.     On March 17, 2011, James settled his account in full through partial payment of the outstanding balance to MCM. *See* Ex. J at p. 1.

**II.     The Undisputed Facts Relating to James's Claim That Midland Filed a False and Misleading Affidavit Against Him**

**A.     The Process By Which Midland Obtains And Maintains Account Records**

████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

33.     The source data transmitted to MCM from the original creditor is also required to be accurate by law (*e.g.*, the Fair Credit Billing Act, 15 U.S.C. § 1666, *et seq.*; the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681), with a consumer having numerous opportunities to dispute the debt with the original creditor before the debt is ever purchased by Midland. *Id.*

████████████████████████████████████████

█████████████████████████████████████████

5

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

**B.      The Process By Which Midland's Legal Specialists Validate And Execute Affidavits For Debt Collection Lawsuits**

37.      When appropriate, MCM may engage an outside law firm to conduct further collection activity and, if necessary, to file a lawsuit.  **Exhibit T** at ¶ 6.

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

40.      If the law firm's collection activity is unsuccessful, the decision may be made to file a collection lawsuit against the consumer.  *Id.* at ¶ 16.

████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

## C.   The Nancy Kohls Affidavit

54.   The Warrant-in-Debt filed against James attached an affidavit signed by Nancy Kohls ("Kohls"), a trained paralegal and Legal Specialist employed by MCM.  *See* Ex. Q at p. 3. In her affidavit, Kohls made a number of statements based on her review of the "business records" of MCM, which showed that James owed "a just and true balance of $1061.85."[2]  *Id.*

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

---

[2] James alleges that Kohls stated she had personal knowledge of the existence and amount of his debt. (Compl., ¶ 43).  This allegation is belied by the actual language of the affidavit, which states only that that the "records pertaining to the account" show James owes a "balance of $1061.85."  Ex. Q at p. 3.

III.   **The Undisputed Facts Relating to James's Claim That A Dominion Lawyer Falsely Told Him That The Lawsuit Would Be Discontinued If He Provided An Identity Theft Affidavit**

57.   James did not speak to a Dominion lawyer at the May 7, 2010 return date on the Warrant-in-Debt.  Ex. N (James Tr. p. 105:23-106:16).

58.   James never submitted a notarized Identity Theft Affidavit to MCM, as required by MCM.  *Id.* (James Tr. p. 132:3-24).

IV.   **The Undisputed Facts Relating to James's Claim that Midland Violated the FDCPA By Suing Him In The Wrong Venue.**

59.   When the James Account was opened on September 15, 2008, James lived in Richmond, Virginia.  Ex. D at p. 24.

60.   Midland sued James in Richmond General District Court.  *See* Ex. Q.

V.   **The Undisputed Facts Relating to James's RICO Claim**

61.   The Kohls Affidavit contains no false representations.

62.   James never read the Kohls Affidavit prior to his October 17, 2011 deposition in this case.  Ex. N (James Tr. p. 108:5-18).

VI.   **The Undisputed Facts Relating to James's Abuse of Process Claim**

63.   The Kohls Affidavit was filed for the sole purpose of collecting the balance due on the James Account.  Ex. U (Kohls Tr. p. 42:21-25).

VII.   **The Undisputed Facts Relating to James's FCRA Claim**

64.   On May 12, 2011 – over a month after this federal lawsuit was filed – Midland received notice of the only dispute ever reported to them by a credit reporting agency regarding James's Capital One account.  Midland received this notice through the e-OSCAR system with the following dispute code: "DISP:001:NOT HIS/HERS."  Ex. L at pp. 8-9; *see* **Exhibit W**.

65.   In response to this notice, Markie Myers, a Consumer Relations Clerk at MCM, promptly performed a manual investigation of the dispute.  Ex. L at pp. 8-9.

66.     In performing her manual investigation, Ms. Myers was permitted to consult all account-level documentation and/or notes regarding James's account.  *Id.*

67.     At the time that the manual investigation was performed by Ms. Myers, the records of the account reflected that: (1) James had disputed the debt with Capital One and that his claim had been denied; (2) James had failed to provide any independently-verifiable proof of his claim of identity theft; (3) James had failed to provide a notarized ID Theft Affidavit; (4) judgment had been entered against James, which was final and had not been appealed or vacated; and (5) James had voluntarily paid the account in full.  *See*, *supra*, Fact Nos. 3-41.

68.     After performing the manual investigation, Midland reported back to the credit reporting agencies in May 2011 that the disputed account had been settled.  Ex. L at p. 9.

69.     The results of this investigation were memorialized in a letter to James from Experian, where Experian noted that it had received the following information from MCM: "Consumer Disputes This Account Information; Paid Collection."  **Exhibit X**.

<u>**ARGUMENT**</u>

**I.      Midland Is Entitled To Summary Judgment On James's Affidavit Claims**

**A.      The Undisputed Evidence Shows That The Kohls Affidavit Was Truthful**

In Count One, James alleges that Midland made "false, deceptive and misleading" representations in connection with the collection of a debt, and therefore violated § 1692e of the FDCPA, by filing a false affidavit in the collection lawsuit against him.

James alleges the following statements in the Kohls Affidavit were "objectively false:" (1) the affiant "has access to pertinent account records;" (2) the affiant is basing the affidavit "upon personal knowledge of those account records maintained by [Midland];" (3) the affiant has "reviewed the records pertaining to the account;" (4) the affiant is "familiar with the manner and method by which [MCM] creates and maintains business records pertaining to the account;"

(5) the affiant knows that the account records are kept in the regular course of Midland' business;

(6) the account records show that James owes the balance sought; and (7) the affiant could testify

to the foregoing if called to testify in court. *Id.* at ¶ 43. However, Kohls's deposition testimony

establishes that all of the above statements were truthful, and there is no evidence to the contrary.

Accordingly, as set forth below, the Kohls Affidavit is not false, deceptive, or misleading.

### B.      James Cannot Rely On The *Brent* Case To Create A Triable Issue

In his complaint, James cites heavily to *Midland Funding v. Brent*, 644 F. Supp. 2d 961

(N.D. Ohio 2009), insinuating that the affidavit at issue in this case must necessarily suffer the

same defects as the affidavit at issue in *Brent*. It does not. In *Brent*, the district court found that

an affidavit used by Midland in 2008 violated the FDCPA because the affiant inaccurately

claimed to have personal knowledge about the debtor and her account. Although the court found

that "the actual account information [in the affidavit] is probably either correct or likely thought

correct by Midland in good faith," the court held that the attestation of personal knowledge made

the affidavit misleading since the affiant had never met Brent and did not have any firsthand

knowledge about her account. *See Brent*, 644 F. Supp. 2d at 968-69.

In its opinion, the *Brent* court made a recommendation as to how Midland could prevent

its affidavits from being misleading in the future and to comply with the FDCPA: "[Midland]

could easily prepare a form affidavit that achieved the same goals without being misleading by

reflecting the truth, plain and simple. Rather than basing the affidavit on false personal

knowledge, they could base it on the accuracy of the records kept and the accuracy of the data."

*Id*. at 969. The Kohls Affidavit is consistent with the *Brent* court's recommendation. Nowhere

does Kohls claim to have personal knowledge about James or his account. To the contrary, her

affidavit clearly identifies Midland's "records" as the source of the account information in the

affidavit. *See* Ex. Q p. 3. And, as noted above, Kohls is familiar with Midland's records,

11

reviewed them, and confirmed the accuracy of the affidavit prior to signing it.  The facts here are not the same as in *Brent*, and focusing on *Brent* is not a substitute for evidence in this case.

### C.     Numerous Cases Establish That Business Record Affidavits Are Acceptable

Turning to the relevant inquiry, numerous courts have held that where, as here, an affiant accurately attests that her knowledge of the account information is based on the debt collector's records, the affidavit is not false and misleading, and it does not violate the FDCPA.  All of these cases are squarely on point and compel judgment in Midland's favor on James's FDCPA claim.

For example, in *Myers v. Asset Acceptance LLC*, 750 F. Supp. 2d 864 (S.D. Ohio 2010), the plaintiff alleged that an affidavit violated the FDCPA because the affiant "had no personal knowledge concerning the purported debt." *Id.* at 867.  The Court granted summary judgment in favor of the debt collector defendant, holding that: "[The affiant] did not state that his affidavit was based on personal knowledge, unlike the affiant in the distinguishable *Midland Funding LLC v. Brent*." *Id.*  In fact, the court held that rather than constituting the type of affidavit "base[d]. . . on false personal knowledge" that *Brent* rejected, "the [supervisor's] affidavit more likely epitomizes that case's recommended affidavit base[d]. . . *on the accuracy of the records kept and the accuracy of the data*." *Id.* at 867-68 (emphasis added and citations omitted).

Likewise, in *Webb v. Asset Acceptance, LLC*, 2011 U.S. Dist. LEXIS 106364 (S.D. Ohio Sept. 21, 2011), the defendant sued the plaintiff in state court and served her with a summons, complaint, affidavit, and a one-page "statement" containing summarized account information. *Id.* at *10.  In explaining the content of the affidavit, the affiant testified that she reviewed a summary "asset statement" prior to executing the affidavit, which contained information that "came from the original creditor." *Id.*  The plaintiff alleged that the affidavit was "deceptive and misleading" because the affiant "had no personal knowledge concerning the matter." *Id.* at *11. The court dismissed the plaintiff's claim: "[The affiant] did not attest that the affidavit was based

on personal knowledge; rather, the affidavit is based on the accuracy of the relevant business records.   The fact that [the affiant] does not have personal knowledge regarding [plaintiff's] alleged credit card debt does not render her affidavit deceptive or misleading."  *Id.* at *12.

Other courts presented with the same facts have reached exactly the same result.  *See, e.g., Goray v. Unifund CCR Partners*, 2007 U.S. Dist. LEXIS 89552 (D. Haw. Dec. 4, 2007) (rejecting claim that affidavit was false and misleading because the affiant did not personally review the documents to verify the amount owed by Plaintiff, and holding that the fact that the affiant "did not personally review the documents to verify the amount owed by Plaintiff does not constitute a violation of the FDCPA.");  *Walsh v. Arrow Fin. Servs., LLC*, 2012 U.S. Dist. LEXIS 9972 at *9-11 (N.D. Ill. Jan. 27, 2012) (dismissing FDCPA claim where plaintiff alleged that the affiant lacked sufficient knowledge to make the affidavit or state that the amounts in the complaint were taken from original books and record because the affidavit, on its face, stated only that the affiant had reviewed the records of the debt collector, not of the original creditor);  *Jenkins v. Centurion Capital Corp.*, 2009 U.S. Dist. LEXIS 98123 (N.D. Ill. Oct. 20, 2009) (affidavit stating affiant keeps accurate records of the debt it acquires did not violate FDCPA).

### D.    James's Contention That The Electronic Records Reviewed By Kohls Were Not "Business Records" Has No Merit

Directly contrary to the above authority, James contends that the electronic records Kohls reviewed before she signed the affidavit do not constitute "account" or "business" records, and that, therefore, her statements in the affidavit that she had access to and reviewed account records and business records were false.  (Compl., ¶¶ 43-44).  This argument is meritless.

It is settled Virginia law that "business records" that are "kept in the ordinary course of business" and "made at the time of an event by a person having a duty to keep a true record of that event" constitute admissible evidence.  *See, e.g., 1924 Leonard Rd., L.L.C. v. Van Roekel*, 272 Va. 543, 555, 636 S.E.2d 378, 385 (2006).  It makes no difference whether the records were

13

originally created by the current custodian or a prior one, such as Capital One. *Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010) (collecting cases) ("A record created by a third party and integrated into another entity's records is admissible as the record of the custodian entity, so long as the custodian entity relied upon the accuracy of the record and the other requirements of [the business record exception] are satisfied."); *accord, e.g., Rambus, Inc. v. Infineon Techs. AG*, 348 F. Supp. 2d 698, 706 (E.D. Va. 2004) ("[T]here is not a requirement that the records have been prepared by the entity that has custody of them, as long as they were created in the regular course of some entity's business.") (Payne, J.).

To the extent that James contends that "business records" can only be hard-copies of account documents, this argument fails as well. In determining the admissibility of "computer records," the Supreme Court of Virginia has "employed the traditional business records exception to the hearsay rule." *McDowell v. Commonwealth*, 273 Va. 431, 434, 641 S.E.2d 507, 508 (2007). Virginia courts have also affirmed that information displayed on a computerized interface – such as the manual validation interface – can constitute business records:

> The computer decodes electronic records, converts them into a format understood by users and either prints them or displays them on a terminal. A person who can verify that the business records are authentic can present the evidence by testifying about what he saw displayed or by presenting a printed copy of the display. Either form is admissible as a business record . . . .

*Lee v. Commonwealth*, 28 Va. App. 571, 577 (1998); *see also McDowell v. Commonwealth*, 48 Va. App. 104, 110 (2006) (computerized summary of inventory pulled from discrete locations is a business record); *Simpson v. Commonwealth*, 227 Va. 557, 566, 318 S.E. 2d 386, 392 (1984); *accord* Fed. R. Evid. 803(6) (permitting a "business record" to take the form of a "record or data compilation."). This rule reflects the modern-day reality that business records are now often hosted on technological platforms where they are made accessible to users, yet they remain business records in every sense.

14

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████   Thus, James's conclusory

contention that the data reflected on the manual validation interface does not constitute a

business record is squarely contradicted by governing authority.

Indeed, specifically in the debt collection context, courts have rejected the very argument

that James makes here.  In *Krawczyk v. Centurion Capital Corp.*, 2009 U.S. Dist. LEXIS 12204

(N.D. Ill. Feb. 18, 2009), the affiant attested to the defendant's indebtedness based on the

affiant's "personal knowledge of creditor's business records and practices," including the

plaintiff's fulfillment of the traditional requirements for business records.  *Id.* at *14.  In granting

summary judgment, the court held that the "records of [the debt collector defendants] fall under

the business records exception to the hearsay rule," as those records were created by reference to

the source data received from the creditor and stored in the defendant's database.  *Id.* at *14-16.

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████   It is established that "only a general

understanding of the records keeping process and how they are prepared is necessary" for the witness to properly authenticate a business record.  5-900 WEINSTEIN'S FEDERAL EVIDENCE § 900.07[1][d].  A witness testifying to the existence of a business record need not have "first-hand knowledge of the contents of the record or of the manner in which the record was complied and kept," and there is no requirement that the witness be the actual custodian of the records.  *Id.* Rather, "[a]ll that is required is a general familiarity with the practices of the business concerning that type of record."  *Id.*; *accord Sparks v. Commonwealth*, 482 S.E.2d 69, 71 (Va. App. 1997) (relevant bank documents were authenticated by a bank vice-president even though she was not the custodian of the records).  Kohls plainly met those requirements.

> **E.**   **James Cannot Establish An FDCPA Violation By Claiming The Kohls Affidavit Would Mislead A State Court Judge**

James also contends that the Kohls Affidavit was somehow designed to trick state court judges into believing that it is a valid business records affidavit, and/or that the affiant reviewed every hard-copy account record (*e.g.*, billing statements, applications) prior to attesting to the amount owed.  (Compl., ¶ 46-50).  As noted above, however, the Kohls affidavit is a valid business records affidavit.  In any event, an FDCPA claim can only be based on communications that could mislead a consumer, not a judge.  *See, e.g.*, *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 944 (7th Cir. 2011) ("Because nothing in the Act's text extends its protections to anyone but consumers and those who have a special relationship with the consumer, we hold that the Fair Debt Collection Practices Act does not extend to communications that would confuse or mislead a state court judge.") (citations omitted).  This claim, therefore, fails as both a matter of law and fact.

16

### F.     There Are No Misrepresentations In The Kohls Affidavit, But Even If There Were, They Would Not Be Material

Even if James could, theoretically, establish a misrepresentation or falsity in the Kohls Affidavit any such misrepresentation would be "immaterial." Courts have held that an FDCPA claimant can only prevail if the he can demonstrate a "material" falsity. *See, e.g., Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757-58 (7th Cir. 2009); *accord Albritton v. Sessoms & Rogers, P.A.*, 2010 U.S. Dist. LEXIS 78371, at *18 (E.D.N.C. Aug. 3, 2010). Statements are "material" if they "relate to the debt at issue in any way that would mislead the debtor as to his rights under the FDCPA." *Id.* at *18. Statements relating to the affiant's depth of review and level of personal knowledge of the debt collector's records do not fall in this category.

The recent decision in *Manlapaz v. Unifund CCR Partners*, 2009 U.S. Dist. LEXIS 85527 (N.D. Ill. Sept. 15, 2009), is on point here. In *Manlapaz*, the plaintiff "claimed that the affidavit contained false representations" regarding the affiant's claimed "personal knowledge" of the debt "because [the affiant's] knowledge of these purported facts was based entirely on statements by other persons on [defendant's] computer system." *Id.* at *10. In dismissing the claim on the pleadings, the court held:

> A statement cannot mislead unless it is material, so a false but non-material statement is not actionable. In this case, for example, the question of whether [affiant] technically had personal knowledge of the facts that she would testify to or not would not likely affect a consumer's reaction to the lawsuit.

*Id.* at *12-13 (internal citations omitted). Thus, James's FDCPA claims, which are based on the alleged falsity of the immaterial statements identified in the Complaint, must be dismissed.

### G.     James's Other Claims Of "Deceptive" Conduct Are Without Merit

In his Complaint, James generally alleges three other instances of "deceptive" conduct that presumably relate to his catch-all FDCPA claim in Count One alleging "false, deceptive and misleading" practices. These claims are also without merit.

1.     **Attaching The "Summary Screen" To The Complaint Was Not Misleading**

James claims that Midland attached the summary screen to the Warrant-in-Debt to make it appear "as if it was authenticated as part of the affidavit itself." (Compl., ¶ 61). It is undisputed, however, that neither the summary screen nor the affidavit reference one another. *See* Ex. Q at pp. 3-4. James's assertion that these two simple documents were "deceptively" presented as interrelated pleadings fails on a simple review of the documents themselves.

A similar claim was rejected in *Albritton v. Sessoms & Rogers*, where the defendants submitted a pre-arbitration packet to the plaintiff, which included an affidavit and a "statement of account," the latter of which was created after the affidavit, but which was "stapled right next to" the affidavit. 2010 U.S. Dist. LEXIS 78371, at *11. Despite the fact that neither document referenced the other, the plaintiff alleged "that by stapling the statement to the affidavit, defendants falsely represented that [the affiant] had sworn to the validity of the Statement of Account." *Id.* The court dismissed the plaintiff's FDCPA claim, holding: "Even assuming that the Sled Affidavit and Statement of Account were stapled right next to each other in that packet, the court is unable to discern how even the least sophisticated consumer could have been deceived or misled by defendants' actions." *Id.* at *10-12. The same reasoning applies here.

Moreover, even if attaching the summary screen to the Warrant-In-Debt was somehow deceptive, it is not "materially" so. The simple enclosure of two documents within a single court filing that do not cross-reference one another, and which both of which state that the debtor owes the *same amount* ($1,061.85), would not have influenced the debtor's decision to pay the debt. *See id.* at *18. This claim must be dismissed.

2.     **Midland Did Not Falsely Represent It Would Dismiss The Debt Collection Lawsuit If James Submitted An ID Theft Affidavit**

James alleged in his complaint that "Midland Funding, [MCM] and/or one of their agents misrepresented to the Plaintiff that upon receipt of the [ID Theft Affidavit], it [sic] would

discontinue litigation against him." (Compl., ¶ 86).  When asked in an interrogatory to set forth "all facts" underlying this allegation, James's counsel wrote:

> On May 7, 2010, Plaintiff went to court to respond to Defendants' Warrant in Debt filed in Richmond General District Court.  He spoke with a Dominion attorney (name unknown); during this conversation, Plaintiff explained to the Dominion attorney and the presiding judge that the account listed on the Warrant in Debt was a fraudulently opened account and that he was not liable for it.  The judge instructed Plaintiff to submit an Identity Theft Affidavit to Defendants and the Dominion attorney agreed that he would dismiss the case when he received the Identity Theft Affidavit.  Shortly after his appearance in court, Plaintiff mailed a completed Identity Theft Affidavit to Midland.  Midland returned the Identity Theft Affidavit to Plaintiff and stated that he must have the Identity Theft Affidavit notarized.  Plaintiff then mailed a notarized Identity Theft Affidavit to Dominion Law Associates.  After receiving the Identity Theft Affidavit from Plaintiff, Defendants' counsel sought and obtained default judgment.

Ex D at p. 26-27.  Thus, this allegation is predicated upon two instances of alleged misconduct: (1) that outside counsel for Midland Funding made a misrepresentation to James at the return date in state court; and (2) that Midland obtained a default judgment after its receipt of the notarized affidavit.  *See id.*

None of this is factually true.  In his deposition, James testified under oath that he had no memory of having any conversations with Midland's counsel at the state court return date.  Ex. N (James Tr. pp. 105:23-106:16).  Moreover, James also testified under oath that he never sent Midland a notarized ID Theft Affidavit.  *Id.* (James Tr. p. 132:3-24).  Thus, because James is asserting an FDCPA claim on these "facts," it must be dismissed.

### 3. The "Servicemembers Civil Relief Act" Affidavit Was Not Deceptive

Finally, James contends that Midland attempted to deceive him by attaching to the Warrant-in-Debt a communication entitled "Affidavit-Default Judgment – Servicemembers Civil Relief Act," at "a time when he was not in default." (Compl., ¶¶ 116-17).  The servicemembers affidavit, however, which is *required* to be filed prior to obtaining a default judgment in Virginia and elsewhere, *see* 50 U.S.C. § 501, *et seq.*, was not misleading.  The affidavit says nothing more

than that James's name was entered into the database of the Department of Defense to determine that he is not in "military service." Ex. Q at p. 2. It did not insinuate that James was in default.

Moreover, James's argument is further discredited by the fact that the servicemembers affidavit was attached to the Warrant-in-Debt, which informed James: "You are not required to appear; however, if you fail to appear, judgment may be entered against you. To dispute this claim you <u>must</u> appear on the return date for the judge to set another date for trial." *Id.* at p. 1 (emphasis in original). The return date was listed on the Warrant-in-Debt as May 7, 2010. *Id.* Therefore, Midland's pleading specifically warned James about the potential for a default judgment, but it also informed him that no such default could occur until May 7, 2010. Reading the pleading *as a whole*, as is required, dooms James's FDCPA claim. *See, e.g., Vitullo v. Mancini*, 684 F.Supp.2d 747, 756 (E.D. Va. 2010); *Schroeder v. First Nat'l Collection Bureau, Inc.*, 2011 U.S. Dist. LEXIS 79901, at *8 (D. Minn. July 21, 2011) (a "the letter must be viewed 'as a whole' to determine whether it runs afoul of the FDCPA") (collecting cases).

## II.     Midland Is Entitled to Summary Judgment on Count Two

Count Two of the Complaint alleges that Midland "falsely represented the character, amount and legal status of the alleged debt, in violation of 15 U.S.C. § 1692e(2)." (Compl., ¶ 112). James contends that "[Midland] knew that the account was a result of identity theft, and therefore could not be collected from Plaintiff." Ex. D at p. 28. This claim fails.

It is not an FDCPA violation to attempt to collect a debt from a person who claims to be a victim of identity theft. *See, e.g., Reed v. AFNI, Inc.*, 2011 U.S. Dist. LEXIS 3600, at *5 (D. Utah Jan. 13, 2011) ("Plaintiff contends that Afni violated the FDCPA by attempting to collect a debt that was not his. Courts have held that the allegation that the debt sought to be collected is not owed, standing alone, cannot form a basis for a false and misleading practices claim under the FDCPA.") (citing *Mammen v. Bronson & Migliaccio, LLP,* 715 F. Supp. 2d 1210 (M.D. Fla.

2009)); *accord Richeson v. Javitch, Block & Rathbone,* 576 F. Supp. 2d 861, 867-68 (N.D. Ohio 2008).  Moreover, Midland could not possibly have known whether James was truly a victim of identity theft because he repeatedly failed to document his claim.   The only documentation James ever sent to Midland prior to the filing of the collection action in April 2010 were the records of the investigation previously performed by Capital One, which found that James *was the true owner* of the account.  Ex. H at 6; Ex. F at 3-4.  Also, *after* the filing of the state court collection action, James sent to Dominion Law Associates an ID Theft "Affidavit," which: (1) was not notarized; (2) did not provide the names of any third parties who could substantiate his claim; and (3) expressed that he had no documentation substantiating his claim.  *See* Ex. R at pp. 3-5.  To this day, those facts represent the *sum total* of Midland's knowledge of James's claim of identity theft.  If these scant facts were enough to establish FDCPA liability, which they are not, any dispute by a consumer, regardless of whether it was at all documented or truthful, would freeze lawful collection activity, generating potentially rampant consumer fraud.

Moreover, even if a violation of § 1692e(2) occurred, Midland cannot be liable because at the time of sale, ███████████████████████████████████████

███████████████████████.  Ex. C at pp. 4-5.  Accordingly, Count Two must be dismissed as the product of a *bona fide* error.  *See, e.g.,* *Edwards v. McCormick,* 136 F. Supp. 2d 795, 803-04 (S.D. Ohio 2001) ("Since any false representations as to Mrs. Edwards's legal obligation to pay the debts of her husband grew out of inaccurate information supplied by PCB, and reasonably relied upon by Mr. McCormick, this Court finds that Mr. McCormick is entitled to the FDCPA's *bona fide* error defense with respect to Plaintiffs' claims under § 1692e(2).").

### III.   Count Three Fails Under § 1692e(11)'s Formal Pleading Exemption

Section 1692e(11) of the FDCPA requires debt collectors to make certain disclosures when a communication is an attempt to collect a debt.  However, these requirements do "not

apply to a formal pleading made in connection with a legal action." 15 U.S.C. § 1692e(11). James alleges that the "Affidavit – Default Judgment," "Affidavit of Nancy Kohls," and the "Summary Screen" were required to contain the § 1692e(11) disclosures. (*See* Compl., at ¶¶ 116-120). James's § 1692e(11) claim must fail because all of the communications he identifies as violations were attached to the state court Warrant-in-Debt, *see* Ex. Q, and, therefore, were formal pleadings exempt from § 1692e(11).

In a one-page Order, the Court previously held that the attachments to the Complaint did not constitute "formal pleadings" such that they were exempt from § 1692e(11). (Dkt. No. 116). Midland incorporates its arguments from its prior Motion to Dismiss Amended Complaint, and Midland respectfully requests that the Court re-evaluate this ruling on the full record, as there is no basis to conclude that while the complaint itself is indisputably exempt from § 1692e(11), the documents attached to, and integrated into, the Complaint may give rise to liability.

## IV. Count Five Must Be Dismissed Because James's Capital One Account Was Opened In Richmond

In Count Five, James asserts that Midland violated 15 U.S.C. § 1692i by suing him in an improper venue (Richmond). (Compl., ¶ 127). Section 1692i provides: "Any debt collector who brings any legal action on a debt against any consumer shall bring such action only in the judicial district or similar legal entity: (A) in which such consumer signed the contract sued upon; or (B) in which such consumer resides at the commencement of the action." *Id.*

James admits that he resided in Richmond, Virginia from September 1, 2008 until October 1, 2009. Ex. D at p. 24. His Capital One application was signed for and opened on September 15, 2008 – while he was living in Richmond. *See* Ex. C. Indeed, in the ID Theft "Affidavit," James stated that the events described in the affidavit (*i.e.*, the signing for and opening of the account by his ex-wife) occurred while he was living in Richmond, Virginia. Ex.

R at p. 1.  Thus, because the state court collection lawsuit was filed in the district where the account agreement was opened, no violation of § 1692i occurred.

**V.     James's RICO Claim Under Count Seven Must Be Dismissed**

**A.     James Cannot Establish Fraud**

In Count Six, James alleges that Midland violated RICO through the predicate act of: "creating fraudulent affidavits for use in collection lawsuits violated the federal mail and wire fraud statutes." (Compl., ¶ 139).  The elements of mail or wire fraud are: (1) a scheme disclosing an intent to defraud; and (2) the use of the mails or wires in furtherance of the fraud.  *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996); 18 U.S.C. § 1343.  A "scheme to defraud requires the making of a false statement or material misrepresentation, or the concealment of material fact."  *United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007); *accord United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009).

As detailed above, James cannot show a scheme to defraud because there are no misrepresentations in the Kohls Affidavit.  Hence, his RICO claim must be dismissed.  *Harrell v. Primedia, Inc.*, 2003 U.S. Dist. LEXIS 13595, at *3 (S.D.N.Y. Aug. 6, 2003) (dismissing RICO claim when there were no facts alleged to show that defendants were not speaking truthfully); *O'Ferral v. Trebol Motors Corp.*, 45 F.3d 561, 563 (1st Cir. 1995) (dismissing RICO claim where Plaintiff failed to identify a "false . . . express statement").

**B.     James Cannot Establish Causation**

Even if James could establish the fraud predicate of his RICO claim, the claim would still fail because he cannot establish that his alleged injuries were caused by that alleged fraud.  To prevail under RICO, a plaintiff must establish that "the defendant's violation not only was the 'but for' cause of his injury, but was the proximate cause as well."  *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2141 (2008).  A plaintiff must prove "direct relation between the

injury asserted and injurious conduct alleged . . . .  A link that is too remote, purely contingent, or indirect is insufficient."  *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 989 (2010).

To establish causation, James alleges that he "relied on the fraudulent affidavit." (Compl., ¶ 142).  But James discredited his own theory when he admitted that he had never even looked at the affidavit prior to his October 2011 deposition.  Ex. N (James Tr. p. 108:5-18).

In a final attempt to plead causation, James asserts that "[i]n order to obtain the default judgment, the state court "relied upon the false collection affidavit and attachment which were presented to the General District court judge in August 2010" when default judgment was entered.  (Compl., ¶ 89).  Yet, whether through deposition testimony or written discovery, James failed to gather any evidence demonstrating that the judge who entered default judgment against him relied on the affidavit, as opposed to granting default judgment based on James's failure to appear at either of the trial dates that he "forgot" about.  Ex. N (James Tr. p. 107:4-22). Summary judgment must be granted.  *Hackney v. Perry*, 1998 U.S. App. LEXIS 29459, at *7-8 (4th Cir. Nov. 18, 1998) ("With respect to an issue on which the nonmoving party bears the burden of proof, such as establishing all the elements of a *prima facie* case, the burden on a party seeking summary judgment may be satisfied by showing that there is an absence of evidence.").[3]

## VI.  Count Eight For Abuse Of Process Fails

In Count Eight, James alleges that Midland committed abuse of process through the filing of false affidavits.  (Compl., at ¶ 151).  Under Virginia law, "[t]o prevail in a cause of action for abuse of process a plaintiff must plead and prove: '(1) the existence of an ulterior purpose; and

---

[3] Additionally, apart from the generally-applicable failings of the civil RICO claim set forth above, James's averred claim under 18 U.S.C. § 1962(d), which implicates a "conspiracy" to violate one of the three other RICO subsections, fails for the reasons set forth in Midland's Motion to Dismiss his civil conspiracy claim, which failed to state a claim under the intracorporate immunity doctrine.  *Sadighi v. Daghighfekr*, 36 F. Supp. 2d 279, 296-98 (D.S.C. 1999) (dismissing claim under 18 U.S.C. 1962(d) because "under the doctrine of intracorporate conspiracy, [defendant] cannot conspire with his corporations, his employee . . . or with his attorney . . . .").  The reasons requiring the dismissal of the conspiracy claim are incorporated by reference herein with respect to any claim under § 1962(d).

(2) an act in the use of the process not proper in the regular prosecution of the proceedings.'"

*Donohoe Constr. Co. v. Mount Vernon Assocs.*, 235 Va. 531, 539, 369 S.E.2d 857, 862 (1988).

The facts establish that James can prove neither element of this claim.

### A.    Because The Affidavits Are Not "False," No Claim for Abuse of Process Lies

James's claim for abuse of process is predicated on the allegation that the affidavit filed in his collection action was "false." (Compl., at ¶ 151). As detailed at length, *supra*, because no facts support this allegation, and the facts conclusively disprove it, this claim must be dismissed.

### B.    Midland Had No Ulterior Purpose In Filing The Collection Action

Even if the affidavit were false – which it is not – the abuse of process claim still fails. Under Virginia law, abuse of process consists of "the perversion of regularly-issued process to accomplish some ulterior purpose." *Donohoe*, 235 Va. at 539, 369 S.E.2d at 862. "Regular and legitimate use of process, though with a bad intention, is not a malicious abuse of process." *Glidewell v. Murray-Lacy & Co.*, 124 Va. 563, 570, 98 S.E. 665, 668 (1919). Thus, even the filing of a "baseless" lawsuit – which the underlying collection lawsuit against James was not – cannot constitute an abuse of process when the sole purpose of the lawsuit was to seek the relief sought. *Capozio v. Baumann*, 59 Va. Cir. 148, 149 (Fairfax 2002).

Here, it is undisputed that the affidavit at issue was filed for the purpose of collecting the outstanding balance of the James Account, and that there was no other purpose in executing and filing the affidavit used in that lawsuit. Ex. U (Kohls Tr. pp. 42:21-25). Thus, the undisputed facts of this action demonstrate that Midland's sole purpose in filing the lawsuit and affidavit was to collect a debt, albeit one James disputes. This conduct, even if true, falls within the "[r]egular and legitimate use of process." *Glidewell*, 124 Va. at 570, 98 S.E. at 668.

### C.    There Is No Evidence Of An Improper Use Of Process

Likewise, the record contains no evidence that would even remotely suggest Midland improperly used the process after it was procured.  As the Supreme Court of Virginia explained, "[t]he gravamen of the tort lies in the abuse or the perversion of the process *after it has been issued*."  *See, e.g.*, *Donohoe*, 235 Va. at 540-41, 369 S.E.2d at 862-63 (filing an unfounded mechanics lien for the purpose of "forcing" settlement supported finding an "ulterior purpose," but holding that the "evidence fails to establish . . . that after filing the lien, [the defendant] committed any 'act in the use of the process not proper in the regular prosecution of the proceeding.'"); *Glidewell*, 124 Va. at 569-70, 98 S.E. at 667-68 (where defendant swore out a criminal misdemeanor with ulterior purpose to collect a private debt and later accepted payment for that private debt that did not support an abuse of process claim because "[w]hatever motive may have prompted the defendants, they had a moral and legal right to accept satisfaction and withdraw the prosecution substantially as they did.").  In short, abuse of process does not lie where a defendant prosecutes an action in a proper manner under Virginia law.

Here, the evidence shows that Midland attempted to collect consistent with the applicable court rules regarding filing and default judgments.  Indeed, default judgment was entered against James by the presiding judge only after James twice forgot to attend the trial date for his case. Ex. N (James Tr. p. 107:4-22).  The prosecution of this action was in all respects in accordance with Virginia law.  Hence, the claim for abuse of process must be dismissed.  *Bank of Ok. v. Portis*, 942 P.2d 249, 255 (Okla. App. 1997) (the bank "took the default judgment only after [plaintiff] failed to answer.  There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though motivated by bad intentions.").

### VII.   Count Nine Must Be Dismissed Because Midland Conducted A Reasonable Investigation Under the FCRA

In Count Nine, James alleges that MCM "violated the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), by failing to fully and properly investigate his disputes regarding the account, and/or by reporting inaccurately the results of such investigation." (Compl., ¶ 127).  To state a claim under § 1681s-2(b), a plaintiff must allege that after he "notified the consumer reporting agency of a dispute, the agency notified the furnisher of information of the dispute, after which defendant failed to adequately investigate." *Craighead v. Nissan Motor Acceptance Corp.*, 2010 U.S. Dist. LEXIS 132123, at *12 (E.D. Va. Dec. 14, 2010).  It is a guiding principle that § 1681s-2 "does not require perfection, only a reasonable response." *Beachley v. PNC Bank*, 2011 U.S. Dist. LEXIS 94236, at *9 (D. Md. Aug. 22, 2011).

### A.   Midland' Response To The Notice Of Dispute Was Objectively Reasonable

As a threshold matter, the factual allegations upon which James has pled his claim under § 1681s-2(b) have been wholly discredited.  Specifically, James alleges:

> On information and belief, the Plaintiff alleges that each CRA then forwarded his disputes to MCM through the credit industry's "e-Oscar" system and in response to each dispute, MCM simply responded that it had "verified" that the account belonged to it and was owed by Mr. James.

> MCM's standard procedure for receiving and processing consumer disputes is to do so entirely by automated response, its "automated batch interface" system.  It does not conduct a substantive investigation.  No human being looks at the files or disputes.  Literally nothing is done to investigate these disputes.

(Compl., ¶¶ 99-100).  These contentions have been disproved by the undisputed facts of this matter, which demonstrate that a *manual* investigation was performed by Markie Myers, and that the results of that investigation (*i.e.*, that the account was disputed but paid in full) were reported to the credit reporting agencies, as opposed to simply claiming the account had been "verified." Ex. L at pp. 8-9; *see also* Ex. W; Ex. X.

Moreover, in contrast to the baseless allegations, the undisputed material facts plainly show that Midland fulfilled its duties under § 1681s-2(b). Upon receiving notice of the dispute from e-OSCAR in May 2011, an employee of MCM undertook a manual investigation of James's file. Ex. L at pp. 8-9; Ex. T. At the time that the investigation was conducted, MCM's records of the account included the following facts: (1) James had previously disputed the debt with Capital One and that his claim had been denied, Ex. H at 6; Ex. F at 3-4; (2) James had failed to provide any verifiable proof of his claim of identity theft, despite repeated demands for such proof, Ex. N (James Tr. p. 132:3-24); (3) that judgment had been entered against James, which was final, **Exhibit Y** at 3; and (4) James had voluntarily settled the account in full. *Id.* at 5. MCM then reported back to the credit reporting agencies. Ex. L at pp. 8-9. The results of that investigation were memorialized in a letter to James from Experian, where Experian stated that it had received the following "additional information" from MCM: "Consumer Disputes This Account Information; Paid Collection." Ex. X.

Nothing in this process reveals an inadequate investigation or credit reporting sufficient to establish liability under § 1681s-2(b).[4] *See, e.g., Aviles v. Equifax Info. Servs., LLC*, 521 F. Supp. 2d 519, 524 (E.D. Va. 2007) (finding no violation of § 1681s-2(b) where the furnisher "submitted an [accurate] AUD dated April 13, 2006, to all three CRAs indicating that there were no delinquencies regarding Plaintiff's account."); *Lang v. TCF Nat'l Bank*, 338 Fed. Appx. 541, 543-44 (7th Cir. 2009) (no FCRA liability where "defendants investigated these disputes and confirmed to ChexSystems that these historical reports were accurate"); *Anderson v. EMC*

---

[4] This is particularly true in light of the scant information received by Midland from the credit reporting agencies in May 2011. In response to receiving notice of James's dispute, the credit reporting agencies informed Midland of James's dispute through the following dispute code "NOT HIS/HERS." No additional documentation accompanied the dispute code. This lack of any supporting detail further militates in favor of summary judgment here. *See, e.g., Malm v. Household Bank, N.A.*, 2004 U.S. Dist. LEXIS 12981, at *14-15 (D. Minn. July 7, 2004) (the "cryptic" and "superficial" "NOT HIS/HERS" dispute code limited the scope of the investigation required to be performed by the furnisher, requiring summary judgment in favor of the furnisher under § 1681s-2(b)).

*Mortg. Corp.*, 631 F.3d 905, 909 (8th Cir. 2011) ("EMC investigated, correctly determined that the reported account status was accurate, and verified that information to the CRAs.  Its duties as a furnisher of information under the FCRA required no more."); *Crews v. SunTrust Bank*, 2010 U.S. Dist. LEXIS 47704, at *9 (D. Md. May 13, 2010) ("[T]o the extent Mr. Crews alleges a violation of § 1681s-2(b), the claim has no factual basis in the record.").

Additionally, the claim that Midland did not reasonably investigate his credit reporting dispute is without merit, as James has not, and cannot, set forth additional measures that Midland should have reasonably undertaken to investigate his credit reporting dispute.  *See, e.g., Benson v. Trans Union, LLC*, 387 F. Supp. 2d 834, 843 (N.D. Ill. 2005) ("Benson has not explained what other investigatory measures Trans Union should reasonably have undertaken and, more importantly, what information a more extensive investigation would have revealed.").  For months prior to the dispute, and despite numerous requests, *see* Ex. J, James had displayed a distinct inability to provide any documentation supporting his claim of identity theft or to provide the names of any individuals with knowledge of his claim.  *See* Ex. N (James Tr. p. 132:3-24).  Also, on the lone document ever submitted to Midland, James stated that the alleged perpetrator of the identity theft had died in November 2008.  *Id.*  Additionally, at the time of the credit dispute, Midland knew of the results of the investigation previously conducted by Capital One where James was found to be the owner of the account.  Ex. H at 6.  ██████████████

████████████████████████████████████████████████████████████████.  Ex. C at pp. 4-5.  Given these facts, additional investigation was not reasonably necessary.

## B.   Even If A Violation Of § 1681s-2(B) Somehow Occurred, It Was Not Willful

Even if a dispute of material fact remains with respect to the alleged violation of § 1681s-2(b), summary judgment is appropriate regarding James's claim for punitive damages under the FCRA.  "[T]o survive summary judgment on a willful non-compliance claim, a plaintiff must set

forth affirmative evidence demonstrating conscious disregard or deliberate and purposeful actions." *Spector v. Experian Info. Servs.*, 321 F. Supp. 2d 348, 357 (D. Conn. 2004). No such misconduct, let alone willful misconduct, is present here.

As the above sequence of events describes, upon receiving the notice of dispute, Midland conducted a manual investigation of the dispute. Ex. L at pp. 8-9. This manual investigation occurred in the context of *objective* indicia that James owned the account, such as the fact that judgment had been entered against him and that he had then paid the judgment. Ex. Y at pp. 3, 5. ███████████████████████████████████████████████████████████

████████. *See* Ex. C at pp. 4-5. Nevertheless, Midland was cautious to report to the credit reporting agencies that James disputed the account, despite the fact it had been settled. Ex. X.

This careful process belies James's asserted willful violation of § 1681s-2(b). Summary judgment should be granted on that claim. *See, e.g., Schade v. MBNA Am. Bank, N.A.*, 2006 U.S. Dist. LEXIS 5553, at *14-16 (W.D.N.C. Jan. 26, 2006) ("Concerning MBNA's conclusion that the Plaintiff was the obligor on the Account, even if ultimately determined by the jury to be incorrect, that position was clearly supported by substantial documentation . . . . Plaintiff has failed to establish that the alleged violation was accompanied by the type of knowing and intentional concealment, misrepresentation or other malfeasance necessary to establish willfulness under § 1681s-2(b)."); *Hinton v. USA Funds*, 2005 U.S. Dist. LEXIS 6275, at *21-22 (N.D. Ill. Mar. 30, 2005) ("general allegations of unreasonableness cannot forestall summary judgment on a Section 1681s-2(b) claim for willful violations of the FCRA.").

## CONCLUSION

WHEREFORE, Defendants, Encore Capital Group, Inc., Midland Funding, LLC, and Midland Credit Management, Inc. respectfully request that the Court: (1) grant their Motion for Summary Judgment; and (2) grant them such other relief as the Court deems just and proper.

**ENCORE CAPITAL GROUP, INC.,**
**MIDLAND FUNDING, LLC and**
**MIDLAND CREDIT MANAGEMENT, INC.**


By:/s/ Timothy J. St. George

David N. Anthony (VSB No. 31696)
Timothy St. George (VSB No. 77340)
*Attorneys for Encore Capital Group, Inc., Midland Funding, LLC*
*and Midland Credit Management, Inc.*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia  23219
Telephone: (804) 697-1200
Facsimile:  (804) 698-5118
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com

John C. Lynch (VSB No. 39267)
*Attorney for Encore Capital Group, Inc., Midland Funding, LLC*
*and Midland Credit Management, Inc.*
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone:  (757) 687-7765
Facsimile:   (757) 687-1504
john.lynch@troutmansanders.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of March 2012, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF System which will then send a notification of

such filing (NEF) to the following:

> Leonard A. Bennett, Esq.
> Susan M. Rotkis, Esq.
> CONSUMER LITIGATION ASSOCIATES, P.C.
> 763 J. Clyde Morris Blvd, Suite 1A
> Newport News, VA 23601
> Telephone:  (757) 930-3660
> Facsimile:  (757) 930-3662
> Email:  lenbennett@cox.net
>
> Matthew J. Erausquin, Esq.
> CONSUMER LITIGATION ASSOCIATES, P.C.
> 1800 Diagonal Road, Suite 600
> Alexandria, VA  22314
> Telephone:  (703) 273-6080
> Facsimile:  (888) 892-3512
> Email:  matt@clalegal.com
>
> Dale W. Pittman, Esq.
> THE LAW OFFICE OF DALE W. PITTMAN, P.C.
> The Eliza Spotswood House
> 112-A West Tabb St.
> Petersburg, VA 23803
> Telephone:  (804) 861-6000
> Facsimile:  (804) 861-3362
> dale@pittmanlawoffice.com
>
> *Counsel for Plaintiff*

> /s/ Timothy J. St. George
> Timothy J. St. George (VSB Bar No. 77349)
> *Attorney for Encore Capital Group, Inc., Midland*
> *Funding, LLC and Midland Credit Management, Inc.*
> TROUTMAN SANDERS LLP
> 1001 Haxall Point
> Richmond, Virginia  23219
> Telephone:  (804) 697-1254
> Facsimile:  (804) 698-6013
> tim.stgeorge@troutmansanders.com

2100519v8